1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

YING YING DAI and CAROLE LUK,      ) Civil Action
                                   ) No. 18-5170 (AMD)
              Plaintiffs,          )
                                   ) BENCH TRIAL
vs.                                )
                                   ) Brooklyn, New York
ABNS NY INC., d/b/a Carvel,        ) Date: February 20, 2020
SHK LI INC., d/b/a Carvel,         ) Time: 9:30 a.m.
and Ka Shek Tam,                   )
                                   )
              Defendants.          )
_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiffs:        Shan Zhu, Esq.
                           Jiajing Fan, Esq.
                           Hang & Associates, PLLC
                           136-20 38th Avenue, Suite 10G
                           Flushing, New York  11354
                           718-353-8588

For the Defendants:        Clifford Mulqueen, Esq.
                           Hines & Associates
                           450 Seventh Avenue, Suite 305
                           New York, New York  10123
                           212-268-8668


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

PROCEEDINGS                                                    2

1          (WHEREUPON, commencing at 10:05 a.m., the following
2     proceedings were had in open court, to wit:)
3          THE COURTROOM DEPUTY:  This is civil cause for a
4     bench trial, Docket No. 18-CV-5170, *Luk, et al., v. ABNS NY,*
5     *Inc., et al.*
6               Counsel, state your appearance, plaintiff first.
7               MR. ZHU:  Plaintiffs' counsel, Shan Zhu from Hang &
8     Associates.  Next to me is Jiajing Fan, my second chair from
9     Hang & Associates.
10              THE COURT:  Good morning.
11              MR. ZHU:  Good morning.
12              THE COURT:  And I take it these are your clients?
13              MR. ZHU:  Yes.  This is the interpreter, and then
14    this is my client, Ms. Luk and Ms. Dai.
15              THE COURT:  Good morning.  And you have the
16    interpreter with you as well.
17              MR. ZHU:  Yes.  And interpreter is able to translate
18    Mandarin and Cantonese to English.
19              THE COURT:  Okay.  Let me have counsel put your
20    appearance on the record.
21              MR. MULQUEEN:  Thanks, Your Honor.  Good morning.
22              Clifford Mulqueen from Hines & Associates for all
23    the defendants.  And I have Mr. Tam sitting next to me.
24              THE COURT:  Hi, good morning.
25              All right.  Let's start by swearing in our

1    interpreter.

2              THE COURTROOM DEPUTY:  Please stand and raise your

3    right hand.

4              (WHEREUPON, the Mandarin and Cantonese interpreter,

5    Hang Su, was duly sworn.)

6              THE COURTROOM DEPUTY:  Please put your name on the

7    record.

8              THE INTERPRETER:  Hang Su, H-a-n-g, S-u.

9              THE COURT:  Okay.  Thank you.

10             I want to make sure -- well, I guess we'll figure

11   this out.

12             (Short pause.)

13             THE COURT:  All right.  So I take it both sides are

14   ready to begin?

15             MR. ZHU:  Yes, plaintiffs are ready.

16             THE COURT:  Okay.  If you want to do opening

17   statements, you can, but I do have your proposed findings of

18   fact and conclusions of law, so, if you want to give a brief

19   opening, that's fine, but if you want to just get the show on

20   the road and call your first witness, you can do that, too.

21             MR. ZHU:  I will ask my adversary.

22             MR. MULQUEEN:  Just call the first witness.

23             THE COURT:  What did you say?

24             MR. MULQUEEN:  Just call our first witness.

25             THE COURT:  I think that's probably not a bad idea.

*PROCEEDINGS*                                                    4

1          MR. ZHU:  Yes.  The plaintiffs, I will call my first

2    witness, Ms. Luk, to take the stand.

3          THE COURT:  Okay.

4          THE COURTROOM DEPUTY:  Raise your right hand.

5          (WHEREUPON, the witness was duly sworn through the

6    interpreter.)

7          THE COURTROOM DEPUTY:  State your name for the

8    record.

9          THE WITNESS:  Carole Luk.

10          THE COURT:  All right.  Let me just give you a few

11    instructions before we begin.  And the first thing I am going

12    to ask you to do is do your best just to answer the question

13    that you are being asked.  If there's a question that you

14    don't understand or that you need to have repeated, let me

15    know, and we'll have it -- we will have them fix the question,

16    okay?  And one other thing I am going to ask you to do is we

17    have got our interpreter, and we will have the lawyer

18    questioning you.

19          I want to make sure that nobody's talking over one

20    another.  So wait until the lawyer finishes the question, and

21    then wait until our interpreter finishes interpreting it

22    before you answer.

23          And do you speak some English?

24          THE WITNESS:  A little bit.

25          THE COURT:  That's okay.  Sometimes when people

1    speak two languages, they start answering in English.  Since

2    we are lucky enough to have an interpreter here, let's make

3    sure -- let her translate the entire question before you start

4    speaking.

5                 THE WITNESS:  (In English)  No problem.  Okay.

6                 THE COURT:  Are you going to do your questioning

7    from the podium?  I just want to make sure we can hear you.

8                 MR. ZHU:  Your Honor, before we get started, I have

9    two -- actually, I have one question and my clients have one

10   request.  My question will be whether my adversary is going to

11   pursue their counterclaim or not.  Because that is not

12   certain.

13                MR. MULQUEEN:  Yes.

14                MR. ZHU:  All right.  And our client has parking

15   outside there, and they probably want to go feed the meter in

16   two hours.

17                THE COURT:  Okay.  Well, why don't you -- okay.  It

18   is your client's car; is that right?

19                MR. ZHU:  That's correct.

20                THE COURT:  Okay.  So I think if as long as your

21   client -- if somebody can go out and feed the meter, that's

22   perfectly fine, I don't think we will need to stop the

23   proceedings for that.

24                MR. ZHU:  I agree.

25                THE COURT:  Okay.  So, yes.  Anybody who needs -- I

1   don't want anybody to get a ticket, so anybody who needs to

2   feed the meter can do that, okay.

3            MR. ZHU:  Thank you, Your Honor.

4            THE COURT:  And one thing I am going to ask all the

5   lawyers to do is just to make sure that you all don't speak

6   too fast either.  I want to make sure that the court reporter

7   can get down everything that everybody has to say and that the

8   interpreter can translate.

9            MR. ZHU:  Sure.  Thank you, Your Honor.

10                        CAROLE LUK,

11  called as a witness herein by the Plaintiffs, having been

12  first duly sworn, was examined and testified through an

13  Interpreter, as follows:

14  DIRECT EXAMINATION

15  BY MR. ZHU:

16  Q    All right.  My name is Shan Zhu, and I am the plaintiffs'

17  attorney.

18            Ms. Luk, we are here today to take your examination.

19            MR. ZHU:  And thank you, Your Honor, to lay all the

20  ground rules for the testimony -- examination.

21  Q    So, Ms. Luk, can you state your name for the record.

22            THE COURT:  Well, I have got her name.  So we can

23  just move right into the substance of what you want to ask

24  her.

25            MR. ZHU:  All right.  Just to make it clear,

1    thereafter I will refer to the corporate defendant, ABNS NY,

2    Inc., and Shk Li Inc., collectively as Carvel ice cream shop.

3            THE COURT:  Perfect.

4            MR. ZHU:  And for specifically, ABNS NY Inc., I

5    refer it as Commack store, and the Shk Li Inc., I will refer

6    it as Jericho store.

7            THE COURT:  Okay.  So just so I am clear, it is two

8    Carvel stores, one is the Commack store, and one is the

9    Jericho store.

10            MR. ZHU:  That is correct, Your Honor.

11            THE COURT:  That makes it a lot easier.  Okay.

12   Q    Is that all right, Ms. Luk?

13   A    No problem.

14   Q    Okay.  Ms. Luk, so can you tell us when you start your

15   employment with Carvel ice cream shop?

16   A    2003 to 2004, I started as part-time.  I started as a

17   full-time at -- in October 2004 until July 15, 2018.  From

18   2011 to 2018, I worked at two stores.

19            MR. MULQUEEN:  Sorry, Your Honor, the question was

20   when did you start working, and we seem to be going into a

21   whole practiced statement.

22            THE COURT:  Okay.  It is all right.  I don't know if

23   I would call it that or not, but there's no jury here.

24            So go ahead.  So you said from 2011 to 2018, you

25   worked at both stores?

1           THE WITNESS:  Yes.

2   A     Three days I worked at Commack, and two days at Jericho.

3   During that time, if Demi was on vacation or my boss was on

4   vacation, I had to be working seven days a week.  No vacation,

5   no break.

6   Q     Can you clarify who is Demi?

7   A     Demi is sitting there on the other end of the table.  She

8   was working in the store as well.

9   Q     Just for clarification, are you referring Demi as

10  Ms. Dai, the plaintiff in this case?

11  A     Yes.

12  Q     Thank you.

13          While you are working for both stores, including

14  Commack store and the Jericho store, do you know the operation

15  hours of the two stores?

16  A     My boss requested me to work at both stores.  For Commack

17  store, on weekdays, 11:30 to 9:15.  On weekend, 11:00 to 9:30.

18  At Jericho store, on the weekdays, 11:00 to 9:30 -- okay,

19  11:30 to 9:30.  And on weekend, 11:00 to 10:00.

20  Q     So, Ms. Luk, are you working during all of those times

21  when the shop was operating?

22  A     Yes.

23  Q     Do you have any co-worker working with you during the

24  operation hours in either store?

25  A     Sometimes my boss.  In the summer, he have an employee

1    part-time who work at nights to several days.

2            THE COURT:  Sorry.  I am not a hundred percent I

3    understood that.  You said in the summertime, there was a

4    part-time employee?

5            THE WITNESS:  Yes.

6            THE COURT:  Was that for the entire time that you

7    worked -- well, let me withdraw that.

8            Was the -- in the summertime, with the part-time

9    employee, was that at the Jericho store, the Commack store, or

10   both?

11           THE WITNESS:  When I was at Commack, I knew there

12   was such a part-time employee, but I don't know if there was

13   such a case for a Jericho store.

14           THE COURT:  Okay.  Sorry.  Go ahead.

15   Q    So you just testified sometime your boss would be here,

16   and sometimes during the summertime there will be a part-time

17   employee.  Is that true, the other time, you are the only

18   person in either Commack store or Jericho store?

19   A    Yes.

20   Q    Occasionally, for example, on March 10, 2018, you are

21   required to working extra hour in the morning?

22   A    It was not requested because the Commack store was sold

23   in March 2018.  So I was working at Jericho store one day, on

24   Sundays.

25   Q    My question is, on that day, did you work around -- did

1    you start working around 11:00, which is the time that Jericho

2    store is in operation, you just testified, Jericho store

3    during the weekend day will open at 11:00?

4    A    Yes.

5    Q    Is that occasionally you will text to Mr. Tam that you

6    are going to working overtime and ask his permission?

7    A    Yes.  I will inform him via text.

8    Q    Can you inform us your job duty in both stores, just one

9    by one, in Commack store and in Jericho store?

10   A    So I did everything the boss request me to do, to service

11   the customers, and then to arrange the kit for the cake and

12   the ice cream, and cleaning and everything he asks me to do.

13   Q    Do you occasionally counting the cash and income for the

14   stores, either Commack store or Jericho store?

15   A    Yes, sometimes when he was on vacation, sometimes when we

16   need to clear the cashier, we will count the cash.

17   Q    When you clear the cashier and counting the cash, do you

18   know how much daily income for that specific day, just

19   approximately?

20   A    It depends on season.  In Commack store, on weekdays, 800

21   to 1,000.  On the weekend, 1,000 to more.  Also, it depends on

22   the summer or not.

23   Q    So you just testified about 800 to 1,000 dollar income

24   through -- during the weekday.  Is that for summer season or

25   winter season?

1  A     This is for summertime.

2         THE COURT:  And did you say that it was less in the

3  wintertime?

4         THE WITNESS:  Correct.

5         THE COURT:  And do you know about how much in the

6  wintertime?

7         THE WITNESS:  It will be one-third less,

8  approximately.

9         THE COURT:  Okay.  And these are -- you're basing

10  this just on the times that you counted the money in the cash

11  register; is that right?

12         THE WITNESS:  Based on the daily report printed by

13  the cashier.

14         THE COURT:  Okay.  All right.

15  Q     So how often do you get a chance to review the receipt

16  printed by the cashier and counting the cash?

17  A     Very often.

18  Q     Do you have an estimate, like four days a week, five days

19  a week, three days a week?

20  A     More or less I think at least three days a week.

21  Q     So just trying to clarify, during the summertime, based

22  on your knowledge, there will be roughly $1,000 per day, like

23  weekend days, so it turns to be $7,000 income for one store;

24  is that correct?

25         MR. MULQUEEN:  Objection, Your Honor.

1    THE COURT:  Well, she said between 800 and 1,000, so

2    math is not my best subject, but I guess that would be 5,600

3    to -- is that right?

4           MR. MULQUEEN:  He is testifying.

5           THE COURT:  5,600 to 7,000.

6  Q    Is that fair -- is that correct, that --

7           THE COURT:  Well, she -- I think we can do the math

8    at the end.

9           MR. ZHU:  All right.

10          THE COURT:  So, yes.  Go ahead.  So let's just let

11   her testify.

12  Q    And during the -- is that correct, during the wintertime,

13   the weekly -- I am going to withdraw that.

14          THE COURT:  I think she said it was a third.

15          MR. ZHU:  Yes.  One-third.

16  Q    Did the Carvel ice cream shop take credit card or cash?

17  A    Both, but in the beginning, they did not accept credit

18   card.  Later, they accepted credit card.

19  Q    Do you know the proportion of the credit card payment and

20   the cash payment, for example, for a specific day?

21  A    In the beginning, we started using the credit card -- to

22   accept the credit card.  One-fourth of income was from the

23   credit card payment and three-quarter was from cash.  And

24   later on I would say half and half.  Because I used to send a

25   message to him.  I took the picture of the money collected,

1  how much was from credit card, how much was from cash, in

2  total, how much.  On that day, 1,600 total income, and half of

3  them was from credit card and half of them was from cash.

4  Q    Will Mr. Tam working for both Commack store and the

5  Jericho store?

6  A    Yes.  Surely.  He is the boss.

7  Q    Will he instruct you to go to Commack store or Jericho

8  store during your employment period?

9  A    Yes, correct.

10 Q    Will he also determine the hours the store is going to --

11 let me rephrase.

12        Will Mr. Tam determine the operation hours of both

13 Commack store and Jericho store?

14 A    Yes, correct.

15 Q    Who hired you?

16 A    Mr. Tam.

17 Q    Since -- have you ever worked with Ms. Dai together?

18 A    Yes.  At a time I worked with Ms. Dai, but for one to two

19 weeks.

20 Q    Is that in the beginning of Ms. Dai's employment period?

21 A    Yes, correct.

22 Q    Do you know who hired Ms. Dai?

23        MR. MULQUEEN:  Objection, Your Honor.

24        THE COURT:  Overruled.  Well, overruled.

25 A    Mr. Tam.

1    Q    So for both stores, for example, during the weekday of

2    Commack store, the operation hour is, you just testified, is

3    11:30 to 9:40.  Are you working during the entire time, if you

4    are working during the weekday?

5    A    Yes.

6    Q    Did you take any break?

7    A    Not formal break.

8    Q    If you are taking an informal break, there is customers

9    showing up to purchase ice cream, what would you do?

10   A    So I have to get up to help him.

11   Q    You just testified, is that correct, you work three days

12   in Commack store and two days in Jericho store after Ms. Dai

13   come to working with Carvel ice cream shop?

14   A    Yes.

15   Q    So which three days you working in Commack store?

16   A    It is not a regular schedule.  It was totally decided by

17   the boss.

18   Q    How he inform you which day you work in, for example, in

19   Commack store for the three days?

20   A    Okay.  So he will put down on a recycled paper, for

21   example, Monday, Tuesday, Wednesday, Saturday, and Sunday, and

22   he will put which day that I will be working.  But without the

23   note of the month or the date.  And it is just for example, I

24   don't remember, he will write down from what time to what time

25   that I have to go work there.  And, also, he will write down

1  which store.

2  Q    So is that correct, on a monthly basis, Mr. Tam will

3  assign you to either work in Commack store or Jericho store

4  for five days per week?

5            MR. MULQUEEN:  Objection.  On a monthly basis?

6  There's no testimony about that.  Again, counsel is testifying

7  for the witness.

8            THE COURT:  Why don't you rephrase the question.

9  Q    How often did Mr. Tam write you this schedule chart?

10  A    Once a week.

11  Q    So is that correct, on a weekly basis, Mr. Tam will

12  assign you work in either Commack store or Jericho store for

13  five days a week?

14  A    Can you please say that again.

15  Q    Is that correct, on a weekly basis, Mr. Tam will assign

16  you to work either in Commack store or Jericho store for five

17  days a week?

18  A    Yes.  It was all assigned by him.  Not necessarily five

19  days.  Sometimes six days or more, or sometimes if I ask for a

20  few days leave, or sometimes I work for the whole month

21  without any break.

22  Q    How often, approximately, do you work six days a week?

23  A    Mostly five days a week, especially after Demi Dai

24  started working there.

25  Q    My question is, how often approximately you work six days

1   a week?

2   A    It was totally assigned by the boss.  I don't quite

3   remember.

4   Q    Do you remember how often time you worked seven days a

5   week without a break?

6   A    When Spencer Tam or Demi Dai took a vacation, and I will

7   work for the whole month without any break.  So Demi Dai, in

8   2014 to 2017, she will take the long vacation, like four to

9   six weeks.  In January or February 2018, she took two month

10  for vacation.  I remember when Spencer Tam took a long

11  vacation, and I had to work even though I was sick, and I have

12  no way to ask for leave.

13       And another vacation when Demi Dai was taking a long

14  vacation, and when I was very sick, I text my boss to ask if I

15  could ask my son to help work here.  And my son came and help

16  me for two days, and my son did not get any pay.

17  Q    What's your son's name?

18  A    Terence Luk.

19       THE COURT:  Terence?

20       THE WITNESS:  Terence.

21  Q    Can you spell that?

22  A    T-e-r-e-n-c-e.

23  Q    Do you know -- do you remember a specific time when

24  Mr. Tam was taking long vacation?

25  A    It should be after Demi Dai's vacation.  It should be

1   around November.  November, but not, I think before that,

2   October, maybe I think the end of September or the beginning

3   of October.  Sometimes in March, but it was not regular.

4   Q    I am going to hand over you this document and trying to

5   refresh your recognition.

6             MR. MULQUEEN:  Objection, Your Honor.  She didn't

7   indicate she needed her recollection refreshed.

8             THE COURT:  Well, what is the -- what are we

9   refreshing her recollection on?

10            MR. ZHU:  It is about Mr. Tam's vacation.  This text

11  message dated 2017, November 4, when my client ask Mr. Tam if

12  he can ask her -- if she can ask her son Terence to come to

13  help.

14            THE COURT:  You can show that to her, and ask her if

15  it gives a clear idea of when this was.  Are you moving it

16  into evidence?

17            MR. ZHU:  No.

18            THE COURT:  Okay.

19            MR. ZHU:  Just for refreshing her recollection.

20            THE COURT:  Okay.

21            THE WITNESS:  Okay.

22  Q    Please let me know if this refresh your recognition

23  regarding when Mr. Tam take long vacation.

24  A    Actually, this long vacation was taken by Demi.

25  Q    So what days vacation?

1  A     November 4.

2  Q     Sorry.  Let me ask it again.

3        From when to -- from what day to what day the

4  vacation was taken; do you remember?

5  A     I don't remember.  Because I know this is not like a

6  regular days, and I remember.  I went to work according to the

7  schedule.

8  Q     Can you -- what is your rate of pay?

9  A     My rate of pay followed the minimum wage by the labor

10 law, and only in the last year it was a little bit higher, it

11 is about $11.50.  And in 2007 to 2009, I always had the same

12 minimum wage.  Each year, we did not get any adjustment.

13 Sometimes I ask him if I could have a raise, and he will raise

14 the rate of pay by 0.025.  25 cents.

15       MR. ZHU:  Your Honor, the plaintiffs' counsel

16 request to take judicial notice of the state minimum wage.

17       THE COURT:  You don't have any objection to that?

18       MR. MULQUEEN:  No.

19       THE COURT:  So judicial notice of the minimum wage.

20 I take it it changed at various points; is that right?

21       MR. ZHU:  Yes.  From 2012 to -- from year 2012 to

22 December 2013, the minimum wage is 7.25 per hour.

23       From January through December 2014, the minimum wage

24 is 8 dollar per hour.

25       From January 15 through December 2016, the minimum

1    wage -- sorry.  From January 2015 to December 2015, the

2    minimum wage is 8.75 per hour.

3             And then in the year of 2015, it is 9 dollars per

4    hour.

5             THE COURT:  2016?

6             MR. ZHU:  Yes.

7             THE COURT:  9 dollars.

8             MR. ZHU:  Yes.  And then 2017, it is $9.70 per hour.

9             THE COURT:  9.70?

10            MR. ZHU:  Yes.

11            THE COURT:  Okay.

12            MR. ZHU:  And 2018 is 10.40 per hour.

13            THE COURT:  Okay.  I want to make sure I have the

14   numbers right.

15            So for 2012, it is 7.25?

16            MR. ZHU:  Correct.

17            MR. MULQUEEN:  '12 and '13, Your Honor.

18            THE COURT:  '12 and '13.  Sorry about that.

19            For 2014, it is 8 dollars.

20            For 2015, 8.75.

21            For 2016, 9 dollars.

22            2017, $9.70.

23            And 2018, $10.40?

24            MR. ZHU:  Based on my notes, that is correct.

25            THE COURT:  Okay.

1  Q    So, Ms. Luk, based on your testimony, your -- is that

2  true, your rate of pay varies from year to year?

3  A    More or less, following the minimum wage set by the

4  department of labor.  Before that, when the minimum wage was

5  not adjusted on the date -- on the yearly basis, I had the

6  same hourly wage for more than a year.

7  Q    So based on the minimum wage, changed in New York state,

8  we just took judicial notice there is a change in the year

9  2014.

10         My question is, Ms. Luk, when the minimum wage

11 changed -- sorry.  Let me rephrase.

12         We just took judicial notice there is a change of

13 minimum wage in the year of 2014.  So, accordingly, did your

14 hourly rate change in that year?

15 A    Yes, he will follow it.

16 Q    Has your rate changed, or not?

17 A    So I think yes, I told him, or I remind him of the

18 adjusting by the department of labor.  So ask if I could have

19 the same raise.

20 Q    So after your rate changed in the year of 2014, did you

21 receive any written notice informing you such change of your

22 rate?

23 A    No.

24 Q    Did you ever receive any notice after your rate changed

25 in the year of 2014, any notice?

1  A     No.

2  Q     I will take an example -- I will take the year of 2018 as

3  an example.  So, for example, in January 2018, if you work on

4  Monday, what will be your pay for that day?

5  A     So the pay will be based on the schedule and the time I

6  worked.  He paid once a week.

7  Q     My question is, on Monday, the shop opened from 11:30 to

8  9:15, and you're working on Monday, based on the hourly rate

9  of -- in the year of 2018, is $10.40 per hour.  How your wages

10 been calculated?

11 A     Actually, it was all calculated by my boss.  He said how

12 much, then it was how much.  So let's calculate from 11:30,

13 12:30, 1:30, 2:30, 3:30, 4:30, 5:30, 6:30, 7:30, 8:30, 9:15,

14 it was totally 9 hours and 45 minutes.  So you will use $10.40

15 per hour times 9 hours and 45 minutes and you will get the pay

16 for the day.

17        Can I say something?  The other parties -- the lady

18 sitting there was making some gestures, like this one.

19 (Indicating).

20        THE COURT:  Who was the lady in the audience?

21        Don't do that.

22        THE WITNESS:  His wife.

23        THE COURT:  I didn't see that.  But don't do that.

24 It is inappropriate.

25 Q     So Mr. Tam determined like how the wage was calculated

1   and how much he's going to compensate you for the specific

2   day, we just take an example as one month in January 2018,

3   without your knowledge; is that correct?

4   A    Yes.

5   Q    Did he provide you any written notice regarding how he

6   calculated the wage?

7   A    He will only put down something on the schedule such as

8   the time, working time was from 9:00 to 10:00 and totally how

9   many hours, and then in the last week how many hours total.

10  But he will never had any writing for me on the calculation.

11  So if I am late, he will deduct a certain pay.

12  Q    And now I am showing you the Defendant Exhibit D.  I am

13  handing it over.

14          THE COURT:  Are you going to move this into

15  evidence?

16          MR. ZHU:  This is a defendants' exhibit.

17          THE COURT:  I know, but do you want it in evidence?

18          MR. ZHU:  No, just refresh her.

19          MR. MULQUEEN:  Objection.

20          THE COURT:  Overruled.

21  A    Okay.

22  Q    Ms. Luk, does this document refresh your recognition?

23  A    Yes.

24  Q    What is -- what happened on that day when you text

25  Mr. Tam?

1  A    So I remember, there was July 22, I said to him, the text

2  message, you sold both stores, Commack and Jericho.  Do we

3  have any severance pay.  He answered, no.  And then I said,

4  really?  And he said, no.

5         Because we text message in Chinese, and his

6  translated version, it may be different.

7  Q    Ms. Luk, you are not allowed to testify for the record,

8  but I am just asking your recognition about the event on that

9  specific day.

10        When did your employment at Carvel ice cream stop?

11        THE INTERPRETER:  The interpreter doesn't understand

12  the last sentence Ms. Luk said.  I need to ask her.

13        THE COURT:  Just ask her to repeat it.

14  A    So when the Commack store was closed in March 2018, I

15  continue working at Jericho store one day a week, on Sundays,

16  until July 15, 2018.

17  Q    After March 2018, when the Commack store was sold, and

18  you worked only one day in Jericho store, how many hours do

19  you work for that single day?

20  A    That was on Sundays, 11:00 to 10:00.  Sometimes my boss

21  come back early, it will be 9:30.

22  Q    How often your boss, Mr. Tam, come back early?

23  A    It depends on him.

24  Q    So based on your estimate and your recognition, my

25  question is, how often he comes back early?  For example, once

1  a month?  Once two months?

2  A    It was hard to estimate.  It totally depended on his

3  schedule, what he had been doing on the special -- on a

4  particular day.  But it was always approaching the closing

5  time.  Sometime if it was snowing, he would close the store

6  early.  But we did not have so many days that snowed.

7  Q    So what -- do you remember what is the last day you work

8  in Jericho store after the Commack store closed?

9  A    July 15.

10  Q    2018?

11  A    Yes.

12  Q    Ms. Luk, do you remember why you are being terminated?

13  A    I don't understand the question.

14  Q    Why you quit the job or why you are being -- why you were

15  terminated from this job?

16  A    I did not quit.  He was selling the stores out, and he

17  mentioned to me the buyer of the Commack store may not want to

18  continue hiring you so you better look for other jobs.  Or

19  maybe he will hire you, we don't know.

20          So I had to look for jobs.  There's not any

21  compensation.

22  Q    Have you ever informed your boss, Mr. Tam, that you are

23  not being compensated properly?

24  A    I don't understand your question.

25  Q    Have you ever complained to Mr. Tam?

1  A    I spoke to him about this, if we can get any severance

2  pay for some compensation.  I did not complain.

3          THE COURT:  I think what the lawyer is asking you

4  is, and you correct me if I am wrong, whether the whole time

5  you worked there, did you ever say that you weren't being paid

6  enough?  Not just when you left.

7          MR. ZHU:  That is correct.

8          THE COURT:  So just the whole time that you worked

9  for Carvel, did you ever complain to your boss that your pay

10 was too low?

11 A    We were discussing this informally, like chatting.  So I

12 said it had been a long time the rate of pay was not adjusted,

13 could we have some raise.  Just like chatting.  And he said

14 the minimum wage was this.  So you will follow that minimum

15 wage.  Because my son watch news from time to time.  He speaks

16 English, so he noticed from the news report that the minimum

17 wage was adjusted.  So he said to me, did Uncle Spencer --

18 well, he calls him Uncle Spencer -- ever adjust or raise your

19 wage.  And then that's how I went to talk to my boss.

20 Q    Have you ever received any notice from Mr. Tam or the

21 Carvel ice cream shop that you are allowed to take tips from

22 the customers?  Any written notice?

23 A    No.  Not in writing.

24 Q    If Mr. Tam assign you to work in the Commack store, are

25 you able to refuse?

1    A    Is there any way I can refuse it?  Usually he assigns me

2    to which store, so I will follow his instructions.  I seldom

3    complained, unless, let's say, I have something or I am sick

4    or something that I cannot -- I could not go to work, I would

5    tell him.

6    Q    Is there any -- in any event, Mr. Tam assign you to work

7    in Commack store, but you want to work in Jericho store, are

8    you able to refuse it?

9    A    No, I did not refuse.

10   Q    My question is, are you able to refuse instead of did you

11   actually refuse?

12   A    Because I did not do that before, so I do not know.

13   Q    We are back to the daily income issue.  Regarding your

14   testimony about like during the weekend day, it's around

15   $1,000 daily income, is that for Commack store or for Jericho

16   store or for both?

17   A    Okay.  In the Commack store, Monday through Thursday, 800

18   to 1,000.  On Friday, 1,000 to 1,200.  Saturday and Sunday,

19   1,200 to 1,600.

20          Jericho store, Monday through Thursday, 600 to 800.

21   Friday, 800 to 1,000.  Saturday and Sunday, 1,200 to -- I'm

22   sorry.  1,000 to 1,200.

23          This is for summer.  In the wintertime, in general,

24   one-third less.

25          On the special days, such as Super Bowl, Mother's

1  Day, Father's Day, Thanksgiving, we have a larger income.  It

2  can be 1,800, 2,000 or 2,600, even more than 3,000.

3          MR. ZHU:  I have no further questions.

4          THE COURT:  All right.  Do you want to take a few

5  minutes?  I don't know if you need --

6          MR. ZHU:  Feed the meter.

7          THE COURT:  Let's take ten minutes, okay?

8          MR. ZHU:  That's okay.

9          THE COURT:  The witness can step down.

10          See you in a few minutes.

11          (WHEREUPON, a recess was had from 11:19 a.m. to

12  11:42 a.m.)

13          THE COURTROOM DEPUTY:  The witness is reminded she's

14  still under oath.

15          THE COURT:  All right.  Cross-examination.

16          MR. MULQUEEN:  Yes, ma'am.

17          THE COURT:  So Mr. Mulqueen is going to ask you some

18  questions.  Same thing, just let him finish the question, and

19  let the interpreter finish translating before you start

20  answering.

21          Go ahead.

22          MR. MULQUEEN:  Thank you, Your Honor.

23  CROSS-EXAMINATION

24  BY MR. MULQUEEN:

25  Q    Good morning, Ms. Luk.

*LUK - CROSS - MULQUEEN*                                          28

1   A    Good morning.

2   Q    Do you recall when you initiated this action?  You filed

3   a complaint against the defendants?

4   A    What do you mean, initiated?

5   Q    When you began this lawsuit, you began it by filing a

6   complaint against the defendants?

7   A    You mean why I sue him or --

8           THE COURT:  He just wants to know, when you started

9   the lawsuit, did you file a complaint, a piece of paper that

10  contains your claims?

11  A    I verbally communicated with my lawyer.

12  Q    And your lawyer created a document called a complaint

13  that was filed in court; is that accurate?

14  A    Yes.  I authorized him to do so.

15  Q    So you reviewed that complaint and the statements that

16  were contained in the complaint?

17          MR. ZHU:  Objection.  Privileged.  Attorney-client

18  privilege.

19          THE COURT:  Just rephrase the question, would you?

20  Q    Did you sign anything that said the complaint was

21  accurate?

22  A    I didn't sign, but when the lawyer Keli Liu asked me to

23  review a document and to review if it is accurate, I signed.

24  Q    So the statements in the document were accurate, to your

25  knowledge?

1          MR. ZHU:  Objection.  The document speaks for

2   itself.

3          THE COURT:  Overruled.

4   A    So the lawyer, Keli Liu, send this document to me, the

5   complaint, asked me to review it, and I had a chance to see

6   the translation, and then if there is anything that was not

7   correct, I will tell him.

8   Q    Did you see the final document that he created?

9   A    I read the complaint in the beginning, and I pointed

10  certain errors.  And later I rewrote again.  There should not

11  be any more problems.

12  Q    I didn't ask you a question, Ms. Luk.

13  A    I read it from English to Chinese.

14  Q    And when you read it before it was filed, was it

15  accurate?

16         MR. ZHU:  Objection.  Asked and answered.

17         THE COURT:  Overruled.

18  A    I read the complaint when Keli Liu gave me the document.

19  There should not be any problems or errors.

20  Q    In paragraph 33 of the complaint, you said from in and

21  around October 2004 to in or around November 2010 that you

22  worked in the Commack store.  Was that an accurate statement?

23  A    Can you say the date, year, month, again?

24         THE COURT:  Do you think it would be helpful for her

25  to have a copy of the complaint?

1          MR. MULQUEEN:  Sure, Your Honor.

2          Your Honor, this was previously marked as Defendants

3    Exhibit A.  I will show it to the witness.

4          THE COURT:  And just put what page do you want her

5    to look at.

6          MR. MULQUEEN:  Yes, ma'am.

7    Q    Page 6, paragraph 33.  The second full sentence in that

8    paragraph.

9    A    So from this time to this time?

10   Q    October 2004 to November 2010, you worked in the Commack

11   store.

12   A    I do not recall for this sentence, at that time.  And,

13   also, my Cantonese and their Mandarin may cause some confusion

14   or misunderstanding.  And the lawyer told me that I could only

15   sue them -- sue him for the half year back.  So I am sure

16   about the following sentence, from in or around December 2010

17   to July 15, 2018.  This one, I was sure.

18   Q    So the second full sentence that we were talking about,

19   not the one you want to talk about, is that an accurate

20   statement or not?

21         MR. ZHU:  Objection, Your Honor.  Outside the

22   statute of limitation.

23         THE COURT:  Overruled.

24   A    So your question is, you asked me, if this second

25   sentence was correct?

1    Q      Yes.

2    A      That was inaccurate.  I believe I corrected it already.

3    Q      This is the complaint that was filed with the court.

4    What's inaccurate about that sentence?

5    A      It said that I worked in the Commack store.

6    Q      Correct.  That's what it says.  What's inaccurate about

7    that statement?

8    A      From October 2004 to November 2010, the correct store

9    name I worked in would be Elwood store.

10   Q      That's also known, we have been referring to that as the

11   Jericho store?

12   A      Yes.  So maybe they had a misunderstanding, they thought

13   the Elwood was Commack.

14   Q      I don't know if they had a misunderstanding.  This is

15   your complaint.

16   A      Yes.  This is my complaint, but I did -- I looked at a

17   following sentence at the time, and then I thought it was

18   correct.

19   Q      Okay.  Let's look at the following sentence that you want

20   to talk about.  It says, between December 2010 and July 2018,

21   that you worked at the two stores for five days a week, three

22   at one store and two at another store; is that correct?

23   A      Yes.

24   Q      You testified earlier that the Commack store was sold in

25   March of 2018.  How could you have worked at the Commack store

1   if it was sold in March of 2018?

2   A    That's right.  Actually, what I meant was, until July 15,

3   2018, I was working for Mr. Tam and his store.

4   Q    It says that you worked five days a week until July 2015,

5   but earlier you said you only worked at the Jericho store on

6   Sundays after March 2018.

7   A    Yes, correct.

8   Q    So it is not true that you worked five days a week at

9   both stores until July 2018?

10  A    Yes, you have your explanation, and I don't know how I

11  should put it.

12  Q    Well, it is either true or it is not true.  Which one is

13  it?

14  A    Half correct.

15  Q    Half correct.

16            Please turn to the paragraph 36, which is on page 7.

17  It says that from July, the first sentence, from July 2012 to

18  July 15, 2018, you worked five days a week with Wednesday and

19  Saturday or Sunday off.  Is that an accurate statement?

20  A    I will need you to say that again, please.

21  Q    Looking at the first paragraph -- first sentence of

22  paragraph 36, on page 7 of your complaint filed with the

23  court, and it says, from on or around July 1, 2012 to on or

24  around July 15, 2018, you, plaintiff Luk, worked five days per

25  week with Wednesday and Saturday, slash, Sunday off.

1    A    Wednesday off, and Saturday or Sunday, one of them, off.

2    Q    Correct.  So you worked five days a week with two days

3    off, that's your statement in the complaint?

4    A    Yes.

5    Q    Is that a true statement?

6    A    Yes.

7    Q    So earlier when you testified that you worked whenever

8    Mr. Tam told you to work and you had no idea what days you

9    were going to work and what days you were going to be off,

10   that was not a correct -- that wasn't correct testimony, was

11   it?

12   A    That was also correct, because the schedule changed all

13   the time.

14   Q    Okay.

15   A    But at the time when we were writing this complaint, we

16   were asked to write down the situation in general.  But more

17   or less, this is like this.

18   Q    So, more or less, you worked five days a week from 2012

19   to 2018, with two days a week off?

20   A    Most of the time, working five days a week, sometimes

21   some days off.

22   Q    You testified earlier that the hours of the store during

23   the weekdays were from 11:30 until 9:30; is that accurate?

24   A    It will depend on weekday or weekend, and, also, if the

25   schedule changed and if it was changed to 11:30.

1  Q    Okay.  The hours of the store -- let's talk about the

2  Commack store, the one you worked at the most.  The hours of

3  the store during the weekdays, Monday through Friday, were

4  11:30 to 9:30; is that accurate?

5  A    11:30 to 9:15.

6  Q    And on the weekends, it was from 11:00 to 9:30?

7  A    Yes.  More or less, yes.

8  Q    So on Monday through Friday, on the days that you worked,

9  you worked 9 hours and 45 minutes per day?

10 A    Yes.

11 Q    Moving to paragraph 37 of the complaint on page 7, the

12 first sentence says that from July 2012 to December 2012 you

13 were paid at a rate of $7.75 per hour.  Is that an accurate

14 statement?

15 A    So I remember that every year, the department of labor's

16 minimum wage rule was followed.

17 Q    Ms. Luk, please listen to the question and answer.  The

18 first sentence of paragraph 37 on page 7 of your complaint

19 says, that from on or around July 1, 2012 to on or around

20 December 31, 2012, you were paid a fixed rate of 7.75 per

21 hour; is that accurate?

22 A    As far as I remember, more or less, yes.

23 Q    And earlier, at the request of your attorney, the Court

24 took judicial notice of the fact that in 2012, the minimum

25 range was $7.25; do you recall that?

1  A    Yes, he mentioned that.  Because my boss never issued

2  anything in writing about the pay and about the total working

3  hours.  So I was remembering the minimum wage, following the

4  department of labor regulations, that's why.

5  Q    Ms. Luk, we are here to determine whether you were paid a

6  fair wage while you were working for Mr. Tam.  So it is --

7  were you paid $7.75 per hour in the year of 2012?

8  A    I do not have the exact figure.  I just estimated the

9  hourly rate at the time.

10 Q    So as you sit here today, you have no idea how much you

11 were paid?

12 A    Actually, at the time I did not have an idea about the

13 exact pay per hour because my boss never issued any writings

14 informing me the pay.  If you are a lawyer, you get your pay

15 stub and you will see your salary, also, the details about the

16 Social Security pay and all the other items.  But, for me, I

17 only rely on my memory to estimate the hourly pay at the time.

18         Why my memory told me that I was paid at a minimum

19 wage, because when I chatted with my boss about the salary or

20 the rate of pay, and he said, I am paying you the minimum

21 wage.  That's why.

22 Q    You knew how many hours a week you worked, correct?

23 A    Yes, I remember.

24 Q    And I understand that Mr. Tam didn't put your wages in

25 writing, but you had a conversation with Mr. Tam about wages;

 1  is that correct?

 2           MR. ZHU:  Objection.  Relevance.

 3           THE COURT:  Overruled.

 4  A    Each week he will write down the total hours I was

 5  supposed to work, and then he will also note down if I was

 6  late, and if yes, he will write down how many hours the total

 7  time.  And then on the beginning of the week, in the paper, he

 8  will write down the total hours I worked for that particular

 9  week.  Actually, he --

10           THE INTERPRETER:  I need the plaintiff to repeat.

11  A    I did not calculate how much exactly I earned, like per

12  hour.  At the time when I accepted the pay, whatever he gave

13  me I accepted.  And because the conversation I had with him

14  was always saying that paying the minimum wage.

15  Q    Ms. Luk, you mentioned that Mr. Tam would deduct wages,

16  if you were late?  How often were you late for work?

17  A    In the beginning, I was not late at all.  After that, I

18  was late sometimes because I was working long hours without

19  even a half hour break.  And so I did not have time to do

20  anything to do around the house.  So I would text him saying

21  that I may be such hours of time late.

22  Q    And the question was, how often were you late?

23  A    How often is hard to say.  Maybe one day per week or two,

24  but not every week.

25  Q    Ms. Luk, isn't it true that Mr. Tam gave you two half

1  hour meal breaks, one for lunch and one for dinner, every day

2  that you worked?

3  A    He did not give us exactly half an hour to have meals,

4  but when we finished certain work and there was no customers

5  around, he will let us to have something to eat.  But during

6  that time, if any customer showed up, we have to stop eating

7  and help customers.  Sometimes when we were busy, we had no

8  time to eat, or we'd pick up whatever we have, a snack to eat.

9  Q    When were the busy months in this ice cream business?

10  A    Summertime.

11  Q    And you testified earlier that when it was busy in the

12  summertime, Mr. Tam would come work at the store as well; is

13  that correct?  And, in addition, he would hire another

14  employee to work in the summertime?

15  A    He will help if we were busy, but when we were not busy,

16  I was not sitting there doing nothing.  I always had other

17  things to do, like cleaning or arranging the decoration kit,

18  and et cetera, et cetera.

19  Q    Well, Ms. Luk, weren't there times, especially in the

20  winter, where maybe you only had one customer come in the

21  store on a given day?

22  A    Do you mean that when we were not busy, there was totally

23  only one customer for the winter?

24  Q    In the wintertime, on a day in the winter, weren't there

25  occasions where there were very few customers, sometimes as

1   few as one customer a day?

2   A    No.

3   Q    What's the fewest amount of customers that ever walked in

4   the store on a given day?

5   A    You are referring to wintertime or the summertime?

6   Q    I am referring to the least amount of customers that ever

7   walked into the store on a given day.  You can decide whether

8   that's winter or summer.

9   A    The minimum customer per day, if it was really slow,

10  maybe one to two.

11  Q    I just asked you if there were days when only one

12  customer came to the store, and you said --

13          THE COURT:  Let's not argue with the witness.

14          MR. MULQUEEN:  Okay.

15  Q    So one to two customers.  So you are in the store for 9

16  hours, 45 minutes, two customers come in the store, and you

17  have no time to take a break?

18  A    If it was snow time, I don't know when the customer will

19  show up.  And, also, if it was really like a snow -- like a

20  big snow, we will close early.  So we will have 100 to 200

21  dollars sales per day.  And this is a service industry.  We

22  will not only serve the customers who we don't know when will

23  show up, but we will need to do a lot of cleaning and to make

24  the hot ice cream and arrange the kit and et cetera,

25  et cetera.  Sometimes I know it will be -- it will be a snow

1   day, and I will ask him if we need to go to work.  And then he

2   said, we don't know if it will snow -- there will be a snow or

3   not.  Just come to work.

4          I don't know the situation at the time or specific

5   circumstances.  Usually I need ten minutes to go home, but if

6   it was snowing like strong snow, then I would need 45 minutes

7   to one hour to go home, and then it was very dangerous.

8   Q    Ms. Luk, I asked you about whether or not you had time to

9   take breaks, and now we are talking about snow days.  Could

10  you please just answer the question that's asked of you.

11         MR. ZHU:  Objection.  Asked and answered.

12         THE COURT:  Well, I will do the directing around

13  here.  But why don't we just put a question to the witness.

14         And just do your best to answer the question that

15  you are being asked.

16         Go ahead.

17         MR. MULQUEEN:  Thank you, Your Honor.

18         THE WITNESS:  Okay.

19  Q    Going back to paragraph 37, page 7 of your complaint, it

20  states that from January 2013 to December 2015, you were paid

21  a rate of $8 per hour.  Is that an accurate statement?

22         And while you are looking at that paragraph or that

23  sentence, it says 2015, but did you mean to say 2014?  Because

24  the next paragraph deals with 2015, the next sentence.

25  A    Looks like, yes.

1  Q    So from 2013 through the end of 2014, you were paid 8

2  dollars per hour?

3  A    It should be, yes.

4  Q    And in the next sentence, it says from January of 2015 to

5  December of 2015, you were paid $10 per hour; is that an

6  accurate statement?

7  A    More or less, yes, because I do not have any papers.

8  Q    And from 2016 to 2018, it says you were paid 10.50 per

9  hour.  Earlier you testified that you were paid $11 per hour.

10 Which one of those is correct?

11            MR. ZHU:  Objection.  The witness never testified

12 that she was paid $11 per hour.

13            THE COURT:  Well, were you ever paid $11 an hour?

14 Let the interpreter --

15            THE WITNESS:  At the time I remember from a text

16 message, which showed daily sales.

17            THE COURT:  Go ahead and finish translating the

18 answer.

19            THE WITNESS:  Before I didn't know, but that day, he

20 asked me to get $110 or $115 minus daily sales.  Based on the

21 hours I worked, I had idea that I earned $11.50.

22            Back to my original point, again, I do not have any

23 paperwork or the writing about exactly pay.  But my constant

24 conversation with him was that I was paid at minimum wage.

25 Q    Ms. Luk, you knew how many hours a week you worked; is

1   that correct?

2   A    Yes, approximately, yes.

3   Q    And you received a certain amount of money at the end of

4   the week; is that correct?

5   A    After the workweek, I would receive the pay two weeks

6   later.  So I will receive the pay for that week I worked two

7   weeks later.

8   Q    But you knew what week you were getting paid for; yes?

9   A    Yes.

10  Q    And you knew how many hours you worked that week; is that

11  correct?

12  A    I didn't calculate, but he wrote it down, yes.

13  Q    You knew how much money you received; is that correct?

14  A    I don't know.

15  Q    So you are telling me you have no idea how much money you

16  were handed at the end of each week?

17  A    Correct.

18           THE COURT:  So just remind me, I am sure you

19  testified about this already, but were you paid in cash?

20           THE WITNESS:  Yes.

21           THE COURT:  Okay.

22           THE WITNESS:  When he gave to me, I did not

23  calculate, and I don't know how much exactly it was.  He did

24  not even say, this is for you, the salary.

25  Q    Ms. Luk, you said you were paid in cash?

1  A    Yes.

2  Q    And that's because you insisted on being paid in cash?

3  A    I asked him if he could pay cash.  I did not insist on

4  it.

5  Q    Did you report the income you received on your taxes?

6           MR. ZHU:  Objection.  Relevance.

7           THE COURT:  Sustained.

8  Q    Ms. Luk, do you and your family receive Medicaid?

9           THE COURT:  Sustained.

10          MR. ZHU:  Objection.  Relevance.

11          THE COURT:  Sustained.

12 Q    Ms. Luk, isn't it true that Mr. Tam gave you 400

13 additional dollars as a bonus every year around Christmas?

14 A    No, not necessarily.  He mentioned that he would pay some

15 kind of a bonus, but he may not pay.  Also, he may delay the

16 payment time.  It could be January or February or March.

17          THE COURT:  I am a little confused.  The first

18 question is, just yes or no, did you get a bonus?

19          THE WITNESS:  Yes.

20          THE COURT:  And did you get the bonus every year?

21          THE WITNESS:  Not necessarily.

22          THE COURT:  Okay.  So when you did get the bonus,

23 did you also get the bonus in cash?

24          THE WITNESS:  Yes.

25          THE COURT:  And did you ever count the cash that you

1   got when you got the bonus?

2              THE WITNESS:  No.

3              THE COURT:  You just handed -- he handed you cash,

4   and you just took it without counting it?

5              THE WITNESS:  I did not count it.

6              THE COURT:  So you don't know how much it was?

7              THE WITNESS:  He will mention that I will give you

8   200 this year.  So I will trust him, it was 200.  Sometimes he

9   will mention that I will not give you right away, if the

10  business was not so good, I will give you a little bit later.

11             THE COURT:  Okay.  So is it correct then that when

12  you got the bonus, he would tell you how much it was?

13             THE WITNESS:  Yes.

14             THE COURT:  All right.  I'm sorry, Counsel.  Go

15  ahead.

16             MR. MULQUEEN:  Thank you, Your Honor.

17  Q    So between 2012 and 2018, how many years did you receive

18  a bonus?

19  A    I don't know how many years, because I did not note it

20  down, but I remember he gave it to me.  And not necessarily

21  every year.  If he said I will give you a little bit later,

22  which was probably January, then how we will count it, will

23  you count it the year before or the year the following year?

24  Also, it is the same as he paid like the weekly wage.

25  Supposedly, he will pay on Friday for the week, but he did not

1   pay on time.  So he paid maybe Saturday or Sunday or Monday.

2   So then it became he paid on Monday.

3           THE COURT:  Just wait one second.  The question is

4   whether you got the bonus or your weekly pay, whether you got

5   it late.  Is it fair to say that you got, let's just stick

6   with the bonus, that you got a bonus every year, even if it

7   was late?

8           THE WITNESS:  During the time, yes.

9           THE COURT:  Okay.  Go ahead.

10  Q    Did you receive tips as part of your employment?

11  A    After 2009, he set up a jar on the counter to let the

12  customer put certain tips on it.  But it was not like the

13  restaurant where you have to pay 15 percent, for example, the

14  tips.  Also, when I took the money out from the jar to count

15  it, he will sometimes be angry and say why did you count it.

16  And sometimes he will take the money away.  So I don't know

17  how much tips I received after all.

18  Q    But you did receive tips?

19  A    I received some.

20  Q    And that was at both stores, the Jericho store and the

21  Commack store?

22  A    If he count it how much, then, yes.  It depend on him.

23          THE COURT:  The question is, you said there was a

24  jar for tips at the Commack store, correct?  Or Jericho, too?

25          THE WITNESS:  No, in both stores.

1          THE COURT:  Okay.  And then customers would put

2   money into the jars; is that right?

3          THE WITNESS:  Yes.

4          THE COURT:  And do you know -- let's start with the

5   summertime.  Did you count how much was in the jar on a busy

6   day?

7          THE WITNESS:  I counted it before, maybe 12 dollars.

8          THE COURT:  Okay.  What's the most -- sorry,

9   Counsel.

10         What's the most that you ever -- that was ever in

11  that jar that you remember?

12         THE WITNESS:  Let's say on the Mother's Day, a very

13  busy time, I count it, it will be 16 dollars or 18 or 22.  But

14  he will say, oh, this is so much tips, we will share it.  So I

15  don't know in the end how much I received.

16         THE COURT:  Okay.  I'm sorry, Counsel.  Go ahead.

17         MR. MULQUEEN:  No problem, Your Honor.

18  Q    In February of 2016, did you leave the Carvel stores to

19  open a dry cleaner?

20  A    I did not consider that as leaving because I still work

21  one day a week there.

22         THE COURT:  And what year is this?  2015?

23         MR. ZHU:  That was in February of 2016.

24         THE COURT:  '16.

25  A    From January to February.  And afterwards, because of

1   some private matters, I could not continue working there, so I

2   work at the other store.

3           THE COURT:  Couldn't still work at the dry cleaner?

4           THE WITNESS:  I was thinking of opening a dry

5   cleaner.  But because of some family matters at home, I could

6   not continue opening such a dry cleaner business.

7           THE COURT:  I see.  Go ahead.

8   Q    So you said from January 2016 you only worked one day a

9   week?

10  A    Yes, at Commack store, for 4 to 6 weeks.

11  Q    And, in fact, didn't Mr. Tam hire another employee named

12  Ellis to take your place?

13  A    I do not remember his name, but I know there was such a

14  person.

15  Q    And how long did that person work for Mr. Tam?

16  A    I don't remember.

17  Q    And while that person was working for Mr. Tam, didn't

18  Mr. Tam tell you that you could only work three days a week?

19  A    It had been a long time so I did not remember if he said

20  exactly I will work three days a week.  No matter what he

21  said, I just follow his instructions.

22  Q    Okay.  But just to be clear, in the year of 2016, you did

23  not work five days a week?

24          MR. ZHU:  Objection.  Leading.

25          THE COURT:  Well, it is cross-examination.  He's

1  allowed.  Overruled.

2  A    If you want to say that, and then I do not have any

3  documentation, then you can have your statement.

4  Q    I am not here to make statements.  You are here to make

5  statements.

6            THE COURT:  Again, just answer the question that the

7  lawyer is asking you.

8  A    So what's your question?

9  Q    Isn't it true that in 2016 you did not work five days a

10  week at the Carvel stores?

11  A    I was not working five days a week at Commack store,

12  correct.

13  Q    Were you working at the Jericho store?

14  A    Maybe one day.  It totally depended on his decision,

15  where he assign me to.  Sometimes -- let's say if he said I

16  need to work at such a store for three days, and he had

17  suddenly something to take care of, then I will have to work

18  more.  Just like if they took the vacation, then I will have

19  to work more, like seven days a week.  So how you will

20  calculate?  You will calculate at the five days a week, or

21  not?

22  Q    How often did Mr. Tam take vacation?

23  A    After his wife retired -- actually, after his wife was

24  laid off, they had more time to take a vacation, maybe once a

25  year, one week to two weeks.  Sometimes they went back to Hong

1   Kong.  When Demi was working in the store from 2014 to 2018,

2   she took the vacation as well, four to six weeks.  So I have

3   to work every day for the week, unless I really had something

4   to do, then I could -- I asked him, he let me have half day or

5   one day break.

6              THE COURT:  Okay.  So the question was really just

7   how often he went on vacation.  And I think we have answered

8   that.  So why don't we put another question to the witness.

9              MR. MULQUEEN:  Yes, ma'am.  Thank you.

10  Q    When did Mr. Tam's wife retire or get laid off?  What

11  year was that?

12  A    I think maybe 2011.

13  Q    Did Mr. Tam ever take vacation at the same time as

14  Ms. Dai took vacation?

15             THE INTERPRETER:  Counsel, Ms. Dai?

16             MR. MULQUEEN:  Ms. Dai.

17  A    No.

18  Q    You mentioned earlier during your direct examination that

19  you would look at the daily register on the cash register; is

20  that accurate?

21  A    Yes.  But not every day.

22             THE COURT:  Okay.

23  A    Not every day.  When I was allowed to see the daily sales

24  receipt.

25  Q    Could you estimate how many days you actually looked at

1    the daily receipt?

2    A    Actually, if I worked, I could see the receipt every day.

3    Q    So now you are saying every day you worked, you looked at

4    the daily receipt?

5    A    Yes.

6    Q    And that daily receipt would include cash receipts as

7    well as credit card receipts; is that correct?

8    A    At a cash register, the receipt did not show how much was

9    from credit card, how much was from cash.  But at the credit

10   card device, there was a daily settlement.  From that record,

11   I could see how much income was from the credit card.  So you

12   would compare the two, and you would know how much was from

13   credit card and how much was from cash.

14   Q    I am not asking you to tell me how much income was from

15   credit card and how much income was from cash.  What I am

16   asking you is when you looked at the daily receipt on the cash

17   register, that would include all receipts, regardless of

18   whether it was cash or credit; is that accurate?

19   A    Yes.

20   Q    You mentioned earlier during your direct examination that

21   your son referred to Mr. Tam as Uncle Spencer; is that

22   correct?

23   A    He called like that, and because he was a kid, he would

24   just call him.  It is a custom.

25   Q    Is it also because after all of the years you two spent

1   together, that you had a familial type relationship?

2   A    We were still employee and employer, the relationship.

3   But you are right, we have been working for a long time

4   together, and, also, we had constant conversation, yes.

5   Q    I just want to make it clear that -- never mind.  I will

6   let that go.

7             So you were fairly angry or fairly upset when you

8   heard that the store was closing and Mr. Tam wasn't going to

9   give you severance pay?

10  A    No.

11  Q    That didn't bother you at all?

12  A    No.

13            MR. MULQUEEN:  Your Honor, may I have a minute to

14  confer with my client?

15            THE COURT:  Sure.

16            (Short pause.)

17            MR. MULQUEEN:  I have no further questions,

18  Your Honor.

19            THE COURT:  It occurs to me I haven't given the

20  interpreter much of a break.  Do you have a lot of questions

21  on redirect?

22            MR. ZHU:  No, just a few questions regarding the

23  complaint, like the process.

24            THE COURT:  Are you okay to work until 1:00?

25            THE INTERPRETER:  That's fine.

1          THE COURT:  Okay.

2          THE INTERPRETER:  Thank you.

3          MR. ZHU:  The interpreter has something around 4:00.

4   Our office informed me she has to leave before 4:00.

5          THE COURT:  Okay.

6          MR. ZHU:  I don't know if that is right.

7          THE INTERPRETER:  4:20, 4:30.

8          THE COURT:  Okay.  I think if we need to, we'll come

9   tomorrow.

10  REDIRECT EXAMINATION

11  BY MR. ZHU:

12  Q    Ms. Luk, regarding this complaint, have you ever signed a

13  verification to verify under oath this complaint is true and

14  accurate?

15  A    In the beginning I review it, but I did not sign.

16  Q    Do you recall who did an intake with you regarding the

17  facts?

18  A    I don't know his Chinese name, but I remember Richard Gu,

19  G-u.

20  Q    Have you worked with other attorneys in this law firm?

21  A    There was another one, Keli Liu.  And then it was you,

22  Shan Zhu.

23  Q    So I am actually the third counsel on this case, right?

24  A    Yes.

25  Q    And your primary language is Cantonese; is that correct?

1    A    Yes.

2    Q    Is there any attorney in this firm that can speak

3    Cantonese?

4    A    No.

5    Q    Is there any interpreter involved when you communicated

6    with your attorneys?

7    A    No.

8    Q    Let me refer you to the complaint.  Can you see this on

9    your screen?

10   A    Yes.

11   Q    On paragraph 33, my adversary just asked you if that is

12   accurate from October 2004 to July 15, 2018, you worked as

13   full-time.

14        Let me -- if that is a correct statement from around

15   October 2004 to March 2018, you worked for the defendants as a

16   full-time?

17   A    Yes.  Until March 2018, at Commack, yes.

18   Q    And for the next sentence, my adversary just asked you,

19   so if it has been changed to from October 2004 to November

20   2010, plaintiff Luk worked in Jericho store; is that correct?

21   A    Correct.

22   Q    For the next sentence, in or around December 2010 to

23   March 2018, plaintiff worked in both Jericho store and the

24   Commack store; is that correct?

25        MR. MULQUEEN:  Your Honor, objection.  Are we

1    amending the complaint?

2            THE COURT:  Well, the objection is overruled.

3            Go ahead.

4    Q    So let me reread it a second --

5            THE COURT:  Can I just -- sorry, Counsel.  I just

6    want to make sure that I understand.  Are you showing her

7    something where you have changed the dates on the original

8    complaint?

9            MR. ZHU:  I am trying -- this is my personal notes,

10   but I am trying to clarify --

11           THE COURT:  The dates.

12           MR. ZHU:  The dates.  My adversary already showed

13   there is some inconsistency in the complaint and her

14   testimony.  Just trying to correct whether that's it.

15           THE COURT:  I see.  I think what counsel is

16   objecting to is the fact that something else is written in

17   there, but I think I understand what you are doing, so.

18           MR. ZHU:  Yes.  So I'm just trying to make the facts

19   straight.

20           THE COURT:  Okay.

21           MR. ZHU:  Is that being allowed?

22           THE COURT:  Sure.  Go ahead.

23   Q    So the last thing, it has been changed to December 2010

24   to March 2018, plaintiff Luk worked in both Jericho store and

25   the Commack store; is that correct?

1  A     Yes.

2  Q     And for the paragraph 36, just want to make sure if it is

3  correct, around January -- I'm sorry.  Around July 1, 2012 to

4  around March 2018, you worked five days per week; is that

5  correct?

6  A     Approximately, yes.

7  Q     Regarding the pay you received by you, when the defendant

8  hand over the payment to you, did he use any envelope to

9  enclose some cash he give to you?

10  A     Cash on the counter.

11         THE COURT:  He wants to know, did he put it in an

12  envelope or did he just hand you the cash?

13         THE WITNESS:  No.

14         THE COURT:  Just handed you the cash?

15         THE WITNESS:  He did not hand it to me, but he put

16  it down on the counter.

17         THE COURT:  I see.

18         Counsel, you know, I have to do another conference,

19  so can we continue after lunch?  Do you have a lot longer?

20         MR. ZHU:  No, actually, I don't have further

21  question besides this one.

22         THE COURT:  Okay.

23  Q     So he put it in a counter so that you can pick it up,

24  right?

25  A     Yes.  This is for you, your pay.

1    Q    My question is, so you pick it up the next day; is that

2    correct?

3    A    So upon the closure of the store, the closing time, he

4    came and then put the money on the counter, and then he said,

5    this is your pay.

6              MR. ZHU:  I have no further questions.

7              THE COURT:  All right.  Thank you, Counsel.

8              Do you have anything else?

9              MR. MULQUEEN:  No, Your Honor.

10             THE COURT:  Okay.  So we are going to break.  You

11   know, just listening -- the witness can step down.

12             I am going to ask counsel, I know I have asked you

13   this before, to consider whether or not there's any

14   possibility that you can resolve this case.  Just given the

15   length of time the plaintiff has worked with the defendant, I

16   feel like there should be some way to resolve it.  If there's

17   not, that's completely fine, we can continue with the trial

18   this afternoon, but just, I don't know if -- you all know

19   better than I do, but I just -- I want to see if there's a

20   possibility that you could come to some kind of agreement.

21   And if you can't, we will press ahead.

22             MR. ZHU:  The defendant is willing to have

23   settlement discussion, given we probably never had one.

24             THE COURT:  Well, why don't you just have a

25   conversation over the lunch hour.  And I think what we'll do

1   is come back at 2:30 -- let's make it 2:45, because I want to

2   make sure -- we have another conference and I don't want to

3   shortchange everybody in the courtroom.

4           So I will see you all back here at 2:45.  And if you

5   think that -- I mean, I am the one that's making the decision,

6   but if you think that I could help you facilitate settlement

7   discussions, or who's our magistrate judge?

8           MR. ZHU:  Judge Mann.

9           THE COURT:  If she's around.  Just let me know.  If

10  it doesn't work out, it doesn't work out, okay?  All right.

11          MR. ZHU:  Thank you, Your Honor.

12          THE COURT:  Have a good lunch everybody.

13          (WHEREUPON, a recess was had from 1:03 p.m. to 2:37

14  p.m.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1         A F T E R N O O N   S E S S I O N

2     (Open court; 2:37 p.m.)

3               THE COURTROOM DEPUTY:  All rise.

4               THE COURT:  Everybody can have a seat.

5               All right.  What's going on?

6               MR. ZHU:  We had a brief settlement discussion, but

7     apparently it is not working out.

8               THE COURT:  Okay.  No hope?

9               MR. MULQUEEN:  Parties are very far apart,

10    Your Honor.

11              THE COURT:  All right.  Okay.  I mean, I really do

12    think that this is something you could work out, but if it is

13    not possible, I know I sent you to mediation and you have

14    tried before, but did you go to mediation or was it somebody

15    else?

16              MR. ZHU:  I didn't go to the mediation, but I

17    believe my colleague, Mr. Ge --

18              THE COURT:  I think that's right, yeah.  Yes.  Oh,

19    well.  Can't hurt to try.

20              All right.  Are you ready to call your next witness?

21              MR. ZHU:  Yes, Your Honor.  My next witness will be

22    Ms. Dai, the plaintiff.

23              THE COURT:  Okay.

24              THE COURTROOM DEPUTY:  Raise your right hand.

25              (WHEREUPON, the witness was duly sworn through the

1   Interpreter.)

2           THE COURTROOM DEPUTY:  State your name for the

3   record.

4           THE WITNESS:  Last name Dai, D-a-i.  First name Ying

5   Ying, Y-i-n-g, Y-i-n-g.

6           THE COURTROOM DEPUTY:  Thank you.  You may be

7   seated.

8           THE COURT:  Okay.  It sounds like you speak some

9   English.

10          THE WITNESS:  Little bit.

11          THE COURT:  Okay.  But we have got a great

12  interpreter here, so let's make sure we use her.  I think it

13  is probably easier for you, okay?

14          THE WITNESS:  Okay.

15          THE COURT:  I know you heard the instructions I gave

16  to the other witness.  I want you to just -- this is

17  important, just answer the question that you are being asked,

18  all right.  If we start talking about other things, it makes

19  it harder to follow.  So just do your best to answer only the

20  question that you are being asked.  And if there's a question

21  that you don't understand, just let me know and we will

22  straighten it out.

23          THE WITNESS:  Okay.

24          THE COURT:  Go ahead.

25          MR. ZHU:  Thank you, Your Honor, for laying out the

1   ground rules.

2                        YING YING DAI,

3   called as a witness herein by the Defendants, having been

4   first duly sworn, was examined and testified through an

5   interpreter, as follows:

6   DIRECT EXAMINATION

7   BY MR. ZHU:

8   Q    Ms. Dai, can you tell us your employment period with

9   defendants -- strike that.  Let me try again.

10            So, again --

11            THE COURT:  Sounded pretty good.

12            MR. ZHU:  Thank you, Your Honor.

13  Q    I will refer to the corporate defendants ABNS New York,

14  NY Inc., and Shk Li Inc. as --

15            THE COURT:  I am just going to cut you off here.  So

16  Carvel is all of the defendants.

17            MR. ZHU:  All of the defendants.

18            THE COURT:  One of them is Jericho and one is

19  Commack, right?

20            MR. ZHU:  That's correct.

21            THE COURT:  And that's how you are going to refer to

22  them?

23            MR. ZHU:  Yes, that's correct, Your Honor.

24            THE COURT:  Perfect.  All right.  Go ahead.

25  Q    So, Ms. Dai, can you -- actually, Ms. Dai, do you

1  recognize the defendant sitting there?

2  A    Yes.

3  Q    Can you let us know who is this person?

4  A    He is my ex-boss or employer.

5         THE COURT:  Referring to the gentleman sitting over

6  by the lawyer there?

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.  Indicating the defendant.

9         Go ahead.

10  Q    So, Ms. Dai, can you let us know your employment period

11  with Carvel ice cream shop?

12  A    In the beginning, the end of December 2010 or the

13  beginning of January the following year.  The last day is

14  March 14, 2017.

15  Q    Do you recall which year the Commack store was being

16  sold?

17  A    I don't know about Commack.

18  Q    Do you know when -- so let's talk about your employment

19  with Jericho store.  Are you working only in Jericho store?

20  Are you working only in Jericho store?

21  A    Yes, I was working at Jericho store.

22  Q    What is your employment duty?

23  A    I did everything I needed to do to welcome and serve the

24  customers.  Made the cakes.

25  Q    Were you counting the money in the cash register or do

1  you have knowledge about the daily sale of Jericho store?

2  A    Yes.

3  Q    Just trying to clarify.  You said your employment with

4  Carvel ice cream shops stopped in March 2017; is that correct?

5  A    I made a mistake.  It should be 2018.

6  Q    All right.  So is that correct, your employment period

7  with Carvel ice cream shop started from December 2010 to March

8  2018?

9  A    Yes.

10 Q    Back to the daily income question, based on your

11 knowledge, what is the daily income of the Jericho store?

12 A    On the weekdays, Monday to Thursday, 600 to 800.  On the

13 weekend, 1,200 to 1,500.

14 Q    Is that for the summer season or winter season?

15 A    Summertime.

16 Q    How about wintertime?  Do you have knowledge?

17 A    In the winter, on the weekdays, 400 to 500.  On the

18 weekend, 800 to 900.

19 Q    When you being hired in December 2010, have you been ever

20 provide any written notice regarding your pay rate and working

21 schedule?

22 A    No.

23 Q    Did you receive any notice from the defendants, Carvel

24 ice cream shop?

25 A    No.

1  Q    Can you let us know your weekly working schedule in

2  Jericho store?

3  A    The weekdays, Monday through Friday, 11:30 to 9:30.  On

4  the weekend, 11:00 to 10:00.

5  Q    Again, are you the only person working in Jericho store?

6  A    Yes, but in the summertime there was part-time person.

7  Q    Would the defendant, Mr. Tam, occasionally come to the

8  Jericho store?

9  A    Sometimes he came to help.

10  Q    Do you recall how often he came to help?

11  A    How often, in the winter, no.  In the summer, from time

12  to time, he came like in the afternoon from 5:00 to 6:00 p.m.

13  Q    How many -- from December 2010, how many days each week

14  you work in Jericho store?

15  A    In the beginning, because it was winter, it was not

16  consistent or constant.  Two to three days a week.  After a

17  month, I worked five days a week.

18  Q    Which day -- which two days do you take off when you're

19  working five days a week?

20  A    In the beginning, for long period of time, I was off on

21  Tuesday and Sunday.  After that, it was Wednesday and Sunday.

22  Q    And do you recall when such change was made?

23  A    The first time that I took the break on those two days,

24  it lasts for two years.

25  Q    So is that correct, since December 2012, you starting to

1    take off on Wednesday and Sunday?

2    A    It started end of January.

3    Q    When you are working in Jericho store, do you work from

4    the opening to the close?

5    A    Yes.

6    Q    Did you take any uninterrupted break?

7    A    No.

8    Q    How often you are being paid?

9    A    From the beginning, I was not paid per hour.  He paid me

10   $75 per day.  Three to four months after, he paid me $500 per

11   week.

12   Q    So is that fair to say, since year 2011, you are being

13   paid for fixed weekly rate at $500?

14   A    Yes.  And in the summertime, he will pay me 520 to 530

15   dollars per week.  The extra part, according to him, was tips.

16   Q    Did you also receive tips separately from the customers?

17   A    I never took it.

18   Q    When you received your paycheck, did you receive -- I'm

19   sorry.  Strike that.

20        Did the plaintiff pay you by check or cash?

21   A    There is four weeks a month.  For the first three weeks,

22   he paid cash.  The last week he paid in check.

23   Q    When you received your payments from the defendants, have

24   you ever been provided any written notice regarding how the

25   wage was calculated?

1   A    No.

2   Q    Is your pay rate, which is $500 per week, remaining the

3   same from the year of 2011 to 2018?

4   A    Yes.

5   Q    Have you ever required to record your time with Carvel

6   ice cream shop?

7   A    I didn't request.

8   Q    My question is, have you ever been requested?

9   A    No.

10  Q    Is there any method employed by the defendants to record

11  your time?

12  A    No.

13  Q    Have you taken any vacation during your employment period

14  with Carvel ice cream?

15  A    Yes.

16  Q    Can you specify the year and approximate month?

17  A    From 2014 to 2017, each year, at the end of October to

18  the beginning of November, I took four to six weeks off to go

19  back to the country.

20  Q    Do you recall who hired you?

21  A    Mr. Kim.

22  Q    Mr. Kim?

23  A    Mr. Tam.

24  Q    Thank you.

25           Who determined -- who decide your working schedule,

1    like, for example, five days a week?

2    A    Mr. Tam.

3    Q    Do you know whether the Jericho store take cash from the

4    customer or credit card?

5    A    Both.

6    Q    Can you specify, like, do you know what approximately

7    portion of the income is from cash?

8    A    When the business was good, the income from the credit

9    card payment was larger than the one from cash.  Sometimes it

10   was just half and half.

11   Q    How do you know the income of Jericho store?  Did you

12   review the cashier receipt or something like?

13   A    There was a key in the cashier device that if you press

14   it, you can see the daily income at the moment.  Because

15   sometimes when the customer made a refund or return -- made a

16   refund, I need to make sure the money was going back.

17              MR. ZHU:  I have no further questions.

18              THE COURT:  All right.  Cross-examination.

19              MR. MULQUEEN:  Yes, Your Honor.

20              THE WITNESS:  I made a mistake.

21              THE COURT:  Oh.  What was the mistake?

22              THE WITNESS:  I made a mistake.  Just now when I

23   mentioned when the Jericho store was sold.  It was July, not

24   March.  I was nervous just now.

25              THE COURT:  That's okay.  So just to be clear, the

1  day that it was sold is in July?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  Do you have any more questions

4  based on that?

5  Q    So is there any change for your employment period?  You

6  just testified from December 2010 to March 2018.  Is that

7  still correct?

8  A    Actually, July 2018.

9  Q    Do you recall which day in July 2018?

10  A    Saturday, July 14.

11         MR. ZHU:  I don't have any further questions.

12         THE COURT:  All right.  Cross-examination.

13  CROSS-EXAMINATION

14  BY MR. MULQUEEN:

15  Q    Good afternoon, Ms. Dai.

16         Do we have Exhibit A, Defendant Exhibit A, the

17  complaint?  Is it up there?  Thank you.

18         So, Ms. Dai, you just testified on direct

19  examination that you would look at the cash register receipt

20  when a customer wanted a refund to make sure that the money

21  was properly taken off the receipt; is that accurate?

22  A    Yes.

23  Q    So you wouldn't necessarily look at it at the end of the

24  day then to see what the total receipts for the day were?

25  A    But I have a habit to look at it in the evening to see

1  how much we earned.

2  Q    Okay.  But that wasn't your testimony on direct

3  examination when your attorney asked you.  You said you looked

4  at it when a customer needed a refund.  You didn't say

5  anything about looking at it at the end of the day.

6  A    Because the previous question was, if I knew the daily

7  income.  I say yes because I did look at it, at the end of

8  day.  In addition to that, I added that when the customer

9  asked for a return refund.

10 Q    You testified that there was no method used to record

11 your time.  Are you not aware of how many hours you worked in

12 a week?

13 A    Actually, I know, because I'm a regular.  I worked from

14 11:30 to 9:30, ten hours.

15 Q    And for your work, for five days a week, you were paid

16 $500 a week; is that correct?

17 A    Yes.

18 Q    And so if we do the math, you were paid $10 an hour?

19 A    Yes.

20 Q    So according to your testimony, from June of 2011 until

21 July of 2018, you were paid $10 an hour?

22          MR. ZHU:  Objection.  Legal conclusion.

23          THE COURT:  Overruled.

24 A    Which month?

25 Q    From June of 2011 until July of 2018, you testified

1   earlier that you were paid $500 a week.  So that would mean

2   you were paid $10 an hour, from June 2011 until July 2018.

3   A     Yes.

4   Q     And, in fact, you testified during the summer months you

5   were paid more than that, correct?

6   A     Yes.

7   Q     And how would you define the summer months?  Would that

8   be May, June, July, and August, or do you have a different

9   definition of summer months?

10  A     June, July, August.

11  Q     Did you also receive a bonus at the end of the year or

12  sometime near the end of the year?

13  A     Yes.

14  Q     And how much was that bonus usually, if you remember?

15  A     $200, around Christmastime.

16  Q     And did you receive that every year that you worked?

17  A     Yes.  From 2011 to 2017.

18  Q     Now, was there a tip jar at the Jericho store?

19  A     Yes.

20  Q     And do people put money in the tip jar?

21  A     Yes.

22  Q     And it is your testimony that you never took any of that

23  money?

24  A     Yes.

25  Q     There were times when you worked at the store by

1    yourself; is that correct?

2    A    Yes.

3    Q    Would you open the store?

4    A    He gave me a key.  When he had something else to do, he

5    will have me open the door.

6    Q    Would you close the store?

7    A    Yes, sometimes when he had something else to do, I would

8    close the door.

9    Q    Okay.  I believe you testified earlier that Mr. Tam would

10   only come to the store around 5:00 or 6:00 in the winter

11   months.  But now you are saying that he would come to the

12   store in the morning to open it, and he would come to the

13   store at night to close it?

14        MR. ZHU:  Objection.  Speculation.  My client didn't

15   testify to that.

16        THE COURT:  Well, overruled.

17        Is that what happened?

18   A    I said in the summer he will come, but in the winter

19   there was not much business, he would not come.  He did not

20   come -- usually he did not come.

21   Q    So he wouldn't come to open the store?

22   A    He opened the door, and then he left.  He needed to put

23   the money in the register.

24   Q    And then he would come back in the evening and close up?

25   A    Most of the time he will come to close up because he

1  needed to collect money.  Occasionally I closed the door

2  myself.

3  Q    And you would leave the tip money in the jar?

4  A    Yes.  I didn't touch it.

5           THE COURT:  How much money are we talking about in

6  the tip jar?

7           THE WITNESS:  In the summertime, we would have

8  better business.  I think it was from $10 to $20, but I didn't

9  count.  I just took an eye on it, because it was all one

10 dollar bills.  I didn't count.

11 Q    Did you get meal breaks?

12 A    We don't have a regular mealtime or break, so if there

13 were not customers during the mealtime, I will take a break.

14 Otherwise, I will not.

15 Q    Were there days when there were only one or two customers

16 that came into the store in a whole day?

17 A    Yes.  Maybe one to two days of the whole year, the two to

18 two days which are the most -- the coldest day of the year,

19 where it's terrible weather.

20 Q    What would you estimate to be the number of customers

21 that would come in on just pick a day in December?

22 A    You mean December?

23 Q    Any December.  Pick a day in December, what would be the

24 average number of customers that came in the store?

25 A    In December we would have 700 to 800 income per day.  It

1  depends on what products the customer bought.  Sometimes they

2  bought a cone that cost 3 to 4 dollars.

3  Q    The majority of the business at the Jericho store were

4  cones, correct?

5  A    Not necessarily.  We also sold cakes, but in the

6  wintertime we sold more cones than cakes.

7  Q    What about in the summertime, would you sell more cakes

8  than cones in the summertime?

9  A    Yes.

10  Q    So it sounds like the majority of the business at the

11  Jericho store was cones, if you would sell more cones in the

12  summer than more cones in the winter?

13  A    We sold many products, like sundae.  Sundae, many

14  products, not only cones.  And, also, order more products.

15  Q    Did you review the complaint that was filed in this case?

16  A    Yes.

17  Q    And was it correct?  When you reviewed it, did you

18  believe the statements were accurate?

19  A    More or less, yes.

20  Q    So when you said in paragraph 44 that from June of 2011

21  to July of 2018 you worked five days a week and were off on

22  Tuesday and Sunday, that's not consistent with your previous

23  testimony?

24          THE INTERPRETER:  I'm sorry, Counsel?

25  Q    Paragraph 44, page 8.

1   A    The first sentence, around April or May.

2   Q    I'm looking at paragraph 44 on page 8.  Second sentence.

3   A    Yes.

4   Q    It says you were off on Tuesdays and Sundays?

5   A    Tuesday and Sunday.

6   Q    But you weren't always off on Tuesday and Sunday.  You

7   testified earlier you had different days off; is that

8   accurate?

9   A    Just now I said Tuesday.

10  Q    All right.  The record will speak for itself, I guess.

11        In the next paragraph, you said on Mondays,

12  Wednesdays, and Thursdays, you worked from 11:00 until 9:30.

13  Is that a true statement?

14  A    Yes.

15  Q    Earlier you testified you started working at 11:30.

16  A    This is the business hours.  I live a little bit far away

17  so I arrived at 11:30.

18  Q    It says here you worked from 11:00 in the morning.  Did

19  you work from 11:00 in the morning or did you work from 11:30

20  in the morning?

21  A    There was a period of time I worked from 11:00 a.m., but

22  I do not recall very clearly.

23  Q    Doesn't the store open at 11:30?

24  A    Later on it was 11:30.

25  Q    When did the store start opening at 11:30?

1    A    After May 2011.

2    Q    Okay.  But you say from June 2011 to July 2018, you

3    worked from 11:00 a.m.  How could you work from 11:00 a.m. if

4    the store didn't open until 11:30?

5            MR. ZHU:  Objection.  Argumentative.

6            THE COURT:  Overruled.

7    A    Maybe I did not recall correctly at the time.

8    Q    But you recall it correctly now?

9    A    Yes.

10   Q    What time did the store close on the weekend?

11   A    10:00.

12   Q    Was there a time during your employment when Mr. Tam

13   would drive to Flushing to pick you up and bring you to work?

14   A    In the beginning, yes, because I did not have a driver's

15   license at the time.

16   Q    And he would drive you from the store home to Flushing at

17   the end of the day?

18   A    Only on the first week, and after that he deferred to the

19   neighbor restaurant, because they had a transportation

20   arrangement with their employees to send their employees home

21   in the evening.

22   Q    So he made an arrangement with the owner of that business

23   to pick you up as well and bring you to Long Island?

24   A    Yes.

25   Q    And then didn't there come a time when he made an

1   arrangement with a second business owner who did the same

2   thing for him, to pick you up and bring you to Long Island?

3   A    Yes.

4   Q    And how long did those arrangements last?  Whether he

5   drove you, whether the first business owner drove you, or

6   whether the second business owner drove you?

7   A    More than half a year.

8   Q    Was it a year and a half or was it a half year?

9   A    Half a year.

10  Q    When did you get your driver's license?

11  A    2011.  In the wintertime of 2011.

12  Q    So that was over a year after you started working for

13  Mr. Tam?

14  A    More or less, yes.

15  Q    And when did you purchase a vehicle?

16  A    I bought it before I obtained the driver's license.

17  Q    So for that year that you didn't have a driver's license,

18  who was driving you to and from work?

19           MR. ZHU:  Objection.  Irrelevant.

20           THE COURT:  Overruled.

21  A    But I had a permit, so my father sometimes drove me.  I

22  sat beside him.

23  Q    Well, how often would that happen?

24  A    You are referring to my father transporting me?

25  Q    Yes.

1   A     Four to five months.

2   Q     Did there come a point when you presented a letter to

3   Mr. Tam that said you worked for 50 hours a month and asked

4   him to sign it?

5   A     Because I needed to apply for certain documents for my

6   family, so I will need a document, attested by my employer,

7   because he was my employer at the time.

8   Q     But my question relates to the fact that the letter said

9   that you only worked for 50 hours per month.  Why was that?

10  A     50 hours per month?

11          MR. ZHU:  Objection.  Foundation.

12  Q     Five, zero, yes?

13          THE COURT:  Overruled.

14  A     Really, 50 hours per month?  50 hours per week.

15  Q     So you are saying that the letter said 50 hours per week

16  and not 50 hours per month?

17          MR. ZHU:  Objection.  Hearsay.

18          THE COURT:  Overruled.

19  A     It should be for per week.

20  Q     How often are you late for work?

21  A     Usually I was not late during the weekdays.

22  Q     So you would be late on the weekends?

23  A     Not all the time.  Sometimes I was ten minutes late.

24  Q     I didn't ask you how long you were there, I just asked if

25  you were late.  So how often were you late?

*DAI - REDIRECT - ZHU* 76

1   A    How often?  Maybe one day every ten days.

2         MR. MULQUEEN:  Your Honor, may I take a moment to

3   talk to my client?

4         THE COURT:  Sure.

5         (Short pause.)

6         MR. MULQUEEN:  Thank you, Your Honor.  No further

7   questions.

8         THE COURT:  Any redirect examination?

9         MR. ZHU:  Yes.

10  REDIRECT EXAMINATION

11  BY MR. ZHU:

12  Q    Ms. Dai, did you just testify occasionally you will come

13  late for work during the weekend; is that correct?

14  A    Yes.

15  Q    But, nevertheless, whether you are late or not, you are

16  paid $500 per week; is that also correct?

17  A    Yes.

18  Q    Is it correct that you are not paid by hours you work?

19  A    Correct.

20  Q    You just -- my adversary just asked you if that's $10 per

21  hour.  Is your answer to this question based on his

22  calculation only?

23  A    Yes.

24  Q    Have you ever received any notice in writing or orally

25  from the defendant Mr. Tam says you are allowed to keep tips

1  from the customers?

2  A    No.

3  Q    May I direct your attention to the complaint, Defendants

4  Exhibit A, paragraph 8 -- sorry, on page 8, paragraph 44, the

5  second -- the third sentence.  It says you worked from 11:00

6  a.m. to 9:30 p.m.  And you testified you actually work from

7  11:30 to 9:30.  When you say 11:00, did you mean you counted

8  the time for traffic -- transportation?  I'm sorry.

9  A    Yes.  Because the transportation took time.  When I

10  arrived at a neighbor store, I will need to walk from that

11  store to my store.  So it took time.

12         MR. ZHU:  I have no further questions.

13         THE COURT:  Any recross?

14         MR. MULQUEEN:  No, Your Honor.

15         THE COURT:  All right.  Thank you so much.  You can

16  step down.

17         (WHEREUPON, the witness was excused.)

18         THE COURT:  Are you going to call any additional

19  witnesses?

20         MR. ZHU:  No, that's all the witnesses.

21         THE COURT:  Are you resting?  Or do you want -- are

22  you putting any physical evidence in?  Any exhibits?

23         MR. ZHU:  Let's say -- I do have two exhibits.  One

24  is defendants' answer and another one is -- I don't -- it is a

25  chart provided by the defendants.

1          THE COURT:  Do you want that to be in evidence?

2          MR. ZHU:  Let me see the chart.

3          THE COURT:  We don't have to do anything formal with

4    it, I just wondered if there's anything else you want to put

5    in.

6          MR. ZHU:  I intend to put in as evidence, yes,

7    Your Honor.

8          THE COURT:  The chart?

9          MR. ZHU:  The chart and the answer.  For the chart,

10   I probably need my adversary's consent because it looks like

11   it is for a communication.

12         THE COURT:  You don't have any objection to that

13   going into evidence?

14         MR. MULQUEEN:  I actually do, Your Honor.  I don't

15   understand the relevance of the answer.

16         THE COURT:  I think he's talking about the chart.

17         MR. MULQUEEN:  Well, he'd ask for two items that

18   he'd put into evidence.  So I don't understand the relevance

19   of the answer, and I don't know when this chart was created

20   and if it is even consistent with the testimony that was

21   given --

22         THE COURT:  He says he got it from you.

23         MR. MULQUEEN:  I'm sorry, I didn't hear him say

24   that.

25         THE COURT:  I thought I did.

1              Where'd you get that chart?

2              MR. ZHU:  I received from the defendants.

3              MR. MULQUEEN:  Okay.

4              THE COURT:  Maybe it was before you got on the case.

5              MR. MULQUEEN:  Absolutely.

6              THE COURT:  Okay.  So you know what?  I will take

7    both items and consider them for what they are worth.

8              MR. ZHU:  Thank you, Your Honor.

9              THE COURT:  Sure.

10             Do you have any evidence that you wish to put on,

11   Counsel?

12             MR. MULQUEEN:  I do, Your Honor, but first I would

13   like to bring up my motion to dismiss.

14             THE COURT:  Is it for the same reason that you moved

15   before?  Did you move before?

16             MR. MULQUEEN:  Well, I moved for a summary judgment

17   motion, and Your Honor denied that motion.  But now that we

18   have the testimony, I think the issues are the same.  So

19   whether I am renewing my summary judgment motion or now making

20   a motion after the plaintiffs' case to dismiss.

21             THE COURT:  All right.  At this point I am going to

22   deny the motion.

23             MR. MULQUEEN:  Can I make a record?

24             THE COURT:  Sure.

25             MR. MULQUEEN:  Well, Your Honor --

1        THE COURT:  You can also remake the entire thing at

2   the end of the entire case.

3        MR. MULQUEEN:  Which I will do as well.

4        THE COURT:  Okay.  Go ahead.

5        MR. MULQUEEN:  I will be very brief, Your Honor.

6        THE COURT:  Sure.

7        MR. MULQUEEN:  First, Ms. Dai's testimony, she

8   couldn't tell us even how much money she made.  How can she

9   make out any of these claims if she can't tell us how much she

10  earned, whether it was more or less than the minimum wage.

11       THE COURT:  Let me just ask you, to what extent is

12  that attributable to the absence of records?

13       MR. MULQUEEN:  Your Honor, I mean, she testified

14  that she received money from the defendant.  She didn't even

15  count it.  She doesn't know how much money she has.  Who does

16  that?  That's not even believable.  She knows how much money

17  she made.  She had conversations with the defendant about what

18  her salary was.  And even in her complaint she makes certain

19  statements about her salary, which are well above the minimum

20  wage, that she made.  And here when she testified, she has no

21  recollection of how much she made.  So how can she even make

22  out any of these claims that she was underpaid.

23       MR. ZHU:  Just for clarification, I --

24       MR. MULQUEEN:  I would like to finish my argument

25  before you clarify.

1          THE COURT:  I don't think -- we don't need to get

2     all lawyerly here.  I mean, I don't think there's any need to

3     get all -- you know, to turn on our Law & Order.

4          But just let him finish, and then I will give you an

5     opportunity to speak.

6          Go ahead.

7          MR. MULQUEEN:  Additionally, Ms. Dai testified as to

8     what the income of the particular stores were.  I did the math

9     over the lunch break, and based on her testimony, the income

10    does not reach the $500,000 minimum required for her to make

11    out her Fair Labor Standards Act claims.

12         THE COURT:  You think the burden is on her to show

13    how much money --

14         MR. MULQUEEN:  Absolutely.

15         THE COURT:  -- your client made --

16         MR. MULQUEEN:  It's part of the evidence.  And if

17    she can't make out that burden, then those claims fail as

18    well.

19         THE COURT:  But where else should she look to find

20    out how much they made?

21         MR. MULQUEEN:  Your Honor, she testified that she --

22         THE COURT:  I know what she testified --

23         MR. MULQUEEN:  -- looked at the cash receipts, and

24    based on her knowledge of the cash receipts, this is how much

25    they made.  What she said does not add up to a half a million

1  dollars a year, even if you combine both stores' income.

2              THE COURT:  Okay.  I think I understand.

3              MR. MULQUEEN:  The same applies for Ms. Dai.

4  Ms. Dai talked about the Jericho store only, what she says

5  doesn't add up to an amount which would make both stores --

6  make the half million dollars a year.

7              THE COURT:  So just explain this to me, because it

8  seems -- perhaps this is because of the almost nonexistence of

9  discovery in this case, but in the ordinary FLSA case, you

10  know, an every day worker is not going to have access to that

11  information.  So I think ordinarily there would be some -- I

12  guess this would have happened during discovery, and I know --

13  well, I am just sort of curious as to how you would expect,

14  you know, a worker in an ice cream shop to have access to the

15  records to know how much they actually made.

16              MR. MULQUEEN:  Your Honor, it is part of the proof

17  of them to sustain their case, and they have failed to sustain

18  those allegations.

19              THE COURT:  But how do they usually get it?  That's

20  my question.

21              MR. MULQUEEN:  I assume some employees are

22  bookkeepers so they have access to records.  In this

23  particular case, these employees had access to the money that

24  came into the store.

25              THE COURT:  Okay.

1          MR. MULQUEEN:  They made certain statements about

2    how much money the store made a day on a given day, depending

3    on the season.  And when you tally those --

4          THE COURT:  I have tried several of these cases

5    before, and I have never had an employee, you know, at a car

6    service or as a security guard, have access to those records.

7    But this might be a question of what happened in discovery.

8          MR. MULQUEEN:  I argued in my summary judgment

9    motion that was a jurisdictional question.  You denied that.

10   It is certainly a question of proof.  I believe you said in

11   your response that they can prove it at trial, and they failed

12   to do that.

13         THE COURT:  How dare you cite me.

14         (Laughter.)

15         THE COURT:  Go ahead.

16         MR. MULQUEEN:  Just one other thing, Your Honor.  I

17   think with regard to Ms. Dai, Ms. Dai testified that she made

18   $500 a week or $100 a day.  That, you know, again, I am doing

19   the math, it adds up to $10 an hour, which far exceeds the

20   minimum wage, especially going back to 2012.

21         THE COURT:  What about the extent to which they are

22   arguing that they worked more than --

23         MR. MULQUEEN:  Our position, and, of course, it is

24   going to be a question of fact and who you believe, but they

25   were entitled to one and one half hours of breaks a day.

1   Whether or not they took them is their business.  They were in

2   exclusive control of the store.  And so the defendant paid

3   them for that, even though he was not required by law to do

4   that.  And so the fact that they worked an extra two hours,

5   which we might call overtime in a day, it was clearly made up

6   for, one, by the excess in the minimum wage that he paid them,

7   if you add that up through the day, as well as the payment for

8   the hours that he was not required to pay them.

9            THE COURT:  All right.  Counsel?

10           MR. ZHU:  Regarding to the first issue, my adversary

11   raised the $500,000 issue is never a jurisdictional issue.  My

12   client, through in-person testimony, testified that at least

13   one store will make around $1,000 per day, another store $800

14   per day.  And it is around $700,000 per year.  But if we are

15   counting the wintertime, which is three months period of time,

16   which equals to 120 days, it doesn't bring it under the

17   $500,000.  But, I mean, my adversary believe, otherwise I

18   demand he provide the calculation.

19           Regarding to the minimum wage, the law require if

20   the employee is working in excess of ten hours, they are

21   entitled to another hour payment, which is called spread of

22   hour.  When calculating minimum wage, this additional hour

23   should be considered.

24           So Ms. Dai, she was paid $500 per week, which she

25   work around 15 -- 51 or 52 hours per week, it brings down to

1    under $10 per week.  If we still consider the additional hour,

2    then she is entitled to five more hours in her paycheck, which

3    was not paid at all.

4              THE COURT:  Okay.

5              MR. MULQUEEN:  Again, Your Honor, 2012, when the

6    minimum wage was $7.25, and she was making $10 an hour, that

7    all adds up and sort of evens out in the end, I believe she

8    was paid even more than she was entitled to.  Even if we

9    consider the time and a half for over 8 hours and the spread

10   of hours, if she did work more than ten hours.  I believe her

11   testimony was not consistent with that.

12             THE COURT:  Okay.  Well, I am going to deny the

13   motion, viewing the evidence in the light most favorable to

14   the plaintiff.  But you can bring a motion again at the close

15   of all the evidence.  Are you putting on a case?

16             MR. MULQUEEN:  I was going call Mr. Tam, Your Honor.

17   Are we going to do that today or --

18             THE COURT:  Might as well.

19             MR. MULQUEEN:  I thought we were quitting at 4:00.

20             THE COURT:  Oh.

21             MR. ZHU:  Just my interpreter, she probably needs to

22   go.

23             THE COURT:  Are you just going to call him?

24             MR. MULQUEEN:  Yes, Your Honor.

25             THE COURT:  So let's -- I don't want to -- thanks

1    for reminding me of that.  Let's do that tomorrow then.  Is

2    everybody available tomorrow?

3              MR. ZHU:  Your Honor, actually, we can let our

4    interpreter go.  Our witness already testified and has been

5    cross-examined and rebutted.

6              THE COURT:  And your witness speaks English?

7              MR. MULQUEEN:  Yes, ma'am.

8              THE COURT:  Well, that's fine then, if we don't need

9    the interpreter services.

10             MR. MULQUEEN:  So just to be clear then, the

11   plaintiffs are not going to be understanding what the

12   testimony is?

13             THE COURT:  Well, you know, this is a civil case,

14   and I trust counsel to make their -- I mean, it is not your

15   side.  Do you want --

16             MR. ZHU:  Actually, it is just the defendant's

17   testimony, and we are crossing the defendants.

18             THE COURT:  Well, I think what counsel's point is,

19   helpfully, that, you know, since your clients worked for the

20   defendant, maybe if they understood exactly what he was

21   saying, they might be able to shed some light on some of the

22   factual matters.

23             You know what I think might be a good idea?  Let's

24   do this tomorrow.  I think, you know, just in an excess of

25   caution, and if you can bring your interpreter tomorrow, that

1   would be great.  Let me just check.

2              (Short pause.)

3              THE COURT:  Why don't we say 10:00 tomorrow, okay?

4              MR. ZHU:  Thank you, Your Honor.

5              THE COURT:  Thanks so much.

6              All right.  Everyone have a good night.  I will see

7   you tomorrow.

8              (WHEREUPON, at 3:58 p.m., the proceedings were

9   adjourned until 10:00 a.m., February 21, 2020.)

10

11

12                             *  *  *  *  *

13

                              **REPORTER'S CERTIFICATE**
14

15             I, ANNETTE M. MONTALVO, do hereby certify that the
    above and foregoing constitutes a true and accurate transcript
    of my stenographic notes and is a full, true and complete
16   transcript of the proceedings to the best of my ability.

17             Dated this 3rd day of April, 2020.

18   /s/Annette M. Montalvo
    Annette M. Montalvo, CSR, RDR, CRR
19   Official Court Reporter

20

21

22

23

24

25

1                               INDEX

2

3      WITNESS                                        PAGE

4

5      CAROLE LUK                                     6

6      DIRECT EXAMINATION BY MR. ZHU                  6

7      CROSS-EXAMINATION BY MR. MULQUEEN              27

8      REDIRECT EXAMINATION BY MR. ZHU                51

9

10     YING YING DAI                                  59

11     DIRECT EXAMINATION BY MR. ZHU                  59

12     CROSS-EXAMINATION BY MR. MULQUEEN              66

13     REDIRECT EXAMINATION BY MR. ZHU                76

14

15

16

17

18

19

20

21

22

23

24

25