89

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF NEW YORK
2

3     YING YING DAI and CAROLE LUK,    ) Civil Action
                                       ) No. 18-5170 (AMD)
4                  Plaintiffs,         )
                                       ) FURTHER BENCH TRIAL
5     vs.                              )
                                       ) Brooklyn, New York
6     ABNS NY INC., d/b/a Carvel,      ) Date:  February 21, 2020
      SHK LI INC., d/b/a Carvel,       ) Time:  10:00 a.m.
7     and Ka Shek Tam,                 )
                                       )
8                  Defendants.         )
      _____
9
                  TRANSCRIPT OF FURTHER BENCH TRIAL
10                        HELD BEFORE
            THE HONORABLE JUDGE ANN M. DONNELLY
11              UNITED STATES DISTRICT JUDGE
      _____
12
                    A P P E A R A N C E S
13
      For the Plaintiffs:      Shan Zhu, Esq.
14                             Jiajing Fan, Esq.
                               Hang & Associates, PLLC
15                             136-20 38th Avenue, Suite 10G
                               Flushing, New York  11354
16                             718-353-8588

17    For the Defendants:      Clifford Mulqueen, Esq.
                               Hines & Associates
18                             450 Seventh Avenue, Suite 305
                               New York, New York  10123
19                             212-268-8668

20

21    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.
22    _____

23    Court Reporter:          Annette M. Montalvo, CSR, RDR, CRR
                               Official Court Reporter
24                             United States Courthouse, Room N375
                               225 Cadman Plaza East
25                             Brooklyn, New York  11201
                               718-804-2711

1          (WHEREUPON, commencing at 10:17 a.m., the following

2     further proceedings were had in open court, to wit:)

3          THE COURTROOM DEPUTY:  *Luk, et al., v. ABNS NY Inc.,*

4     *et al.*

5          THE COURT:  All right.  Everybody okay this morning?

6     I take it there's no progress on any kind of accommodation.

7     So you want to go ahead, Counsel?

8          MR. MULQUEEN:  Yes, ma'am.  But before I do, I would

9     like to move Defendants Exhibit A into evidence.  It is the

10    complaint.

11         THE COURT:  Sure.  You have any objection?

12         Here's my bottom line.  Since this is not a jury

13    trial, I take all of this stuff for what it is worth.  I have

14    seen the complaint, I know what it says.  I mean, I am going

15    to let it in.  But if you want to make a record about it, you

16    can.

17         MR. ZHU:  For the record, this complaint is not

18    verified; therefore, it is our core assertion it is to

19    prove -- it is not a verified complaint, therefore, it should

20    be excluded as hearsay, because it is our core assertion it is

21    used to prove the truth for subject matter asserted.

22         THE COURT:  I think it is being introduced because

23    there's an allegation that it is different than what is being

24    asserted here.

25         Is that right?

*PROCEEDINGS*                                           91

1          MR. MULQUEEN:  Well, and, also, you know, that the

2    salaries that the plaintiffs say they made actually are above

3    the minimum wage, so.

4          MR. ZHU:  We consent, if the defendants introduce it

5    for impeachment purpose, but if he's trying to allege -- he's

6    trying to say whatever being asserted in the complaint is

7    true, then I have to object to that.

8          THE COURT:  All right.

9          MR. MULQUEEN:  I point out also that the plaintiffs

10   on the stand said that they reviewed the complaint and that

11   the statements were true.

12         THE COURT:  Remind me, because I just don't

13   remember, was their testimony about their salary consistent

14   with the complaint?

15         MR. MULQUEEN:  Ms. Dai's testimony was consistent.

16   Ms. Luk's testimony was that she didn't know how much she

17   made.  So I can't say that it was consistent or inconsistent.

18         THE COURT:  All right.  I will take it for what it

19   is worth.  All right.

20         (Defense Exhibit A received in evidence.)

21         MR. MULQUEEN:  So then moving forward with, for

22   instance, tax returns and other things, should I just assume

23   Your Honor will consider them and not move them into evidence,

24   or should I go through the process of moving them in?

25         THE COURT:  You don't have any objection to the tax

*PROCEEDINGS*                                                    92

1  returns, do you?

2          MR. ZHU:  Under 901, it is not authenticated.

3          THE COURT:  You think they are not really his tax

4  returns?

5          MR. ZHU:  That is not my belief.  The tax return on

6  its face does not have a signature.  It says "copy."  It has a

7  stamp on it, it says "copy;" therefore, I assume the original

8  does not bear his signature.  So based on 901, it is not

9  properly authenticated.

10          THE COURT:  It is not signed, the tax return?

11          MR. MULQUEEN:  The original that was signed was sent

12  to the IRS.

13          THE COURT:  Right.

14          MR. MULQUEEN:  The defendant wouldn't have that

15  information, so --

16          THE COURT:  I actually do know that.  But I wondered

17  if he kept a copy of the signed one.

18          MR. MULQUEEN:  I mean, all the information he gave

19  to his accountants.

20          THE COURT:  All right.  I will accept it into

21  evidence.

22          MR. MULQUEEN:  Thank you.

23          (Defense Exhibit, tax returns, received in

24  evidence.)

25          MR. ZHU:  Your Honor, an additional request.  Since

1   we have an interpreter here, although I understand defendant

2   does not need an interpreter, but I ask my adversary if they

3   examine the witness, can he slow down so that my translator

4   can interpret it.

5              THE COURT:  Well, let's give him a chance first.

6              MR. ZHU:  Thank you.

7              THE COURT:  All right.  Ms. Green reminds me that we

8   need to swear our new interpreter in.

9              THE COURTROOM DEPUTY:  Raise your right hand for me,

10  please.

11             (WHEREUPON, Arthur Kwok, Cantonese and Mandarin

12  Interpreter, was duly sworn.)

13             THE COURTROOM DEPUTY:  Please state your name for

14  the record.

15             THE INTERPRETER:  Arthur Kwok, K-w-o-k.

16             THE COURT:  Hi.  Good morning.

17             THE INTERPRETER:  Good morning, Judge.

18             THE COURT:  All right.  Are you ready to proceed?

19             MR. MULQUEEN:  Yes, Your Honor.  The defense calls

20  Mr. Tam.

21             THE COURT:  Okay.

22             THE COURTROOM DEPUTY:  Raise your right hand for me,

23  please.

24             (WHEREUPON, the witness was duly sworn.)

25             THE COURTROOM DEPUTY:  State your name for the

1   record.

2              THE WITNESS:  Ka Shek Tam, T-a-m.

3              THE COURT:  Mr. Tam, that chair doesn't move.  So it

4   is not a trick.  It is just the way it is.

5              So I am going to ask you to do a couple things.  I

6   want to make sure the microphone is in a good place for you to

7   use.  That does move, so if you want to move it a little

8   closer, completely fine.

9              I am going to ask you not to speak too quickly.  Our

10  court reporter takes down everything that you say, and it

11  makes it harder if we speak too quickly.  Plus we have an

12  interpreter who's working hard.  So let's try to just take our

13  time.

14             And for the same reason, I am going to ask you not

15  to talk over whichever lawyer is asking you questions.

16  Because if we talk over one another, it also makes their jobs

17  harder.

18             If there's something that isn't clear to you or you

19  want to have repeated, just let me know that, too, okay?  If

20  there's a question that's not clear, just tell me and I'll

21  have -- I will get it straightened out.  All right?

22             THE WITNESS:  Yes, Judge.

23             THE COURT:  All right.  Go ahead.

24                       KA SHEK TAM,

25  called as a witness herein by the Defendants, having been

1  first duly sworn, was examined and testified as follows:

2  DIRECT EXAMINATION

3  BY MR. MULQUEEN:

4  Q    Good morning, Mr. Tam.

5  A    Good morning.

6  Q    Did there come a time when you purchased a Carvel

7  store -- two Carvel stores on Long Island?

8  A    Can you say that again?

9  Q    Did there come a time when you purchased two Carvel

10 stores on Long Island?

11 A    A time?  Yes.  I bought Commack store in December 2008.

12              THE COURT:  2008?

13              THE WITNESS:  2008.

14              THE COURT:  Okay.

15 Q    And did you own any other Carvel stores?

16 A    I own Jericho store, I own it almost 20 years.

17 Q    You owned the Jericho store for 20 years?

18 A    Yes.

19 Q    And had you ever owned a Carvel store before that?

20 A    Never.

21 Q    Had you ever owned your own business before you purchased

22 the Jericho store?

23 A    Never.

24 Q    Have you ever had employees before you purchased the

25 Jericho store?

1  A     No.

2  Q     Did there come a time when you sold each of those stores?

3  A     What time I sold the store?

4  Q     Is there a date -- I'm sorry.  Let me say, was there a

5  date that you sold either or both of those stores?

6  A     I sold the Commack store on March 2018, and I sold the

7  Jericho store on July 2018.

8  Q     And how much money did you receive for selling the

9  Commack store in March?

10  A     Commack store, the selling price is 190,000.  The Jericho

11  store is 50,000.

12  Q     Did there come a time when you hired or a date when you

13  hired the plaintiff Carole Luk?

14  A     I remember I hired her on 2004.  Yes.  2004.

15  Q     And had you known Ms. Luk before you hired her to work at

16  the Jericho store?

17  A     I met her before in the Chinese restaurant.  She's in-law

18  of my wife friend, called Anita.  She's the in-law of Anita.

19  So we met before I hire her.

20  Q     Could you tell us, particularly between 2012 and 2018,

21  what the hours of the Jericho store were?

22  A     It is weekday, Monday through Friday, is 11:00 to 9:30.

23  And Saturday, the weekend, is -- you say -- sorry.  You are

24  talking about the Jericho store?

25  Q     Yes.

1  A     Jericho store?  Yes.  Sorry.  It is Saturday is 11:00 to

2  10:00, that's -- yes.  And Sunday is 11:00 to 9:30.

3  Q     And the weekday hours for that store?

4  A     Weekday hours for the Jericho store?

5  Q     Yes, sir.

6  A     It is 11:00 to 9:30, from Monday to Friday.  Saturday is

7  11:00 to 10:00, and Sunday is 11:00 to 9:30.

8  Q     How about the Commack store, what were the hours of the

9  Commack store?

10  A     Commack store is weekday, Monday to Friday, is 11:30 to

11  9:15.  On Saturday is 11:00 to 9:30.  And Sunday is 11:00 to

12  9:15.

13  Q     Now, how often would you go to either of these store

14  locations?

15  A     Basically, I go every day.

16  Q     And how much time would you spend at each of the stores?

17  A     Let's say, in the summertime, I'm basically back and

18  forth, back and forth, from both store.

19         THE COURT:  Can I just ask you, how far apart are

20  the two stores?

21         THE WITNESS:  Okay.  It is like I -- it is between

22  Jericho store and Commack store is about five-minute drive.

23         THE COURT:  Five-minute drive?

24         THE WITNESS:  Also, my house is five-minute drive.

25  It is like a triangle.  I am on top of the point, and then I

1   go either Jericho and Commack, both about five minutes.

2              THE COURT:  Okay.

3              THE WITNESS:  So from Jericho store to the Commack

4   store also about five, six-minute drive.

5              THE COURT:  Pretty convenient?

6              THE WITNESS:  Yes, yes.  Thank you.  Yes.

7              THE COURT:  Go ahead.

8   Q    So you were telling us how often you went to each of the

9   stores, and you were talking about the summertime.  So could

10  you continue, please.

11  A    Basically, I concentrate on the Commack store.  So when I

12  wake up, I go to the store, even if the store is not open,

13  maybe.  I go there, 11:00, 10:00, something, to prepare, to do

14  a lot of work.  So until -- usually I keep -- until Carole

15  came to work and I leave, I work some hour.  And I watch the

16  Elwood store, Jericho store, sorry, to make sure it is open,

17  and I feel comfortable.  And I keep on doing -- keep doing a

18  lot of work, yeah.

19  Q    So just to be sure, when you make reference to the Elwood

20  store, you are talking about the Jericho store as well?

21  A    Jericho store is -- I sometimes always mention about

22  Elwood store.  Sorry.

23  Q    And why do you call it the Elwood store?

24  A    Because it is Elwood shopping center.  But here you

25  mention about the Jericho store, so.

1   Q     That's fine.  I just want to make it clear that when you

2   say either Elwood or Jericho, you are referring to the Jericho

3   store; is that correct?

4   A     Yes.

5   Q     So use either one you are comfortable with, as long as

6   everyone knows what store --

7   A     So I try to remember it is Jericho store.

8   Q     That's fine.  If you say Elwood, I just want to make sure

9   everyone knows we are talking about Jericho.

10          THE COURT:  I've got it.

11  Q     And, obviously, Commack is the Commack store?

12  A     Yes.

13  Q     Now, you say you focus on the Commack store.  Why do you

14  focus on the Commack store?

15  A     Number one is it is late -- I purchase that store late --

16  it is later.  And the gathering is higher, that mean more

17  business.  Also, that's cake store.  So I mention about what's

18  cake store --

19  Q     Well, you mentioned that to me.  You didn't mention it to

20  the Court.

21  A     Okay.  Sorry.  It is usually it is in Carvel, you

22  separate in two kind of store.  One is called cake store or

23  one is called fountain store.

24          THE COURT:  So in the cake store, is that where you

25  make all the cakes?

1              THE WITNESS:  The cake store means the revenue

2     usually is higher than the fountain.

3              THE COURT:  I see.

4              THE WITNESS:  The fountain store usually is the

5     revenue is higher than the cake.  So if you get some

6     statistic, or that you sell more cake on that store or more

7     fountain on the store.  Fountain mean besides the cake, let's

8     say the cone, sundae, yes.  That kind of revenue it generate,

9     called the fountain.

10             THE COURT:  So you said the fountain has more

11    revenue than the cakes?

12             THE WITNESS:  Than the cake.  Yes.

13             THE COURT:  All right.  And which is the cake store?

14    Is the --

15             THE WITNESS:  The cake store is the revenue --

16             THE COURT:  No, no.  Is the cake store -- I couldn't

17    remember.  Is the cake store Jericho or Commack?

18             THE WITNESS:  Oh.  The cake store is Commack.

19             THE COURT:  All right.  Sorry.

20             Go ahead.

21    Q    So you're saying that of your two businesses, the Jericho

22    store made more money?

23    A    Jericho make more money?  Actually, the Commack made more

24    money.

25    Q    Okay.  But you just said that -- you said that the

1    Commack store generates more revenue, and then you also said

2    that the Jericho store generates more revenue, in answer to

3    the Court's questions.  So which store makes more revenue?

4    A    Commack store.

5    Q    Okay.

6    A    So I -- can I --

7              THE COURT:  Go ahead.

8    A    Can I say, it is compare with the store itself.  Let's

9    say, for example, Commack store for the cake store, you

10   figure, for example, 20,000 that month, maybe you sell the

11   cake about 12,000, 13,000, and the fountain is 7,000.  But you

12   add up, it is -- compare it sell.  The store sell, not compare

13   two store which is more revenue, cake store is higher or

14   fountain store is higher.

15   Q    Okay.  So the Commack store makes more money than the

16   Jericho store?

17   A    Correct.

18   Q    But the Jericho store makes more money from the fountain

19   or the soft ice cream aspect of the store than the Commack

20   store?

21   A    So I didn't make the comparison of the how much revenue

22   for the fountain on the Jericho store or how much money for

23   the Commack store.  I only compared with the store itself,

24   only independent, that that store, let's say, my revenue in

25   Jericho store, for example, is 170.  So my statistic is

1  probably 100,000, and the revenue for the fountain is 70,000.

2  So, yearly, yes, so it is like that.

3  Q    So I am going to show you what's been marked as

4  Defendants B, 1 through 6.  First of all -- sorry, before I do

5  that.

6            Did you own these stores in your own name or did you

7  own them in some other name?

8  A    I owned Jericho store under the corporation name Shk Li

9  Inc., and the Commack store I owned under the name is --

10  corporation name is ABNS NY Inc.

11            MR. ZHU:  Objection.  This piece of paper is not in

12  Defendants Exhibit B.

13            THE COURT:  It is not what?

14            MR. ZHU:  It is not in Defendants Exhibit B.

15            MR. MULQUEEN:  It is B1 through B6.  Well, this is

16  B1.

17            MR. ZHU:  Can I have a copy -- my B1 is the year of

18  2017.

19            MR. MULQUEEN:  You are correct.  Let's go backwards

20  then.  I was trying to go chronologically.

21            THE COURT:  Well, you can use the same one, it is

22  just a different number, right?

23            MR. MULQUEEN:  This would be B6.

24  Q    So, Mr. Tam, can you tell us what this is?

25  A    This is the tax return form.

1    Q     For which store?

2    A     It is ABNS NY Inc. is Commack store.

3    Q     And for what year was it?

4    A     On the paper, it is 2012.

5    Q     And what was your income for that year for that store?

6    A     The revenue is 158,8-something, yes.  158,893.

7    Q     Thank you.

8          And taking a look at B5, can you tell us what that

9    is?

10   A     This second year is 2013, also the Commack store.  And

11   ABNS NY Inc. from, yes.

12   Q     And what was your yearly income for that store?

13   A     It is 159,632.

14   Q     Thank you.

15         And if you take a look at this, which would be B3.

16   Can you tell us what this is?

17   A     The tax return on 2014 for the Commack store.

18   Q     And how much did you earn on that year?

19   A     The revenue is 161,786.

20   Q     Taking a look at what's going to be B4.

21   A     It is 2015 on the Commack store tax return.

22   Q     And what was your revenue in that year?

23   A     It is 170,727.

24   Q     Thank you.

25         Taking a look at B5, can you tell us what that is?

1  A    It is 2016 year of ABNS NY Inc., the Commack store.

2  Q    And what was your income for that year?

3  A    165,133.

4  Q    Thank you.

5       And looking at B6, can you tell us what that is?

6  A    It is 2017, of the Commack store.

7  Q    And is that the year -- was that -- does that tax return

8  go until you sold the Commack store?

9  A    Yes, Commack.  Because you can see the date, the period

10  is from November 1 to the March 31, 2018.  Because I sold the

11  store on March 2018.  So they cut off on the day of March.

12  They said, from the CPA, that is not the whole year.

13  Q    And what was your income for the store for that year?

14  A    It is 62,786.

15           THE COURT:  This is more March 2017?

16           MR. MULQUEEN:  This is his 2017 tax return, but it

17  includes through March 2018, when he sold the store.

18           THE COURT:  Why is that?  Because it was a different

19  period?

20           MR. MULQUEEN:  Well, he's following the federal tax

21  year, which would go --

22           THE COURT:  Okay.

23           MR. MULQUEEN:  -- October.

24           THE COURT:  All right.  So it is a different fiscal

25  year.

1       MR. MULQUEEN:  Federal fiscal year, yes, ma'am.

2   Q    Thank you, sir.

3       I want you to take a look at what's been marked as

4   C1.  Can you tell us what this is?

5   A    That's the Jericho store tax return --

6       THE COURT:  I'm sorry, the plaintiff has an

7   objection.  Counsel, is your microphone on?

8       MR. ZHU:  Yes.

9       THE COURT:  Move it a little closer to you.  I want

10  to make sure I don't miss what you are saying.

11      MR. ZHU:  Yes.  This is not Defendants Exhibit C1,

12  but instead it is last page.

13      MR. MULQUEEN:  I'm sorry, I did it again,

14  Your Honor.  C6.

15      THE COURT:  Just so the record is clear.  Thanks.

16  Q    So Defendants Exhibit C6.  Can you tell us what this is,

17  Mr. Tam?

18  A    It is the year 2012, the Jericho store tax return.

19  Q    And what was your income for that year?

20  A    143,653.

21  Q    And looking at what's been marked as Defendants Exhibit

22  C5, can you tell us what this is?

23  A    2013 year of the Jericho store tax return.

24  Q    And what was your income for that year?

25  A    Total revenue is 147,861.

1   Q    Looking at what's been marked as C4, can you tell us what
2   this is?
3   A    Yes.  2014 year, the Jericho store tax return.
4   Q    And what was your income for that year?
5   A    155,473.
6   Q    And what's been marked as C3, Defendants Exhibit C3, can
7   you tell us what this is.
8   A    Yes.  Year 2015, the Jericho store tax return.
9   Q    And what was your income at that store for that year?
10  A    157,029.
11  Q    Looking at what's been marked as Defendants Exhibit C2,
12  can you tell us what this is?
13  A    2016, of the Jericho store.
14  Q    The tax return for that year?
15  A    Yes.  Tax return.  Sorry.
16  Q    And what was your income for that year?
17  A    153,606.
18  Q    And, lastly, looking at what's been marked as Defendants
19  Exhibit C1, can you tell us what this is?
20  A    It is 2017, it is the tax return.  But it is from -- the
21  day is from October to July 31, '18, because I sold it on
22  July -- the middle of July on 2018.
23  Q    And how much was your income at that store during that
24  six-month period of time -- eight-month period of time?
25  A    116,369.

1  Q    Thank you.

2  A    You're welcome.

3  Q    Can you tell us how the ice cream at Carvel stores are

4  made?  Or is made?

5          THE COURT:  How the ice cream is made?

6          MR. MULQUEEN:  Yes, ma'am.

7          THE COURT:  Do I need to know that?

8          MR. MULQUEEN:  It is relevant, I assure you.

9  A    Usually we order the mix from the supplier that's

10 appointed by the Carvel corporation.  Usually the mix go

11 inside the ice cream machine, and it come out to make all the

12 products.

13 Q    Okay.  So that mix is used to make cakes and sundaes and

14 flying saucers and cones?

15 A    Correct.

16 Q    Is it used to make every product you sell in your store?

17 A    Correct.

18 Q    Is there a ratio of -- well, how does that mix come?  In

19 what size container?

20 A    It is ten gallon -- that mean two bag of mix, and box it

21 in the paper box, it is really heavy, and it is shipped by the

22 supplier.

23 Q    And is there an estimated revenue that is generated from

24 each gallon of mix?

25 A    Yes.  We call in Carvel, that's called return per gallon.

1   That means usually how much mix, usually you can generate how

2   much the revenue.

3   Q    And so what is the average of how much revenue you can

4   generate per gallon of mix?

5   A    The return per gallon from the Carvel statistic is around

6   60 to 70.

7   Q    Dollars?

8   A    The ratio.  It's a ratio.  Let's say ten gallon, if you

9   times the return per gallon, let's say it is 60, you supposed

10  to make 600.  Yes.  Something like that.

11  Q    So it is expected that per gallon of mix you will make 60

12  to 70 dollars?

13  A    Yes, correct.

14  Q    And do you know how many gallons of mix you used at each

15  store in a given year?  Or how many gallons of mix you

16  purchased from Carvel?

17  A    Yes.  Usually you can check it on the Carvel corporation,

18  also.  So they send you the statement.  So I remember the

19  Jericho store, the last year is 22 something.  2,200

20  something.

21  Q    Okay.  So then in 2018 in the Jericho store, you --

22  A    For the 20 -- the whole year of the year end for the 2017

23  is 2,200 something gallons, yes.

24  Q    So in 2017, you used over 2,000 gallons of mix?

25  A    Correct.

1  Q    And so if we multiply that by either 60 or 70 dollars, we

2  can come to another -- come to what your revenue was for that

3  year; is that accurate?

4  A    That's quite accurate, because the Carvel corporation,

5  for 90 years establishment.  Every year they hold the

6  conference.  So in the conference, they mention about our --

7  so they mention about the return per gallon, how we

8  successfully, how if you cannot reach the return per gallon or

9  you can reach the revenue, so probably your store have some

10 problem.  Yes.

11           THE COURT:  Where is the Carvel corporation located?

12           THE WITNESS:  Atlanta.

13           THE COURT:  Atlanta, Georgia?

14           THE WITNESS:  Yes.

15           THE COURT:  Is that where they send you the ice

16 cream from?

17           THE WITNESS:  No, no.  The supplier is from

18 New Jersey.

19           THE COURT:  From New Jersey.

20           THE WITNESS:  PFI Performance, Inc.

21           THE COURT:  Okay.  Go ahead.

22 Q    So in the Commack store, what's the most amount of

23 gallons you purchased from Carvel -- gallons of mix that you

24 purchased from Carvel in a given year?

25 A    I remember it is 3,000 something, yes.  The 3,300 or 400.

1   Q    So 3,400 gallons was the most mix you have ever purchased

2   in one year?

3   A    Yes.  Correct.

4   Q    And, again, if we multiply that number by average of 60

5   or 70 dollars per gallon, we'll come out with what your

6   expected revenue would be?

7   A    Yes.

8   Q    What about -- that was the Commack store.  What about the

9   Jericho store, what is the most amount of gallons of mix you

10  ever purchased for the Jericho store?

11  A    The highest mix I purchased?  I have no idea.  But it

12  keep on dropping on the Jericho store.  So if you are talking

13  about ten years ago, it is over 3,000.  3,000, yeah.  3,000

14  gallons, yeah.

15  Q    So as we got closer to 2017, how many gallons did it drop

16  to?

17  A    Dropped the last year, in 2017, as I said, it is 2,200

18  gallon.

19  Q    Okay.  Now, does the ice cream have a shelf life?

20  A    Ice cream?

21       THE COURT:  You've got to keep it in the

22  refrigerator, right?

23       THE WITNESS:  Correct.

24  A    So they told me it is not more than two month.

25       THE COURT:  Two months.

1              THE WITNESS:  Yes.

2   Q    And so is there any waste at the store?

3   A    Yes, a lot.

4   Q    So how much would you estimate is wasted in a given month

5   or that you have to throw away because it expired?

6   A    Usually it is like some single flying saucer or packaged

7   flying saucer we keep in the freezer too long, or the hard ice

8   cream from the freezer, if you keep it too long, it will taste

9   sandy.  And the flying saucer is -- some ice on the flying

10  saucer, it don't -- it doesn't taste like good, so we throw

11  away.

12  Q    Okay.  So my question is, you said you had a lot of

13  waste.  So I want to try to put a dollar figure on the amount

14  of waste you have in a given month.  Can you do that?

15  A    I can't do that.  I have no idea how much I throw away.

16  Because in summertime, always not that much to throw away.  I

17  would say not much to throw away.  So because the customer

18  always, the turnover is higher, the high volume, usually you

19  can sell it.  But the wintertime, it is really, really quiet.

20  That's a problem for keeping the ice cream product in the

21  freezer.  I correct you, it is not that -- I would say not

22  that much to throw away.

23  Q    In the winter or the summer?

24  A    Especially in the summer.

25  Q    Okay.

1   A    But I also mentioned, I been in the Commack store, the

2   freezer had broken many, many times.  I would say every year

3   have at least one time.

4            THE COURT:  The freezer broke?

5            THE WITNESS:  Yes.  The freezer broke, the cake

6   freezer.  So all melt down.  So we throw all away, throw out

7   all of way of the cake.  It is a disaster.  Let's say the

8   typhoon Sandy long time ago, I throw a lot of -- because the

9   stop of the electricity.

10           THE COURT:  Right.  Did that affect your store?

11           THE WITNESS:  Yes, yes.  So I throw all the cake

12  away.

13           THE COURT:  Oh.

14           THE WITNESS:  That's a disaster.

15  Q    On Long Island, are the power lines above ground or below

16  ground?

17  A    I have no idea.  For my best of my knowledge, the Commack

18  store, they both above ground, yes.

19  Q    How often do the stores lose power?

20  A    So sometimes in the summertime, everybody used to use the

21  electricity, it can shut off the power, let's say half hour,

22  ten minutes, something like that.  But for the whole half day,

23  cut off the electricity, from my memory, it is -- basically,

24  it is not that much.  Yeah.  Basically, one time, for the past

25  few years, yeah.

1  Q    Okay.  And what about loss due to theft?  Do you have

2  loss due to theft?

3  A    My -- both store have the record of the theft, yes.

4            THE COURT:  What do they steal?

5            THE WITNESS:  In Commack store?

6            THE COURT:  Yes.

7            THE WITNESS:  There's one incident, that is the --

8  they just took all the money from the cash register.

9            THE COURT:  Did they break it or was it a robbery?

10           THE WITNESS:  Yes, just walk in with a knife and

11  then point out to you, and then open the cash register and

12  took all the money.

13           THE COURT:  How many times did that happen?

14           THE WITNESS:  It happened one time.

15           THE COURT:  One time.

16           THE WITNESS:  Yes.  In Jericho, it is burglary, some

17  people --

18           THE COURT:  Broke in after hours?

19           THE WITNESS:  In the midnight, yes.  So they cut off

20  the hole in the roof, and then go inside and then took the

21  money.  And, yeah.  From the cash register.

22           THE COURT:  How many times did that happen?

23           THE WITNESS:  I would say two times during the

24  Jericho, yes.

25           THE COURT:  And they took money?  Did they take -- I

1   mean, did they take -- I guess they didn't take any cakes?

2           THE WITNESS:  I -- no.  Maybe she took one bite

3   before she left.  Yeah.

4           THE COURT:  Do you know how much money you lost as a

5   result of those three -- the robbery and the two burglaries?

6           THE WITNESS:  So the Jericho store, because of

7   burglary, they took all the change in the cash register.

8   Sometimes I keep the change in the cash register.  So I report

9   to the police, it is a hundred something, 150.  Exactly how

10  much, I don't remember.

11          For the Commack store, because during the office

12  hour, I lost 400, I think.  Something like that.

13          THE COURT:  All right.  Go ahead.

14          MR. ZHU:  Your Honor, I have to object to this

15  series of questions because the incident of burglary and

16  stealing does not affect the gross sale or gross receipts of

17  either store.

18          THE COURT:  It doesn't sound like it was a huge

19  amount of money, so.

20          MR. ZHU:  Yes.  Just for the record.

21          THE COURT:  I will take it for what it is worth.

22  And you're really objecting to my questions, so.  Sustained.

23          Go ahead.

24  Q   What about, do you have a policy about your employees

25  eating the ice cream while they are working?

1   A    I usually -- I'm very generous.  So every employee, I

2   say, you can have the free ice cream on the store.  You can --

3   during the working hour, you can have the free ice cream.

4   Even the -- usually, the part-time, the student in the

5   summertime, say, go ahead and eat ice cream in the store.  Of

6   course that -- one time in during the working period, don't

7   take few many times.  Because once keep on eating ice cream,

8   when I been hiding, once every hour they take the ice cream

9   and took the ice cream.  So afterward I said, you can't have

10  the ice cream.  Only one time per your working period.

11  Q    Okay.  Are you aware of whether Ms. Dai or Ms. Luk took

12  ice cream while working at the store?

13  A    Yes.  They do.

14  Q    And are you aware of whether they took ice cream home to

15  their family or gave ice cream to their friends?

16           MR. ZHU:  Objection.  Relevance.

17           THE COURT:  Well, I mean, how much ice cream are we

18  talking about here?

19           MR. MULQUEEN:  It just goes to revenue of the

20  stores.

21  Q    I mean, they are not paying for the ice cream they take,

22  correct?

23  A    No.

24           THE COURT:  Have to eat a lot of ice cream.

25  A    So I -- that's some -- I would say Carole Luk did because

1   she told me she bring some ice cream to her son.  So, also,

2   she brings every -- in the high -- her son Terence is in the

3   high school.  I know that she -- every birthday, she make the

4   cupcake for her son, yes, to bring to the school.

5           Also, I remember she make the ice cream cake for her

6   husband.  So it is a very beautiful cake for her husband.

7   Because, yeah.  It is my memory.

8   Q    Can you tell me about your relationship with Ms. Dai and

9   Ms. Luk?  Or let's start with Ms. Luk.  How would you describe

10  your relationship with her?

11  A    I hire her on -- because we -- before we met, because

12  she's a friend of my -- the in-law of my wife friend.  So,

13  basically, we have excellent relationship from the beginning.

14  Q    Did the relationship exist outside of work as well?

15  A    Yeah.  Basically, yeah.  Because we don't have too much

16  contact beside the work, so -- but the whole -- the first few

17  years we have relationship.  Because I remember, let's say,

18  she have two car, she got accident on her car.  And then in

19  Long Island you must have the car for the transportation.

20          I follow my -- she asked me if I can borrow her --

21  my car, because, actually, she -- I have the car.  At that

22  time, my son is not supposed -- available.  So I borrow her my

23  Honda Accord to her for a few days.  Because, you know, in

24  America, you are not supposed to borrow the car for somebody.

25  It's your responsibility.  It maybe -- some accident happen,

1    the car owner may take that responsibility.  So I was told,

2    try not to borrow any car to somebody.  But I still take a

3    risk to borrow my Honda Accord, to borrow her, because her

4    husband at that time need to go to work.  And so that's the

5    reason he needed that car.  Because they have two car, both

6    had some problem.

7    Q    So when you say that you borrowed the car for her, are

8    you saying that you lent her your car or that --

9              THE COURT:  You loaned it to her, right?

10             THE WITNESS:  Loan.  Loan.  Loan?

11             THE COURT:  I understood what you meant.

12             THE WITNESS:  It is money?

13             THE COURT:  No.  No.  You let her use the car?

14             THE WITNESS:  Correct.

15             THE COURT:  Okay.

16             THE WITNESS:  Correct, Judge.

17   Q    What kind of car did Ms. Luk have?

18   A    At that moment, she got two car.  Both is -- maybe she's

19   die hard fan of the American car called Saturn.  So one is the

20   old -- it is a sedan car.  It is over -- I think it is 12

21   year.  So, and another is brand new, pretty new, Saturn SUV.

22   So she got accident on the brand new -- the newly -- the new

23   SUV, Saturn, yes.

24   Q    Would you do other favors for Ms. Luk?

25   A    I --

1          MR. ZHU:  Objection.  Relevance.

2          THE COURT:  I mean, is it fair to say that you had a

3   good relationship with her?

4          THE WITNESS:  Correct.

5          THE COURT:  All right.  I don't know if we need to

6   go into every incidence of --

7          MR. MULQUEEN:  I am trying -- I mean, there are --

8   there is discretion in the law for Your Honor, should you find

9   that the defendant violated the law, that if he acted in good

10  faith, you have some discretion.

11         THE COURT:  Well, you knew her for how long?

12         THE WITNESS:  So during the -- after I hire her, so

13  I knew her 15 years.

14         THE COURT:  Okay.

15         THE WITNESS:  So before that, I knew her a few

16  months earlier, so maybe half a year.

17         THE COURT:  Okay.

18         THE WITNESS:  So can I mention one more incident?

19         THE COURT:  Sure.  I am not trying to keep you from

20  telling us.  Go ahead.

21         THE WITNESS:  Okay.  One more incident is I tried to

22  help her maybe the freezer thing.  So one day she bought a

23  whole lot of food from her house.  So I stay in the store, I

24  said, what happened.  She said my freezer is broken.  So I

25  don't want to throw all the food away.  So it is a lot a lot.

1   So she said, I want to put it in your store.  So that's quite

2   a lot.  So put in the freeze -- in the empty freezer in my

3   store.

4           I said, oh, try to fix it, because it is violation

5   from Carvel.  Not supposed to have steak, fish, or chicken

6   wing, vegetable, over my -- it's an ice cream store.  If the

7   inspector come, I probably got fired and some violation.

8           So she said okay, okay, okay.  And then I do her a

9   favor.  So at that time she try to use my mechanic to go to

10  her house to fix that freezer.

11          THE COURT:  Oh, the Carvel mechanic?

12          THE WITNESS:  That's -- because I usually hire -- to

13  call that mechanic, we have the good relationship.  Because

14  not too many people can fix the ice cream machine.

15          So she said, I try to call Dennis, the mechanic's

16  name, okay, to fix my freezer.

17          So I said, he, Dennis, doesn't take care of the

18  family -- the home -- only fix commercial.

19          But, actually, she called Dennis, and they maybe --

20  that's a good relationship between me and Dennis.  So he

21  finally came to her house to fix her freezer -- not fix, to

22  check the freezer.  Eventually, he told Carole that it is

23  totally broken.  It is not worth to fix it.  So Carole have to

24  buy the new freezer.

25          So it take about more than a week to move back

1    the -- from the stuff to her house.

2              THE COURT:  Okay.  Counsel, I wasn't trying to keep

3    you from making your record.  So if there's anything else you

4    want to ask, you can.

5              MR. MULQUEEN:  Thank you, Your Honor.

6    Q    Did there come a time when Ms. Luk stopped working for

7    you prior to the closing of your store?

8              Was there a date that Ms. Luk stopped working for

9    you prior to closing your store?

10   A    She resigned many time from the store for a short period.

11   But the longest time she left is 2016, in January, mid

12   January, about -- left for about three month.  And then, also,

13   the longest period she resign or left is 2018, March, because

14   I sold the store, Commack store.  So she left before the

15   closing, about two weeks earlier.  So she -- and then about

16   two month.  After two month, so she came back to say she want

17   to work part-time again.

18   Q    And so how many days a week did she work after that?

19   A    On 2018, March, after she resigned, so she worked one day

20   on -- one day only on the Jericho store.  Because she --

21   because I have -- I don't need her, but she keep on asking me,

22   I have time, Spencer, I work Friday in the new employer, so I

23   still have time.  I want to make more money, can I work one

24   more day for you, and then I have some money.

25             So she work one day on -- I would say May.  Starting

1   from 2018, May.  So she worked one day on the Jericho store.

2   Usually it is specially on the Sunday.  But it is -- sometimes

3   it depend on her.  So sometimes she say, I don't have time to

4   come, so just let me go, and so she didn't come.

5            The one thing I remember is Father's Day.  Usually

6   we think that is the most generating revenue on that day.  On

7   that Jericho store -- I mean, all the Carvel store, if you

8   pick one day, it is the most high -- the higher volume revenue

9   day, is Father's Day.

10           So she said, I don't have time to come on that day.

11  So I said, I said, it is the busiest day.  Why don't you come?

12  Oh, I can't come.  Sorry.  So she didn't come on even the

13  Father's Day on 2018.

14  Q    You mentioned that she resigned several times.  How many

15  times during her employment did she resign?

16  A    Three time.

17  Q    So you mentioned specifically two times?

18  A    The longest, yes.

19  Q    Once in 2016 and once in 2018.  When was the other time?

20  A    That's about -- it is back to 2008 or '07.  So she

21  worked -- she resigned for the medical office.  But only take

22  about one week.  So we said one week or two weeks.  And then

23  she -- more kind of reason, I want to come back.  So tell me

24  the detail.

25           But that's -- I remember she resigned on long time

1    ago for 15 years ago -- ten years ago, at least.

2    Q    So you said in 2018 when you were closing your store, she

3    resigned two weeks before you closed the store.  Why did she

4    resign in 2016; do you know?

5    A    2016?  Oh, yes.  2016, she want to open her own business.

6    So at that moment, she told me that he plan to take over the

7    dry cleaner, to buy a dry cleaner, so on 2016, January.  So

8    she informed me, it is use -- one week ahead.

9           So, Spencer, I plan -- of course she mentioned

10   about, oh, I am interested to do the business in dry cleaning.

11   Something like that.  But actually told me she decided to

12   leave the store is about 2016 of January.

13          So she told me that, Spencer, I have to go.  I want

14   to go for my own business.  So because she said somebody from

15   a mutual friend.  Later on, I know it is called -- the person

16   who called Veronica.  So she borrowed me some money.  I will

17   open my own business.  It is a dry cleaner.

18          So we have a long talk about that one week before.

19   And they say, I don't finish before you, as a friend, because,

20   you know, business is for the dry cleaning, from you said it

21   is for the -- a lot of revenue.  January by the -- to change

22   people's clothes, the tailoring.  Some kind of business, the

23   job.  So you don't have the knowledge of this kind of job.

24          Her answer is, oh, it is very easy because the owner

25   from that the dry cleaner store will help me.  So I figure I

1    can get probably 6,000, 7,000 profit on a month.  So compared

2    to your store.  How much you can give me?

3             So at that time I gave her 9.25 per hour, and then I

4    said I can raise up to $10 to you.  So it is per hour.  I

5    tried to tell her that it is the best I can give her.  So I

6    can't make any higher.  But compared with the 10, it is low

7    risk, and then you are comfortable for this job.  But so she

8    insist to walk away to do the own business.  I tried to

9    analyze, not from my side, because so probably said, oh, of

10   course you don't want me to leave because everybody's

11   supporting me because of my mutual friend is coleader.

12            I said, I figure you need help, I can help you, so

13   go ahead to open your own business.

14            From my experience, she think the job is too rough

15   job.  Let's say, to make the cake, nobody -- very fast, even

16   faster than me, even I work like do the decoration, the cake,

17   all the time, she usually even faster than me.

18            So you are not the person to do the fine job, the

19   small job, let's say.

20            She said, I can do that.  If I do the one, I make a

21   lot of -- it is big money.

22            So, honestly, I'm trying to analyze all the

23   situation from her, is she's not sure about to takeover to go

24   out for -- to take a risk.  Because it is, I told her that --

25            THE COURT:  I think I have got the gist of this.  I

1    am not trying to cut you off.  I think I understand that.

2              THE WITNESS:  Okay.

3              THE COURT:  Go ahead.

4    Q    So during that conversation that you were describing, you

5    had a discussion about salary?

6    A    Yes.

7    Q    And how much you paid her per hour?

8    A    Yes.  I mentioned about the whole day long, mention about

9    how much minimum wage is right now, and how much I can offer.

10   So I said, finally, I offer 10.50.  10.50 per hour for her.

11   She said, no way.  At least you gave me $12 per hour, I don't

12   take it.  So she set up a corporation and walk away after one

13   week.

14   Q    Do you know if she actually opened the dry cleaning

15   store?

16   A    Yes, I believe so.

17   Q    But there came a time when she came back and asked to be

18   rehired?

19   A    So I heard she got some problem after one month, or few

20   weeks later, three weeks, four weeks, and then -- but she

21   really would come back to me after three month.

22   Q    What about Ms. Dai, what was your relationship with

23   Ms. Dai?

24   A    Also, we have the good relationship.

25   Q    And did you assist her outside of work as well?

1  A    I remember one time she -- her car is broken in the

2  highway.  So she call me at the midnight -- not midnight,

3  10:00, in the parkway, and say, Spencer, my car is broken.  I

4  can't start the engine.

5          So I rush to the spot and helped her to drive her

6  home.  And then next day I try to call the tow car to tow it

7  to my friend's location and then pick her up.  And then to

8  the -- and fix -- she finally, she got the car and towed to

9  the Flushing and repair it.

10 Q    Was there a point when you were driving Ms. Dai to and

11 from work?

12          MR. ZHU:  Objection.  Irrelevant.  I believe defense

13 counsel may have misinterpretation of the law.  The good faith

14 means good faith effort to comply with the law, instead of

15 good relationship with my clients.

16          THE COURT:  Well, I thought there was some testimony

17 from your client about the driving back and forth.

18          MR. ZHU:  That's correct.

19          THE COURT:  I do take your point about what the good

20 faith -- I don't think it means just generally being a good

21 person, although that never hurts.

22          MR. ZHU:  I take your point.

23          THE COURT:  So I think that -- but is it fair to say

24 that you drove -- you drove the plaintiff to work?  Is it

25 Ms. Dai?

1          MR. MULQUEEN:  Yes, ma'am.

2          THE COURT:  You drove Ms. Dai to work when her car

3   broke down?

4          THE WITNESS:  But are you talking about the

5   beginning of the job?

6          THE COURT:  Well, there was a time where you picked

7   her up and took her to work, right?

8          THE WITNESS:  So it is the first year.

9          THE COURT:  Okay.  For how long did you do that?

10         THE WITNESS:  On and off, probably one and a half

11  year.

12         THE COURT:  Okay.  All right.

13  Q    You would pick her up at home, bring her to the store,

14  and then drive her from the store back home?

15  A    Yes.  Because some arrangement between that one and a

16  half year, the first arrangement is I arranged the Japanese

17  restaurant next to me, about five minutes walk, so the hours

18  were still there.  So 11:30 to 9:30, basically, it is the same

19  hour of my ice cream store.

20         So I said, if you can pick up my employee.  So she

21  said, okay, I can do it for you.

22         So Ms. Dai take the employee van, go to the Aki

23  restaurant, and then she walked from there to my location,

24  five minutes.  But, yeah.  On the day of, and on the day of,

25  she go there, and then take the employee van back to Flushing.

1   Yes.  It take about three month -- around for three month to

2   have that arrangement, yes.

3           And because one thing maybe she took the different

4   van home so her boss is -- the boss isn't happy.  He say, I

5   can't take your employee again, so it stopped.  So back to

6   take her back and forth to Flushing for a period of time.

7           And then later --

8           THE COURT:  I think I've got the gist of this, also.

9   Do you think so, Counsel?

10          MR. MULQUEEN:  Yes, Your Honor.  If you say you have

11  it, you have it.

12          THE COURT:  Well, I feel like I do.  As I say, I

13  think I have got the general point.

14  Q    Were your employees allowed to receive tips at the

15  stores?

16  A    Yes, they do.

17  Q    And how were the tips handled?

18  A    I would say beginning the first days on the latest days,

19  or different day, they are different location, different

20  employees.  So, basically, it is different arrangement, I can

21  say.

22          So let's say for Carole, Carole Luk, and first I --

23  they both are told they can have that, the tips.  So on the

24  beginning, so, beginning stage, she, basically, every day end,

25  so she count the tips, tips jar, and then she took it away.  I

1    have no idea how much they took.

2           But latest days, I found -- but usually it is most

3    is the coin.  So maybe come up to ten dollar, 12 dollar a day.

4    So she take -- put the coin in the cash register and then took

5    the paper money to her pocket.  So I don't -- I have no idea,

6    so how much, but I know -- that's the kind of arrangement.

7           So latest days, when I have first set up the camera.

8    So why I set up the camera --

9           THE COURT:  Well, I don't think we need -- do we

10   need to go into --

11   Q    Did there come a point where the procedure you just

12   described changed?

13   A    Yes, it changed, yes.

14   Q    And how did it change?

15   A    The change is I don't feel comfortable with some incident

16   happened, and I don't feel comfortable for her to put the

17   money on the cash register and took the paper money from my

18   cash register.  So I told her some change of the arrangement.

19   I say, Carole, how about we cut -- we count the tips before

20   you leave, before you left, and then in front of me, my

21   witness, and then you can put back the change in the cash

22   register and took the paper money.  Or if you don't need to

23   open the cash register, you can just put the coin or change

24   the paper money, and I have no objection.  But you want to put

25   some money to change, or to change the paper money to the

1  change, you have to do it in my witness.

2  Q    Okay.  So when did that change occur, approximately?

3  A    I would say in 2016.

4  Q    Okay.  And what about at the Jericho store with Ms. Dai,

5  what was the policy for tips there?

6  A    So she also allowed to have the tips for herself.  But

7  compared with the Commack store, the Jericho, it's much less.

8  So maybe the different -- I told her to take tips.  So

9  sometimes she never take the tips from the tip jar.

10  Q    Are you okay?

11  A    Yes.  I am not sleeping well these days.  Sorry.

12  Q    Do you need a drink or something?

13              THE COURT:  Is there water there?

14              THE WITNESS:  At my table.

15              THE COURT:  We will give you some water.

16              THE WITNESS:  I have my own water.

17              THE COURT:  We will give it to you.

18              THE WITNESS:  Thank you so much.

19              (Short pause.)

20              THE COURT:  Are you all right?

21              THE WITNESS:  Thank you, Judge.

22              THE COURT:  Go ahead.

23  Q    So at the Jericho store with Ms. Dai, how were the tips

24  handled?

25  A    So she -- I told her to -- she can take the tips, but she

1    never took the tips.  She seems a lot -- take care of the tips

2    that much.

3           Some -- let's say some student or the part-time

4    usually take care of the tips.  So even they count it and they

5    share tips, to share the tips.  But Dai seems not that much

6    care of the tips.  So -- but, honestly, it is not that much

7    compared with the Commack store.

8           So, basically, I gave her, during the paycheck, I

9    say, oh, this is 20 dollar more for the tips.  I say, okay,

10   something like that.  Thank you.  And then that's it.

11   Q    So you would pay her extra to cover the tips?

12   A    Yes.

13          MR. ZHU:  Excuse me, Your Honor.  My client just

14   asked me if she can go down to feed the meter.  I would ask

15   the Court to relieve her.

16          THE COURT:  That's fine.  Go ahead.

17          MR. ZHU:  Thank you, Your Honor.

18          THE COURT:  Sorry, do you know about how much more

19   time you have?  I just want to give the interpreter a break.

20          MR. MULQUEEN:  I assume before noon I will be done.

21          THE COURT:  Okay.  Are you doing all right?

22          THE INTERPRETER:  I'm fine.  Thank you.

23          THE COURT:  Go ahead.

24          MR. MULQUEEN:  So we are going to continue without

25   Ms. Luk being here?

1          THE COURT:  That's what we said yesterday we would

2    do.

3          MR. MULQUEEN:  Counsel has no objection?

4          MR. ZHU:  No objection.

5          THE COURT:  We discussed it yesterday.  Believe me,

6    I have got this part.

7          MR. MULQUEEN:  Sorry.

8          THE COURT:  That's all right.

9    Q    Mr. Tam, with regard to the salary or the money that you

10   paid to your employees, did you have discussion with them

11   about how much money they would be earning per hour or per

12   day, how you would pay them?

13   A    Yes.  They basically -- Carole is basically paid by hour.

14   How much on the hour we agree -- the money that we agree, yes.

15   So probably, yes.  I would say it is Carole is paid by hour.

16   Demi is paid by day.

17   Q    All right.  Let me just stop you.  Earlier on your

18   mentioned the name Spencer three times.  Who is Spencer?

19   A    It is myself, yes.  My English name.

20   Q    Okay.  So you are referred to as Spencer?

21   A    Yes.  Correct.

22   Q    Okay.  And you just made reference to the name Demi.

23   A    Demi is Ying Ying Dai.  Ms. Dai.

24   Q    So the plaintiff?

25   A    Sorry.  Yes.  So I call Demi --

1        THE COURT:  That's okay.  I've got it.  Go ahead.

2   Q    So you had discussions with Ms. Luk about how much she

3   would be paid per hour?

4   A    Yes.  Correct.

5   Q    Okay.  And during the course of her employment, did her

6   salary per hour ever change?

7   A    Yes.  We -- starting from the employee month, so

8   according -- because we were -- I was reminded by the Carvel

9   corporation, let's say the law is -- the minimum wage is

10  changed to from that kind of money to that kind of money.  So

11  I -- on the time that -- the effective day, I change it.

12       So from our mutual agreement or mutual contract

13  during the interview, I promised to, in 2004, I was -- it is

14  50 cents higher than the minimum wages gave to her.

15  Q    Okay.  I guess my question, Mr. Tam, is did you -- if her

16  salary changed, would you have a discussion with her telling

17  her that her salary changed?

18  A    So for the new way or the new minimum wages, usually I

19  mention on one time on the wages.  I say, hey, Carole, new

20  wage is from, let's say, 8 dollar to 8.25.  So it is a new

21  8.25.  I mentioned once.  But she's quite sensitive on the

22  minimum wages.  So I think she know how much for that minimum

23  wage are at that time.

24  Q    Okay.  But would you pay her the minimum wage or would

25  you pay her more than the minimum wage per hour?

1  A    So it is since 2004, I -- it is 50 cents more, but

2  some -- like, let's say, in 2016, I pay her 10.50.  It is 150

3  higher than the minimum wage on 2016.

4            And 2013, I -- 125 higher than the minimum wages.

5            Also, because for the -- starting from 2009, I --

6  administrative, to give them the bonus.

7  Q    So how much bonus would you give to Ms. Luk?

8  A    Ms. Luk, is from 2009, I gave her 350, I remember.  So

9  next year is 400.  And then keep on paying her until 2017.  So

10  why -- can I explain why I need to give her the bonus?

11            THE COURT:  Why don't you just put a question to the

12  witness and see if we can move this along just a shade.

13  Q    Why did you determine to pay bonuses to your employees?

14  A    Because talk -- we talk about the motivation.  Someone

15  told me that the happy employee work harder.  I believe that.

16            So I told her, I said, hey, Carole, I give you a

17  bonus.  I hope you can work harder.  I don't think you are not

18  working harder, but you spend a lot of time on your TV pad, to

19  your TV drama on the break.  Even if it is longer than the

20  break, you still have to stay on the TV drama.  I want you to

21  do more cleaning work or some other side job in the store.

22            This woman, so many job, it never end.  So some

23  cleaning.  So don't sit there for the TV, or for the TV pad.

24  Something like that.  So motivation.

25  Q    And did you pay $400 to her every year after the first

1  year as a bonus?

2  A    The second year -- 350, first year.  The second year,

3  400.  And then the third year, she told me that it is still

4  400 higher?  So I said, depend on your performance.  I try her

5  to understand, I try to raise up the bonus, if it is -- she

6  work harder or performance is better.

7            But on the 2016, that Christmas Eve, that Christmas

8  Day, I withhold 100 from the bonus because some incident

9  happened.

10 Q    Okay.  So the first year you gave her 350.  Let's start

11 in 2012 to 2017.  Did she get a $400 bonus every year except

12 for 2016?

13 A    Yes.  I still pay -- it is never stop, basically, but it

14 is postponed.  Can I say that?  On 2016, it is postponed $100

15 for the bonus.

16 Q    Did you eventually give her that $100?

17 A    Yes, I did.

18 Q    So that would have been a $400 bonus?

19 A    Yes, correct.

20 Q    And what about Ms. Dai, did she receive bonuses?

21 A    Yes.  It is -- I pay her the bonus, the same thing, on --

22 starting on 2011, Christmas Day, around the period of

23 Christmas.  So it is $200.

24 Q    And she received a $200 bonus every year while she worked

25 for you?

1  A    Yes, correct.

2  Q    Okay.  And did you -- let's talk about Ms. Dai's salary.

3       How did Ms. Dai get paid?

4  A    I pay her -- basically, it is first year is $80.

5  Q    Again, let's talk about from 2012 through 2018.

6  A    So you mean the salary?

7  Q    Yes.

8  A    The salary is -- I pay her $60 from -- on 2012, right.

9  The seven years ago, yeah.  And the second year also $80 per

10 day.  And the third year, raise up to 90, and then keep -- and

11 then another year is still $90 per day.  And then after raise

12 up to $100 per day, $100 per day, something like that.  So,

13 yeah.  Because she's not paid by hour.

14      The reason I am thinking at that moment is very

15 simple.  Because she worked from Flushing.  So if it is -- if

16 she -- I suppose she worked the whole day, but instead of

17 Carole, Carole probably have a lot of change to take the --

18 some days she want to come late --

19 Q    We will talk --

20 A    Okay.

21 Q    Right now we are talking about Ms. Dai's salary.

22 A    Yes.  Sorry.

23 Q    Okay.  So you paid her by the day?

24 A    Yes.  Correct.

25 Q    Okay.  And how many hours did she work in a day?

1   A    If she worked on time, ten hours per day.

2   Q    Okay.

3   A    For the weekday.

4   Q    So in 20 --

5   A    So I pay her $80 during the 2011.

6   Q    Okay.  And, again, we are talking about from 2012 to

7   2016.

8   A    You want me to mention about is she -- the salary?

9   Q    I don't even know -- no.  Don't mention anything.

10          So did there come a time when you paid her more than

11  $100 a day?

12  A    Let's say, in 2018, I pay her 111 -- 110 per day.  2017,

13  I pay her 105 per day.

14  Q    Okay.  And is that still for the same ten hour day?

15  A    Yes.  Basically, no matter she work ten hour or even

16  less.  Usually I thought this -- usually longer working hour

17  than less working hour.  But, actually, something happened.

18  For incidence, the store that day, let's say it is -- I am

19  expected slow earlier, so I remember I let her leave, the

20  earliest is 5:00, I say, you can leave.  I don't want you to

21  get hurt or problem in the highway.

22          So I still pay her $100 per day, something like

23  that.  Yes.  I think that's -- I remember one time it is on

24  2014, on the Christmas, on 23rd of the 2014.  She was late,

25  and she came at 1:00.  So that I -- she didn't -- I didn't

1   know.  Because unless -- until my district manager called me

2   on that day, saying, hey, Spencer, there's nobody open your

3   store.  And the inspector, that's a mystery inspector come to

4   try to inspect my store, and then the store is not open.  I

5   called your store.

6          Demi admits she came at 1:00.  So it did happen

7   on -- so I have no idea, she came late on that date.  Because

8   one day before, I told her I -- so sometimes you mention about

9   the personal things.  So she will say, what are you doing

10  tomorrow, Spencer.  I said, oh, probably shopping before

11  Christmas.

12         So on that day, afterwards I asked her, so why you

13  late for the store.  And she told me, oh, suddenly, something

14  happened.  So I need to stay at home to handle it.

15         So I say, why don't you call me?  Let me know, I

16  came back to the store.  And I cannot go out if you call me at

17  that moment.  I said, oh, because it is unexpected.  So I

18  thought you were in the Flushing.  It is too late.  So that's

19  why I --

20  Q    Mr. Tam, how often was Ms. Dai late?

21  A    I would say, if you figure out 15 minutes is late, so it

22  always happened.

23  Q    Can you put a number on it always happened?

24         THE COURT:  Did it happen every day the whole time

25  she was working there or just sometimes?

1    THE WITNESS:  Let's say, one year, it is half.  Half

2 the year.

3    THE COURT:  All right.  So half of the time of a

4 year?

5    THE WITNESS:  Yes.

6    THE COURT:  Okay.  Next question.

7 Q    Did you pay her when she was late her full salary?

8 A    I still pay her the same salary.

9 Q    If you closed the store early for whatever reason, did

10 you still pay her the same salary?

11 A    One of the reason --

12    THE COURT:  You don't have to say.  Just if you

13 closed the store early, you didn't cut anybody's pay, did you?

14    THE WITNESS:  No.

15    THE COURT:  Okay.  Next question.

16 Q    Mr. Tam, did you have a policy with regards to breaks

17 that your employees can take?

18 A    Usually I mentioned during the -- in the interview time,

19 I mentioned once.

20 Q    Okay.  And what was your policy?

21 A    The policy, when I hired them, I mentioned about we

22 are -- because the nature of our job, so it is different from

23 the other corporation or the other organizations.  You

24 cannot -- you have to take the lunch, dinner break or the

25 regular break, only take it -- taken in the store.  You are

 1    not supposed to leave the store for lunch --

 2              THE COURT:  But they had breaks, right?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Okay.  Next question.

 5    Q    How long were those breaks?

 6    A    How long?

 7              THE COURT:  Just approximately.

 8    A    One hour -- altogether, one hour in the lunch break, one

 9    hour in the dinner break, and half hour for the regular break.

10              THE COURT:  Okay.  Next question.

11    Q    So that's two and a half hours worth of breaks in a

12    ten-hour day?

13    A    Yes, correct.

14    Q    Did you pay them for those hours?

15    A    Yes, correct.

16    Q    Mr. Tam, did you have any conversations with Ms. Luk when

17    you told her, when she found out that you were selling your

18    stores?

19    A    Yes, I did.  So on March, before the closing, I finally

20    scheduled with the buyer for the closing day.  I told her

21    about two weeks before, around two weeks before, and I said,

22    Carole, I found a buyer.  So I let you know, and the buyer

23    won't ask you if you want to stay to work for her.  So she --

24    her answer is, let me think about it.  So I think about it.

25    So after one week, so very quickly, to find another job.  So

1  she resigned then.

2  Q    Okay.  And did you have any conversations with regard to

3  whether she was entitled to severance pay?

4  A    No.  Because she resigned and found a better job, and I

5  not supposed to pay extra money to her, right.

6  Q    I am going to show you what's been marked as Defendants

7  Exhibit D.  Can you tell me what this is?

8           MR. ZHU:  Objection.  Hearsay.  And this translation

9  was not authenticated.  No certification from a translator.

10          THE COURT:  Well, do you have one here?  The

11  objection is overruled.  This is, I take it, text messages

12  between Ms. Luk and Mr. Tam; is that right?

13 Q    Is that correct, Mr. Tam, these are text messages between

14 you and Ms. Luk?

15 A    Yes, correct.

16          THE COURT:  Didn't Ms. Luk testify about this?

17          MR. MULQUEEN:  I don't recall exactly.

18          THE COURT:  I thought you might have shown it to

19 her.

20          MR. MULQUEEN:  I think maybe plaintiffs' counsel

21 did.

22          MR. ZHU:  I mean, just to refresh her recognition,

23 but I did not admit it into evidence.

24          THE COURT:  Right.  The objection is overruled.

25          Go ahead.

1   Q    Can you tell us what this is, Mr. Tam?

2   A    This is the first time I see the English version.

3   Q    All right.

4   A    But the Chinese version, yes, still in my phone.  So I --

5   yes.  It is -- I have it, the text message from her, yes,

6   correct.

7   Q    And what is this conversation about?

8   A    Can I read the English -- yes, it is --

9        THE COURT:  Is this about the severance pay?  Is

10  this a conversation about the severance pay?

11       THE WITNESS:  Yes.

12       THE COURT:  Okay.  And can I read it.  So there's no

13  need to --

14       MR. MULQUEEN:  Yes, ma'am.

15  Q    Mr. Tam, what has been your relationship with Ms. Luk

16  since you closed your store?

17  A    You mean I sold the store?  After I sold the store?

18  Q    Yes.  What's been your relationship with her after you

19  sold the store?

20  A    I have no connection with Carole no more.  The

21  relationship?  Well, so she sued me in the court.  Right now,

22  if you ask me, I would say it is a very bad relationship with

23  her or bad impact with her.

24  Q    So let me focus my question on between the time that you

25  had this conversation about severance pay and before she sued

1  you in court.  Did you have any contact with Ms. Luk?

2  A    Can you more -- can you repeat the question more

3  specifically?

4  Q    I don't know if I can.  I am talking about after the text

5  messages and before you received the complaint in this case,

6  what was your relationship with Ms. Luk?  Had you had any

7  contact at all?

8  A    No.

9  Q    And then how did you pay Ms. Luk and Ms. Dai?

10 A    Ms. Luk is cash basis, yes.  And because she told me --

11 one time I remember, I tried -- I have no cash, I say, can I

12 write you a check.  She said -- she insisted, no, I don't

13 accept check.  So, finally, that's the one day to take the

14 cash for her.

15      So Demi, some is paid by check, some is paid by

16 request by her, so.

17 Q    Okay.  So she requested that you pay her in cash and --

18 partially in cash and partially by check?

19 A    Yes.  Correct.  But usually I -- for Demi, I say, how

20 about I give you all in check.  So she told me that it is

21 better, can you do me a favor, I don't want that too much in

22 the W-2.  So it is better.

23      MR. ZHU:  Objection, Your Honor.  My client's W-2 is

24 not at issue.

25      THE COURT:  I didn't hear what you said.

1              MR. ZHU:  My client's W-2, the issue is irrelevant
2    to this case.
3              THE COURT:  Well, I don't know if we need the
4    reasons for it, but she wanted it to be in cash; is that
5    right.
6              MR. ZHU:  We accept that part of it.  Not the reason
7    like my client didn't want --
8              THE COURT:  Well, it is really not relevant why she
9    wanted it, but she wanted it in cash; is that right?
10             THE WITNESS:  Yes, correct.
11             THE COURT:  Okay.  Next question.
12             MR. MULQUEEN:  Nothing further, Your Honor.
13             THE COURT:  I think this might be a good opportunity
14   just to take a break.
15             And do you know about how long you'll have?
16             MR. ZHU:  I only have -- I think I will need to go
17   through the tax returns.  So this probably takes more than
18   half hour.
19             THE COURT:  All right.  Let's take a break.  Why
20   don't we come back in about ten minutes.
21             You can step down.
22             Are you going to have additional evidence after
23   that?
24             MR. MULQUEEN:  No, Your Honor.
25             THE COURT:  Okay.  So I will see you all in about

1    ten minutes.

2              (WHEREUPON, a recess was had from 11:48 a.m. to

3    12:21 p.m.)

4              THE COURT:  Let's have the witness take the stand

5    again.

6              THE COURTROOM DEPUTY:  The witness is still under

7    oath.

8              THE COURT:  Go ahead, Counsel.

9    CROSS-EXAMINATION

10   BY MR. ZHU:

11   Q    Good afternoon, Mr. Tam.  My name is Shan Zhu.  I'm the

12   counsel for the plaintiffs.

13             Are you fluent in English?

14   A    If you say fluent in English --

15             THE COURT:  I can tell.  He speaks -- his English is

16   fine.  Go ahead.

17   Q    Do you need assistance from an interpreter?

18             THE COURT:  You know what?  I think there's some

19   things I don't know, but this part I have got.  So if he needs

20   some assistance, I am sure he will tell me.  Go ahead.

21             MR. ZHU:  Thank you, Your Honor.

22   Q    You just testified that the Jericho store has decreased

23   annual income; is that correct?

24   A    The mixes keep on dropping, and the income -- yeah.  It

25   is slightly going down, yes.  Correct.

1   Q    I am going to show you the Defendants Exhibit B, from the

2   very end to the very beginning.

3           So this is for the year of 2012, which item 1A, it

4   says the gross sale is around $143,000.

5           And for the next year, it is the year of 2013, and

6   the income is $147,000.

7   A    Uh-huh.

8   Q    And for 2015, it becomes $155,000?

9   A    Uh-huh.

10  Q    And in the year of 2015, it becomes $157,000.

11  A    Uh-huh.

12  Q    And in the year of 2016, it becomes $153,000.

13          So is that still correct, that the sales and income

14  in Jericho store is decreasing?

15  A    It's, I would say, almost the same, but the profit is

16  decreasing, yeah.

17  Q    So you're clarifying the sales percentage is not

18  decreasing, but the profit is decreasing; is that correct?

19  A    Because in my memory, the mixes keep going down.  So I --

20          THE COURT:  The what keeps going down?

21          THE WITNESS:  The mix.

22          THE COURT:  Okay.  The mix.

23  A    So I really don't have keep detail -- my tax return.  So,

24  basically, my idea is it's almost the same, keep going down,

25  yes.  So I don't -- yeah, maybe you are right, it is from the

```
1   figure is around 10,000, in a range, yeah.
2   Q    My question is --
3   A    Because --
4            THE COURT:  That's okay.  Let the lawyer put another
5   question.  Okay?
6            Go ahead.
7   Q    My question is, is that true from the year of 2012 to the
8   year of 2016, the sales gross sale in Jericho store is
9   actually slightly increasing or stay the same?
10           THE COURT:  At least according to your tax returns,
11  right?
12           THE WITNESS:  Yes.  Yeah.
13           THE COURT:  Okay.  So next question.
14  Q    Again, I am showing you the tax return, which is in the
15  Defendants Exhibit B, for the tax return for Commack store.
16  May I draw your attention to this little stamp on top of the
17  tax return.  It says "copy."  Do you know what that means?
18  A    Copy is the CPA gave me that copy.
19  Q    Does that stamp means this copy is identical to the
20  original document?
21  A    I think definitely it is the same.
22  Q    So is that your testimony, the original document does not
23  bear the signature of yourself and the CPA signature as well
24  as the date being prepared?
25           THE COURT:  Well, let me just ask you this:  You
```

1    sign your return that you filed, correct?

2              THE WITNESS:  And the CPA, yes.

3              THE COURT:  And the CPA gave you this copy?

4              THE WITNESS:  Yes.

5              THE COURT:  Go ahead.

6    Q    So the CPA stamped the little stamped "copy" before you

7    signed the original document; is that correct?

8    A    Yes.  Correct.

9    Q    So how do you know that the document you signed is

10   identical to this document?

11   A    So I trust the CPA.  Because they are professional,

12   they --

13   Q    Still the same piece of paper, may I draw your attention

14   to item 30, which says salaries and wages.  This is for

15   Commack store?

16   A    Uh-huh.  Yes.

17   Q    Who works in Commack store?  Ms. Dai or Ms. Luk?

18   A    They both -- mostly it is Ms. Carole Luk, yes.

19   Q    And you testified approximately a day, you probably will

20   pay around like roughly $100 to either one of them, based on

21   the calculation?  For example, for Ms. Luk, you paid her

22   around $10 per hour for ten hours work.  And for Ms. Dai, you

23   paid her around $100; is that correct?

24             THE COURT:  Hundred dollars for what?

25             MR. ZHU:  Per day.

1          THE COURT:  Per day.

2    A    Yes, basically, it is correct.

3    Q    And your shop opened 365 days per year; is that correct?

4    A    No.  Because on Christmas day, New Year's day --

5    Q    Let me rephrase the question.

6          Is that true, your shop will open at least 300 days

7    throughout the year?

8    A    360?

9    Q    300 days?

10   A    300 days?

11   Q    At least throughout the year?

12   A    Yes.  Correct.

13   Q    And you paid at least -- not at least, around $100 per

14   day; is that correct?

15   A    No.  If I work by myself, this is -- I don't get paid

16   from that.

17   Q    You don't pay yourself from the corporation --

18   A    Yes.

19   Q    -- for work you did?

20   A    Yeah.

21   Q    How many days do you work in Commack store throughout the

22   year?

23   A    So, basically, I work --

24   Q    Would that be more than 200 days?

25   A    I work four days.  They both off two days, so, basically,

1    I work four days.  So 52 weeks.  So, yeah, 42 -- 52 weeks,

2    that is over 200 days.  Yes, correct.

3    Q    And then will either of my clients, Ms. Dai or Ms. Luk,

4    work over the 200 days in Commack store for -- in total?

5    A    Each person?

6    Q    No.  Two of them.  Either Ms. Dai or Ms. Luk?

7    A    Over 200 days?

8    Q    Throughout the year of 2016?

9    A    Yes, correct.

10   Q    So is that correct, you were paid, at least as wage and

11   salary, for more than 20,000 for the work they did?

12   A    Yes, correct.

13   Q    Then item 30 of your tax return, indicating you are only

14   paid -- you are only paying $11,000.  So which story you are

15   sticking with?

16   A    Yeah, this is a cash deal.  They want -- they don't want

17   it in the books, so it is -- the item 13 is --

18   Q    The question is, how much you paid as wage and salary in

19   the year of 2016?

20   A    To which employee?

21   Q    Both.  All employees work in Commack store.

22   A    In Commack store?

23   Q    Yes.

24   A    Commack store basically is Carole Luk.  So I -- it is

25   every year is --

1   Q    I am not asking for every year, just this specific year

2   of 2016.

3   A    Okay.  Sorry.  In 2016, I estimate I paid her under

4   20,000, because 2016 -- year 2016 is a little bit special --

5   Q    Let me rephrase it.

6            Is it above $11,000?

7            THE COURT:  Did you pay her more than $11,000?

8            THE WITNESS:  Yes, I think so.

9            THE COURT:  So why did you put the $11,000 on the --

10           MR. ZHU:  Thank you, Your Honor.

11           THE COURT:  -- tax return?

12           THE WITNESS:  Yes, because she don't want -- she

13  doesn't want to take the -- she want the cash deal.  So it is

14  not -- it is not accurate on the salary.

15  Q    So is that your testimony, that the tax return for the

16  year of 2016 is inaccurate, at least for this page?

17  A    Yeah, at least for the salary, yes, correct.

18  Q    How about other years?

19  A    I --

20  Q    How about other years like?  For example, I am showing

21  you the year of 2015.  Same issue, the wages, $50,000; is that

22  correct?

23  A    It is not 100 percent correct.

24  Q    My question is, is it correct or not?

25  A    Not correct.

1           THE COURT:  And is this amount supposed to reflect

2     the amount that you paid to both employees?

3           MR. ZHU:  Who work in the Commack store.

4           THE WITNESS:  Yes, because --

5           THE COURT:  Just yes or no.  So on that, that's --

6     you're representing in that tax return that you paid a total

7     of, I think in that one, it was -- the one that's up on the

8     screen says $11,000, to all your employees, right?

9     A     Correct.

10          THE COURT:  Okay.  Next question.

11    Q     Ms. Luk and you are the only employee besides the

12    part-times working in Jericho store; is that correct?

13    A     Basically, it is correct.

14    Q     I am showing you the tax return, which is in Defendants

15    Exhibit C, of the year 2016.  And please draw your attention

16    to item 13.  It says salary and wage for employees is $8,000.

17          My question is, did you pay Ms. Luk $8,000 for that

18    year?

19    A     $8,000?

20    Q     Yes.

21    A     2016.  Should be more than $8,000, yes.

22    Q     So, again, the tax return for Jericho store is incorrect;

23    is that true?

24    A     Yes.  It is incorrect.

25    Q     So, again, for the year of 2015, like this is just an

1  example.

2         So, still, item 13, is that correct?

3  A    The tax -- the salary on the item 13?

4  Q    Yes.

5  A    Item 13 is not correct.

6  Q    So is that also true that the tax returns filed by

7  Jericho store, since the year 2012 to the year of 2016, is

8  not -- are not correct?  Or you need me to show you one by

9  one?

10 A    I list that salary on my tax return, not 100 percent

11 correct.

12 Q    Are you aware you must state correctly on your tax

13 return?

14        MR. MULQUEEN:  Objection.

15        THE COURT:  Overruled.

16 Q    Please answer my question:  Are you aware you have to put

17 the truth in your tax return?

18 A    Yes.

19 Q    But you nevertheless decide not to do so; is that

20 correct?

21 A    One item is not incorrect.  The fare is incorrect, yes, I

22 admit it.

23 Q    Do you recall in the year of 2018, July 1, what is the

24 daily sale on that specific day in Jericho store?

25 A    January 1?

1  Q    Yes.

2  A    I have no idea for that -- what day is that?

3  Q    January 1, 2018.  I am showing you this document, trying

4  to refresh your recognition.  Please let me know if this

5  refreshes your recognition.

6            MR. MULQUEEN:  What is this document, Your Honor?

7            MR. ZHU:  It is not evidence --

8            THE COURT:  Okay.  Everybody stay in their lanes.

9  If you want to -- you can refresh people's recollection with

10 anything.  But why don't you not put it up on the screen.  Why

11 don't you just hand it to him.

12 Q    So, again, I am showing you this document trying to

13 refresh your recognition.  Let me know when you are ready.

14 A    I don't recall it.  But I think it is right, yes.

15 Because --

16 Q    My question is, does it refresh your recognition?

17           THE COURT:  About what?  What do you want to refresh

18 his recollection about?

19           MR. ZHU:  The daily sale on July 1, 2018.  Daily

20 sale.  The sales income.

21           THE COURT:  Okay.  So he asked you a question about

22 the sales from that day.  When you look at that document, does

23 that refresh your recollection about what the sales were?  Is

24 that -- am I asking the right question?

25           MR. ZHU:  Yes, that's correct.  Thank you,

1    Your Honor.

2    A    It doesn't refresh any idea for that day.

3              THE COURT:  All right.  Next question.

4    Q    You just testified, there will be a Carvel corporation;

5    is that correct?

6    A    Yes, correct.

7    Q    And that they will inform you about minimum wage; is that

8    also correct?

9    A    Yes, correct.  They usually remind me when the law

10   require to change the minimum wage on an effective date.

11   Q    Do they also inform you about the overtime requirement,

12   which means you have to pay one and a half times for

13   employers -- for employees who work over 40 hours?

14   A    Not from the Carvel, but it is from my simple accounting

15   knowledge, yes.  Or somebody remind me during I open the

16   store.

17   Q    So you are aware there is a law requiring you to pay your

18   employees one and a half times for work for overtime work; is

19   that correct?

20   A    Correct.

21   Q    But you, nevertheless, decide not to pay them --

22             MR. MULQUEEN:  Objection.

23   Q    -- one and a half overtime premium?

24             MR. ZHU:  What's your objection?

25             THE COURT:  I'll sustain the objection as to form.

1           The question is, are you aware -- what was the --

2    Q    The question is, nevertheless, you decide not to

3    compensate your employees for one and a half time of overtime

4    in their work?

5           THE COURT:  Well, I'll sustain the objection to

6    that.

7    Q    So are you both aware that there is a minimum wage

8    requirement and the overtime requirement; is that correct?

9    A    Correct.

10   Q    How about spread of hours, has anyone informed you that

11   you have to pay your employees extra hour payment when they

12   work more than ten hours per day?

13   A    I am not sure.  I really know is my basic accounting

14   knowledge, that people over 34 hours is protected by the

15   minimum wages law and overtime law.

16   Q    Earlier you testified in Commack store you would have

17   3,400 gallons, what is that, 3,400 gallons of the product you

18   are purchasing from Carvel corporation; is that correct?

19   A    Yes.

20   Q    And you say that will be around 60 to 70 dollars per

21   gallon; is that also correct?

22   A    Return per gallon, correct.

23   Q    I am showing you this document as Defendants Exhibit B,

24   the tax return of 2016, which covers the period of November 1,

25   2016 to October 31, 2017.

1           In that tax return, item 1A, you state that the
2   gross sales is $165,000; is that correct?
3   A    Yes, correct.
4   Q    If you multiply 3,400 gallons by $60 per gallon, it will
5   be $204,000; is that correct?
6   A    So can you --
7           THE COURT:  You are asking him to multiply --
8           MR. ZHU:  I am doing the math.
9           THE COURT:  That's okay.  I just want to make sure I
10  understood the question.
11          MR. ZHU:  I will strike that part.
12  Q    So is that your testimony, that the waste of the product
13  will be exceeding of 25 percent for that specific year?
14  A    I still don't understand your question.  Sorry.
15  Q    My question is, you have purchased the product from
16  Carvel corporation, which supposed to generate around
17  $204,000, but your gross sale is around $165,000.  Is that
18  true, the remaining of the products were being thrown away?
19  A    So how do you pick out 200,000 number?
20  Q    It is 3,400, multiplied by $60 per gallon.
21  A    Uh-huh.
22          THE COURT:  And what number do you come up with
23  that?
24          MR. ZHU:  Can I write it out?
25          THE COURT:  Just tell us.

1   Q     The number is $3,400 -- sorry -- 3,400 gallons, you
2   testified earlier this morning, that you would purchase from
3   Carvel corporation to generate your product.
4         THE COURT:  So you are saying that -- you're
5   multiplying $3,400 -- 3,400 gallons times 60 --
6         MR. ZHU:  $60 per gallon.
7         THE COURT:  Okay.  And what number does that get
8   you?
9         MR. ZHU:  204,000.
10        MR. MULQUEEN:  Your Honor, I did the math, and
11  that's correct.
12        THE COURT:  Okay.  So what he's saying is, so that
13  $204,000, and you are asking about the difference between the
14  $204,000 and the $165,000 on the tax return?
15        MR. ZHU:  Yes.  Where this money went.
16        THE COURT:  Yes.  He's asking you whether or not
17  that difference is from throwing products away and things like
18  that.
19        MR. ZHU:  Waste.
20        THE COURT:  Or waste.
21        THE WITNESS:  So there's a lot of reason to make
22  that discrepancy.
23  Q     I am just asking you whether this is a result from the
24  waste of your product, like you threw it away?
25  A     I would say part of it.  Not all -- not all -- maybe some

1    of the reason.  But the other reason is not come up that -- as

2    you said, it is 200,000 something.  Maybe a lot of reason.

3    Maybe the inventory.

4    Q    But, nevertheless, you are expecting more than $200,000

5    income, then it comes to be $165,000.  And the remaining of

6    them are not sold or you throw it away; is that correct?

7    A    Can you -- because --

8              THE COURT:  I think he wants to know if that

9    difference is all attributable -- or let me put it this way.

10   If that difference between those two numbers is just because

11   of ice cream that your products that you had to throw away, or

12   is it some other reason?

13             THE WITNESS:  No, maybe some other reason, yes.

14             THE COURT:  Okay.  So some of it is waste and some

15   of it is something else?

16             THE WITNESS:  Yes.

17             THE COURT:  All right.  Next question.

18   Q    So you're only selling it for like about 75 percent of

19   your product versus purchased from Carvel corporation; is that

20   correct?

21   A    I still don't fully understand the question.

22   Q    Let me strike that.

23             When you say your employees are allowed to take a

24   break, but you testified it is your policy they have to take

25   the break in the store; is that correct?

1    A    Yes.  Correct.

2    Q    And you say that is because of the nature of your

3    industry; is that also correct?

4    A    Yes, correct.  Maybe in the -- yes.  I cannot represent

5    the whole industry.

6    Q    So what is the nature in your consideration?

7    A    The nature of my corporation or nature of my store?

8    Q    The nature you just described, which cause your employees

9    must to have breaks inside of the store instead of going

10   outside?

11   A    That's -- I -- my explaining is according to the

12   interview.  Our situation under my store, the situation in the

13   store.  Under the -- we have a mutual agreement.

14               THE COURT:  I am just going to stop you for a

15   minute.  You have to let him finish.

16               So I just want to make sure I understand your

17   question.  Are you asking him why he told his employees that

18   they had to stay in the store on their breaks as opposed to

19   going out?

20               MR. ZHU:  Yes.

21               THE COURT:  Okay.  And I think you just said that

22   was just the way you wanted to do it?

23               THE WITNESS:  Yes, correct.

24               THE COURT:  Next question.

25   Q    When they are taking lunch break in the store, what will

1  happen if the customer come?

2  A    So let's say, for example, I work seven day in the

3  Commack store.

4          THE COURT:  I am really trying to keep this on track

5  here.  The question is, if somebody's taking a lunch break in

6  the store, let's say they are sitting in the back eating their

7  lunch, but a customer comes in, what happens?

8          THE WITNESS:  What happens, if no other employee,

9  like me or other employee, it is supposed to put down the meal

10 and serve the customer.

11         THE COURT:  And serve the customer.

12         Okay.  Next question.

13 Q    Do you have a designated place in your store for

14 employees to take lunch or dinner?

15 A    What this space?

16         THE COURT:  He wants to know if there's a special

17 room or a place, when the employee is on break, is there a

18 lunch room or a place where the person can have her lunch?

19         THE WITNESS:  It is a really small store.  800

20 square feet, Commack store.  Basically, it is front part and

21 the back store, and the front store.

22         THE COURT:  So where does a person eat?

23         THE WITNESS:  So we supposed to stay in the back

24 store because you don't take the meal, let the customers

25 looking at you.

1           THE COURT:  So where do they actually --

2           THE WITNESS:  So there's a table behind the counter,

3    the front store, and inside room.  So that there's a table.

4    Usually they take the table and they will take the meal on

5    that table.

6           THE COURT:  Okay.  Next question.

7    Q    Do you punch out your employee when they are about to

8    take a break?

9    A    Punch out?

10   Q    Time out?

11   A    Time out?

12          THE COURT:  Do you have like a punch card?

13   Q    A punch card, time out your employees while they are

14   taking a break?

15   A    Sorry.  I don't have that kind of machine, no.

16   Q    Are you aware that employers are supposed to provide

17   employees with wage notice?

18   A    Wage notice?

19   Q    Which shows them how you calculated the wages?

20   A    So I think the schedule, the paper, that I put right on

21   the -- that's -- it is enough for they to know how much they

22   got paid.

23   Q    Have you provided this piece of paper to your employees?

24   A    So it is stuck on the wall.  So keep it at least two

25   month.  So --

1   Q    My question is, do you give the piece of paper posted on

2   the wall to your employees?

3   A    No.

4   Q    Are you aware there is a requirement to give the

5   employees a notice about their hourly rate and their working

6   schedule?

7   A    That, I don't know.  Because they don't need it, because

8   maybe -- even I give them the check, they don't take it.

9   Q    Did Carvel corporation often do inspection for employment

10  policy?

11  A    I have no idea for that kind of inspection.

12  Q    Will Carvel company -- sorry, Carvel corporation ever

13  advise you regarding your employment policy?

14  A    Employment policy?  They just remind us to follow the

15  minimum wages law and overtime law.

16  Q    So I take it your answer is yes; is that correct?

17  A    Yes.

18            MR. MULQUEEN:  The answer speaks for itself,

19  Your Honor.

20            THE COURT:  Overruled.  Go ahead.

21            MR. ZHU:  I have no further questions.  Thank you,

22  Your Honor.

23            THE COURT:  Any redirect?

24            MR. MULQUEEN:  Yes, Your Honor.

25            THE COURT:  Okay.

1   REDIRECT EXAMINATION

2   BY MR. MULQUEEN:

3   Q    So, Mr. Tam, you testified on cross-examination that with

4   regard to your taxes for the years of question, item number

5   13, which is the salaries of your employees, at the particular

6   stores, was underestimated; is that accurate?

7   A    Underestimated?  Maybe I say it is incorrect, yes.

8   Q    So is it lower or is it higher?

9        Is the number on the tax return lower than the

10  actual salaries paid or higher than the actual salaries paid?

11  A    If you combine, it is lower.

12  Q    And item number 13, is a deduction from your taxable

13  income; is that correct?

14  A    Yes.

15  Q    And so, essentially, you underestimated the amount of

16  money that you deducted from your taxable income?

17  A    Yes.

18  Q    And why did you do that?

19  A    Because I do them a favor.  Yeah.

20  Q    So when you say you do them a favor, who are you

21  referring to?

22  A    My two employees, Carole Luk and Demi Dai.

23  Q    And why is that a favor to them?

24  A    First of all, they request it.  And then they said, if --

25  let's say for Carole.  So if she rather to leave our store,

1    to -- instead of -- to keep the payroll record, yeah.  Because

2    it is -- she explained to me, it is benefit to her son's

3    father is away, her low income credit, the medical, so she

4    insist that I want to be off the book.

5    Q    All right.  Thank you, sir.

6              THE COURT:  All right.  Any recross-examination?

7              MR. ZHU:  No, Your Honor.

8              THE COURT:  Okay.  You can step down.

9              THE WITNESS:  Thank you, Judge.

10             (WHEREUPON, the witness was excused.)

11             THE COURT:  And I take it that you are resting?

12             MR. MULQUEEN:  Yes, Your Honor.  Defense rests.

13             THE COURT:  And you are not going to put any

14   additional evidence on?

15             MR. ZHU:  No, Your Honor.

16             THE COURT:  All right.  And you are going to renew

17   your motion?

18             MR. MULQUEEN:  Yes, Your Honor.

19             THE COURT:  For the same reasons that --

20             MR. MULQUEEN:  Yes, Your Honor.  That the testimony

21   did not meet the elements of the causes of action.

22             MR. ZHU:  Which causes of action?

23             THE COURT:  I take it -- well, there's been some

24   concession on some of the state law claims, at least with the

25   wage and hour notice.

1          MR. MULQUEEN:  Yes, Your Honor.  But, again, as I

2    pointed out in my summary judgment motion, that you can

3    forgive that if you believe --

4          THE COURT:  I get that.  I am just trying to figure

5    out what the status is here.  You are not saying that there's

6    insufficient evidence of that?

7          MR. MULQUEEN:  Your Honor, we admit that he did not

8    provide notice to his employees about their wages.  Written

9    notice, I should say.

10          THE COURT:  Right.  The issue which I think is the

11   most difficult for the plaintiff is whether this is a Fair

12   Labor Standards Act case because of whether the defendant

13   falls within the $500,000.

14          It is your burden to prove it, and I am not a

15   hundred percent seeing how you did that.

16          MR. ZHU:  Your Honor --

17          THE COURT:  And just parenthetically, I think I have

18   said this a few times before, I have always been kind of

19   surprised that there was really no discovery done in this

20   case.  But I am not -- I really also realize that you are the

21   third lawyer on the case.  I think you are; is that right?

22          MR. ZHU:  That's correct.

23          THE COURT:  Yes.  And I think you have done an

24   excellent job, but you've got the hand that you were dealt.

25   So it is not entirely clear to me what the basis is for

1    concluding that the defendant falls within the FLSA, given the

2    evidence about how much money those two stores made.

3           MR. ZHU:  There is testimony from my client that the

4    store during the summer season will have income in the

5    weekdays, which they define as Monday through Thursday, will

6    be $800 to $1,000.

7           THE COURT:  So that's -- I am cutting you off only

8    because that's what we talked about yesterday.  So that's the

9    sole basis from which I could conclude that?

10          MR. ZHU:  And, also, the plaintiff indicating the

11   tax return is totally fake.  Like the number, the fraud on the

12   record, I am not -- please do not take it as a threat, but

13   this is -- if this is the document filed with the IRS, then

14   this probably is fraud.

15          THE COURT:  Well, I think what you are saying is if

16   there's an incorrect number on one line, that perhaps the

17   other lines are incorrect, also?

18          MR. ZHU:  Basically --

19          THE COURT:  Are you just saying I should disregard

20   it because it is -- because of the --

21          MR. ZHU:  Fraud nature.

22          THE COURT:  Okay.  I think I understand.

23          MR. ZHU:  And, also, like we indicated, there's no

24   signature either from CPA nor from the defendant, as well

25   as -- it is stamped as "copy," which means it must match with

1    the original.  Therefore, it is pretty reasonable to say that

2    the original document does not bear the signature and the

3    date.  Because this stamp, which is very reliable --

4          THE COURT:  You are saying because it is not signed,

5    because the copy doesn't have the signature, that there's no

6    guarantee that that was what was filed?  Am I -- maybe -- I

7    just want to make sure I understand.

8          MR. ZHU:  Actually, in opposite, because there is no

9    signature and there is a "copy" stamp, which indicating the

10   original does not bear the signature and the date.

11         THE COURT:  Oh, you think -- but you don't think

12   that they submitted an unsigned -- filed an unsigned tax

13   return to the IRS, do you?

14         MR. ZHU:  I don't, but I just challenge this

15   document on its face.

16         THE COURT:  I see.

17         MR. MULQUEEN:  So, Your Honor, if I may respond.

18         THE COURT:  Sure.

19         MR. MULQUEEN:  The plaintiffs' testimony themselves,

20   the numbers that they provided, do not add up to a half

21   million dollars, even if you combine both of these stores,

22   which may or may not be correct, since they are two separate

23   corporations.  The tax returns indicate what the income was

24   for the year.  And I understand that Mr. Tam admitted, he

25   forthrightly admitted, that the deductions he took were less

1    than he was allowed to take.  That is not fraud.  The IRS

2    doesn't care if you take fewer deductions than you're entitled

3    to.  They only care if you take more deductions than you are

4    entitled to.  And he explained that as a favor for his

5    employees, which he considered part of his family, he helped

6    them out so that they didn't have to report income that they

7    received.

8              So there's no fraud on the tax returns.  And I

9    understand it is within your discretion to determine whether

10   or not, you know, all of the tax return may be false as well,

11   based on that admission.

12             THE COURT:  I am only going to -- I am not going to

13   endorse your general statement about whether there's anything

14   wrong with filing a return that isn't accurate, because, I

15   mean, the government might have a different view about whether

16   or not, you know, filing documents that are inaccurate in

17   order to enable somebody else to underreport, or however you

18   want to --

19             MR. MULQUEEN:  I am not saying it is proper.

20             THE COURT:  But I take your point.

21             MR. MULQUEEN:  And one more thing.

22             THE COURT:  Sure.

23             MR. MULQUEEN:  I'm sorry to interrupt.

24             But Mr. Tam also testified about the amount of

25   gallons of mix that he purchased from Carvel, the

1    distributors.  And based on the gallons that he testified

2    about, once again, you cannot come up to a half a million

3    dollars.  Every product in the store that he sold was made

4    from that mix.  And based on the calculations, there's no way

5    those two stores come up to a half a million dollars.  So for

6    those three reasons, it was -- I suggest, as I have before,

7    that we certainly don't fall within the FLSA.

8                MR. ZHU:  Your Honor, I do not agree with my

9    adversary's calculations based on our client's testimony.  And

10   this $500,000 issue goes on the merit of my client's FLSA

11   claim instead of subject matter jurisdiction.

12               THE COURT:  No.  I think we already -- that ship

13   already sailed.  I already agreed with you on that.

14               MR. ZHU:  Yes.

15               THE COURT:  But --

16               MR. ZHU:  Nevertheless, of course, let's assume

17   whatever's alleged by the defendant is true, if you take

18   whatever is true, the Court should exercise supplemental

19   jurisdiction over my client's state law claim.

20               THE COURT:  Well, I am definitely doing that because

21   we wouldn't have gone through this whole exercise only to have

22   me say I didn't want supplemental jurisdiction.  So regardless

23   of what happens with the FLSA, I have jurisdiction over the --

24   I mean, we tried the case.  So I will not force you to go to

25   state court on the -- that would be a real waste of time.

*PROCEEDINGS*                                                      170

1          MR. ZHU:  If that is the case, we can stipulate to

2    withdraw the FLSA.

3          THE COURT:  With the FLSA?  Okay.

4          MR. MULQUEEN:  I would still like to make arguments

5    then about the state claims.

6          THE COURT:  You can certainly make those arguments.

7    I am going to suggest you would probably come in second, but

8    you can still make the arguments.

9          MR. MULQUEEN:  Well, again, Your Honor, Ms. Luk took

10   the stand and essentially said she doesn't know how much money

11   she made.  So how can she sustain a claim that she wasn't paid

12   minimum wage, when she can't tell the Court how much money she

13   made.

14         So I find it hard to imagine how Your Honor can

15   calculate that Mr. Tam did not pay her properly, and then

16   penalize them for that, when we don't even know from her mouth

17   how much she made.

18         And Ms. Dai told you, essentially, since 2012, she

19   made $10 an hour.  Well, in 2012, the minimum wage was $7.25.

20   So if she made $7.25 -- if she made $10 an hour, that's $2.75

21   per hour more than the minimum wage, and that more than makes

22   up for the time and a half she would have received for the two

23   hours of so-called overtime that she worked.

24         Let's also -- again, it's within your discretion to

25   credit Mr. Tam's testimony that the employees were entitled to

1   two and a half hours of breaks per day that he is not required

2   to pay them for, yet he did.  So he paid them for two -- a

3   full ten hours a day, and probably because of the nature of

4   his business, he asked that they stay in the store and take

5   their breaks.  He paid them that amount.

6           But under those circumstances, neither -- I should

7   say, Ms. Dai was not underpaid, no matter how you look at this

8   situation.

9           So with the exception of the written notice

10  allegations, I would argue that the plaintiffs have not

11  sustained their state claims either.

12          THE COURT:  What do you have to say about that?

13          MR. ZHU:  My client Ms. Luk already testified she

14  was paid, at a minimum wage, and we took judicial notice of

15  the minimum wage, and, also, Mr. Tam testified basically the

16  same thing.  So there is not unclear how much Ms. Luk was

17  being paid.

18          With regard to the lunch break, it is not about

19  credibility.  Mr. Tam testified there is no uninterrupted

20  lunch break during the ten-hour workday.  Therefore, there's

21  definitely overtime.

22          Basically, our main claim is overtime.  And for

23  minimum wage, if my adversary wants to move to dismiss, we can

24  stipulate pretty much from 2012 to 2014, there's probably no

25  minimum wage issue.  But go back to Ms. Luk, it is very clear,

1    spread of hour is part of minimum wage issue.  The spread of

2    hours doesn't care whether you take a break or not, it is just

3    from the beginning to the end of work, if any exceeding of ten

4    hours, they are entitled to spread of hours.

5            If Ms. Luk was paid by minimum wage, or as testified

6    by Mr. Tam, was 50 cents above the minimum wage, it does not

7    render her income above the minimum wage.  It is throughout

8    all relevant time.

9            THE COURT:  So this is what I think would be a

10   really good use of your time and an even better use of my

11   time, which would be if you -- I want you to look at what your

12   claims are.  And I have to say, I appreciate your recognition

13   that some of the claims might not survive, given the

14   testimony.

15           What I would like you to do is take a look and see

16   which ones you are going to press ahead with.  And then,

17   again, maybe this is a triumph of hope over experience, but I

18   still feel like you all could work this out.  But if you

19   can't, that's fine.  But I think it is always good to narrow

20   what we all have to focus on.

21           So is it your position, and if you want to think

22   about this, that is also, fine, too, but is it your position

23   that the minimum wage claims have not -- do you agree that

24   those -- that you are going to withdraw those?

25           MR. ZHU:  No.

 1            THE COURT:  Okay.  Some of them?

 2            MR. ZHU:  But if my adversary is keeping -- stick on

 3    this, probably some of them we can -- I can stipulate with

 4    him, but it is not -- I don't want to be prejudiced against my

 5    client.

 6            THE COURT:  No, no, and that's why I am not trying

 7    to -- that's fine.

 8            So I am denying the motions at this point.  I am

 9    going to set a briefing schedule for you to submit -- I know

10    you submitted your proposed findings of fact already, but,

11    obviously, you might want to change those, that they are

12    different, at least in some respects, from what you submitted.

13            So if you submit your briefs on that and -- so I am

14    trying to think.  I have only been doing this for 15 years and

15    I still can't set a briefing schedule, who should do what

16    when.

17            MR. MULQUEEN:  Your Honor, can I suggest that --

18            THE COURT:  Yes, please do.

19            MR. MULQUEEN:  -- counsel inform us first which

20    causes of action he wishes to pursue, so that would limit the

21    issues that we have to brief?

22            MR. ZHU:  I can inform you that we are pursuing all

23    the causes of action.

24            THE COURT:  But not the FLSA, right?

25            MR. ZHU:  I mean, can we start with the state law

1    claim first?  Because this is the same identical issue.

2           THE COURT:  Right.  The only question in the FLSA

3    context is whether or not they fall under the federal claim.

4    The state law claims are before me.  So if your concern is

5    that I wouldn't exercise supplemental jurisdiction, that's not

6    a concern, because I already have.

7           So I will -- I also do not -- you know, you don't

8    have to -- you should stick to your guns if you feel like you

9    have got a case.

10          MR. ZHU:  I cannot give it up in this moment.

11          THE COURT:  That's fine.  That's fine.

12          So let's set a briefing schedule.  But I am back to

13   wondering who goes first or if you should just submit them

14   together.

15          (Short pause.)

16          THE COURT:  Okay.  So as the much smarter person in

17   the room has reminded me, I think the defense should move

18   first.  So let's say --

19          THE COURTROOM DEPUTY:  March 23.

20          THE COURT:  If you need more time, that's also fine.

21   I realize you might have other cases besides this one.

22          MR. MULQUEEN:  That should be fine.  If I can ask

23   the court reporter how long it would take to provide a

24   transcript once it is ordered.

25          (Short pause; off record discussion.)

1          THE COURT:  So let's move it out a little.

2          MR. MULQUEEN:  Yes, please.

3          THE COURT:  Let's go to end of April.

4          THE COURTROOM DEPUTY:  April 23.

5          MR. MULQUEEN:  Okay.

6          THE COURT:  April 23.  And then your response will

7    be due --

8          THE COURTROOM DEPUTY:  May 25.

9          THE COURT:  That's not Memorial Day, is it?

10          THE COURTROOM DEPUTY:  No.  I don't think so.

11          THE COURT:  And then two weeks for a reply.

12          THE COURTROOM DEPUTY:  8th.

13          THE COURT:  June 8.

14          And if between now and then you work something out,

15    you will let me know, okay?

16          MR. MULQUEEN:  Sure.  Do we have a date to come back

17    here or you will make a written decision?

18          THE COURT:  I will make a written decision.  Okay.

19          MR. ZHU:  Thank you, Your Honor.

20          THE COURT:  Thank you so much.  Everybody did a

21    great job.

22          (WHEREUPON, at 1:12 p.m., the proceedings were

23    concluded.)

24

25

**REPORTER'S CERTIFICATE**

I, ANNETTE M. MONTALVO, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of April, 2020.

/s/Annette M. Montalvo
Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

*PROCEEDINGS*                                                  177

1                            INDEX

2     WITNESS                                      PAGE

3

4     KA SHEK TAM                                    94

5     DIRECT EXAMINATION BY MR. MULQUEEN             95

6     CROSS-EXAMINATION BY MR. ZHU                  144

7     REDIRECT EXAMINATION BY MR. MULQUEEN          163

8

9

10

11    EXHIBIT                                    RECEIVED

12    Defense Exhibit A                             91

13    Defense Exhibit, tax returns                  92

14

15

16

17

18

19

20

21

22

23

24

25