UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                         :

**YING YING DAI** and **CAROL LUK**,        :

                   Plaintiffs,    :   **MEMORANDUM DECISION**
                                          :   **AND ORDER**

           – against –             :   18-CV-05170 (AMD) (RLM)
                                           :

**ABNS NY INC. d/b/a CARVEL**, **SHK LI INC.**   :
**d/b/a CARVEL** and **KA SHEK TAM**,       :

                   Defendants.    :

-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

        The plaintiffs brought this action against their employers, alleging violations of the Fair

Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  (ECF No. 1.)[1]  I held a

two day bench trial on February 20 and 21, 2020, at which the plaintiffs and defendant Ka Shek

Tam testified.  The parties submitted post-trial briefing.  (ECF Nos. 63-66.)  After carefully

considering the evidence introduced at trial, the arguments of counsel and the controlling law on

the issues presented, I make the following findings of facts and conclusions of law, as required

by Rule 52(a) of the Federal Rules of Civil Procedure.

---

[1] The plaintiffs did not conduct any discovery.  Three days before the trial was scheduled to begin in
October of 2019, the defendants questioned for the first time whether the Court had jurisdiction over this
case, asserting that the defendants did not meet the earnings requirement to be covered by the FLSA.  I
ordered the parties to brief the issue, denied the defendants' motion for summary judgment and
rescheduled the trial.

# FINDINGS OF FACT[2]

## 1. The Defendants

In 1998, defendant Ka Shek Tam bought a Carvel store in Jericho, Long Island under the corporation name Shk Li. Inc.  (Tr. 95:9-18, 102:8-9.)  He bought a second store in Commack in 2008, using the corporation name ABNS NY Inc.  (Tr. 95:9-13, 102:9-10.)  He owned both stores until 2018; he sold the Commack store in March and the Jericho store in July.  (Tr. 96:6-7.)

## 2. The Plaintiffs

Mr. Tam hired Carol Luk to work full time at the Jericho store in 2004.  (Tr. 7:14-17, 96:12-14.)[3]  She started working at both stores in 2011.  (Tr. 7:17-18.)  When the Commack store closed in March of 2018, she worked on Sundays at the Jericho store until July of 2018. (Tr. 32:2-7.)  She had various responsibilities, including serving customers, arranging kits for cake and ice cream and cleaning.  (Tr. 10:8-12.)

Mr. Tam hired Ying Ying ("Demi") Dai at the end of 2010 or the beginning of January of 2011.  (Tr. 60:10-14.)  Her job responsibilities included welcoming and serving customers and making cakes.  (Tr. 60:22-24.)  She was employed until July 14, 2018.  (Tr. 66:5-10.)

## 3. Income from the Stores

Ms. Luk estimated that in the summer months, the Commack store made approximately $800 to $1,000 on weekdays (Monday through Thursday), $1,000 to $1,200 on Fridays and $1,200 to $1,600 on the weekends.  (Tr. 26:17-19.)  The Jericho store made approximately $600 to $800 on weekdays, $800 to $1,000 on Fridays and $1,000 to $1,2000 on the weekends.  (Tr. 26:20-22.)  The income during the winter for both stores was about two thirds what it was in the

---

[2] These findings of fact are based on the trial testimony and exhibits.

[3] Ms. Luk was hired as a part time employee in 2003, and full time in 2004.  (Tr. 7:14-17.)

summer.  (Tr. 11:5-8.)

Ms. Dai gave higher income estimates for the Jericho store.  In the summer months—June, July and August (Tr. 68:7-10)[4]—the Jericho store made approximately $600 to $800 on weekdays (Monday through Thursday) and $1,200 to $1,500 on Fridays and the weekends.  (Tr. 61:10-13.)  In the winter, the Jericho store made approximately $400 to $500 on weekdays and $800 to $900 on weekends.  (Tr. 61:17-18.)

According to the defendants' tax returns, the income for the Commack store was $158,893 for the 2012 tax year, $159,632 for 2013, $161,786 for 2014, $170,727 for 2015, $165,133 for 2016, and $62,786 for 2017.  (Def. Exs. B1-6.)  The income for the Jericho store was $143,653 for the 2012 tax year, $147,861 for 2013, $155,473 for 2014, $157,029 for 2015, $153,606 for 2016, and $116,369 for 2017.  (Def. Exs. C1-6.)[5]

Mr. Tam also testified about the amount of ice cream and cake mix that he purchased for each store, and the expected income per gallon of mix.  He said that for the Commack store, he bought at most 3,400 gallons of mix a year; one gallon of mix is expected to generate 60 to 70 dollars in revenue.  (Tr. 108:3-13, 109:22-110:3.)  For the Jericho store, he bought more than 3,000 gallons a year about ten years ago, but he purchased smaller amounts in the years that followed; in 2017, he purchased 2,200 gallons of mix.  (Tr. 110:8-18.)  There was "a lot" of waste at the store, but he could not assign a dollar figure to the amount of waste and had "no idea" how much he threw away.  (Tr. 111:2-15.)

I have considered all of the evidence and conclude that the tax returns are the most reliable and credible evidence of the stores' income.  Although the copies of the tax returns were

---

[4] Ms. Luk did not define the summer months.
[5] Each tax year begins on November 1st, and ends on October 31st of the following year.  The 2017 return for the Commack store covers the period from November 1, 2017 until March 31, 2018, and the 2017 return for the Jericho store covers the period from November 1, 2017 until July 31, 2018.

not signed, I credit Mr. Tam's testimony that the tax returns showed the stores' income.  (*See* Tr. 102:24-106:25.)  The plaintiffs offered good faith estimates, but their estimates lacked precision and consistency.  For example, the plaintiffs gave different estimates for the Jericho store and did not testify about the income for any specific year or that the actual income for the relevant years fell at the higher end of their income range estimates.[6]

### 4.  Plaintiff Dai's Hours and Wages

Ms. Dai testified that she worked from 11:30 a.m. to 9:30 p.m. Monday through Friday, and from 11:00 a.m. to 10:00 p.m. on the weekends.  (Tr. 62:1-4.)  She also testified that she worked "ten hours" a day, from "11:30 to 9:30," and she knew the hours she worked because she was "a regular."  (Tr. 67:10-14.)  She was sometimes ten minutes late to work on the weekends.  (Tr. 75:21-23.)  After her first month, she worked five days a week, with one weekday and one weekend day off each week.  (Tr. 62:13-21.)  Beginning in January of 2013, her days off were Wednesday and Sunday.  (Tr. 62:20-63:2.)

Mr. Tam testified that when Ms. Dai came to work on time, she worked "ten hours per day;" she was late about half of the time, but he was not specific; he testified that "if you figure out 15 minutes is late," lateness "always happened."  (Tr. 135:25-136:1, 137:20-138:5.)  Ms. Dai did not have an uninterrupted break; if customers came into the store during her break, she was required to help them.  (Tr. 63:6-7, 160:4-11.)

Ms. Dai's testimony about her hours on the weekends was inconsistent; for example, she said that she worked from 11:00 a.m. to 10:00 p.m.—eleven hours—but also that she was "a

---

[6] Mr. Tam's estimate about the expected income based on the number of gallons of mix he purchased, while made in good faith, lacked sufficient details—including the precise amount of mix he bought each year, the amount of mix that was wasted, and the precise revenue per gallon of mix—to be credited as more than a rough estimate.  Based on the high end of his ranges—3,400 gallons for the Commack store and 3,000 for the Jericho store—the income was at most approximately $384,000 to $448,000 a year.

regular" who worked "ten hours" a day.  I conclude that she worked ten hours a day, which comports with Mr. Tam's testimony about her hours.  I credit Ms. Dai's testimony that she regularly worked five days a week.  Although I also credit the testimony that Ms. Dai was sometimes late, there were insufficient details in the testimony—both Ms. Dai's and Mr. Tam's—about her lateness to make a conclusion of fact about whether and by how much her lateness reduced her weekly hours.  Because I find that Ms. Dai did not have bona fide meal breaks, I do not adjust her daily hours for breaks.

Ms. Dai testified that when she first started working for Mr. Tam, he paid her $75 each day; three or four months later, her pay went up to $500 a week for most of the year, and $520 to $530 a week in the summer months—the extra money during the summer was from tips.  (Tr. 63:8-15; 67:15-17.)  Mr. Tam also testified that Ms. Dai's wages changed throughout her employment, and that he paid her a set salary regardless of whether she worked "ten hour or even less."  (Tr. 136:14-16.)  He said: "The salary is—I pay her $60 from—on 2012, right . . . And the second year also $80 per day.  And the third year, raise up to 90, and then keep—and then another year is still $90 per day.  And then after raise up to $100 per day, $100 per day, something like that."  (Tr. 135:8-12.)  When asked if he ever paid her more than $100 in a day, he said: "Let's say, in 2018, I pay her 111—110 per day.  2017, I pay her 105 per day."  (Tr. 136:10-13.)

In resolving these conflicting accounts, I credit Ms. Dai's testimony about the wages she received.  Mr. Tam's testimony was vague, and he seemed to be guessing about what he paid Ms. Dai, qualifying his testimony with phrases like "something like that" and "[l]et's say."  He also testified that he paid her $110 a day in 2018 and $105 a day in 2017, but it was not clear whether he paid her these amounts each day she worked in those years, or only some days.

However, I credit Mr. Tam's testimony that he paid Ms. Dai based on the number of days that

she worked; she received a daily wage that was paid weekly.  Ms. Dai did not explain how the

wages that she received were calculated, while Mr. Tam gave a credible explanation for the

method by which these wages were calculated.

In addition to her regular pay, Ms. Dai received yearly cash bonuses of $200.  (Tr. 68:11-

15, 134:20-135:1.)

Because Ms. Dai took four to six weeks off for vacation each year from 2014 to 2017 (Tr.

64:13-19), I find that she worked approximately 47 weeks in each of these years.

I find that throughout the relevant period, Ms. Dai generally worked ten hours a day, five

days a week, and was paid $100 a day, or $500 a week, for most of the year, with an additional

$20 to $30 a week in tips during the summer.

### 5.  Plaintiff Luk's Hours and Wages

Ms. Luk testified that she worked during operating hours on each day that she worked.

(Tr. 8:20-22.)  She and Mr. Tam gave similar accounts of the stores' hours, with minor

differences.  Mr. Tam, who went to one or both stores "[b]asically . . . every day" (Tr. 97:13-18),

testified that the Jericho store was open from 11:00 a.m. until 9:30 p.m. on weekdays (Monday

through Friday), from 11:00 a.m. until 10:00 p.m. on Saturdays, and from 11:00 a.m. until 9:30

p.m. on Sundays.  (Tr. 96:20-97:7.)  Ms. Luk's testimony was similar, except that she testified

that the hours for the "weekend" were from 11:00 a.m. until 10:00 p.m.—suggesting that these

were the hours for both Saturday and Sunday.  Her testimony about the weekday hours was not

entirely consistent; she seemed to suggest that the store opened both at 11:30 a.m. and 11:00 a.m.

on weekdays.  (Tr. 8:13-19 ("At Jericho store, on the weekdays, 11:00 to 9:30—okay, 11:30 to

9:30.  And on weekend, 11:00 to 10:00."); Tr. 9:25-10:4.)

According to Mr. Tam, the Commack store was open from 11:30 a.m. until 9:15 p.m. on weekdays (Monday through Friday), from 11:00 a.m. until 9:30 p.m. on Saturdays, and from 11:00 a.m. until 9:15 p.m. on Sundays.  (Tr. 97:8-12.)  Ms. Luk's testimony was similar, but she said that the "weekend" hours were 11:00 a.m. to 9:30 p.m.  (Tr. 8:13-17.)

Ms. Luk did not have a formal break; she had to serve customers who came into the store when she was on an informal break.  (Tr. 14:6-10, 36:25-37:8, 160:8-11.)

Before the Commack store closed in March of 2018, Ms. Luk usually worked five days a week: three days at the Commack store and two days at the Jericho store.  (Tr. 7:24-8:2, 14:11-14, 33:2-6.)  She generally had one weekday and one weekend day off, but the schedule was not "regular;" it changed often and was "totally decided by the boss," Mr. Tam.  (Tr. 14:15-17, 33:1-21.)  She sometimes worked six days or more, but she did not "quite remember" how often.  (Tr. 15:18-16:3.)  She worked more when Ms. Dai and Mr. Tam were on vacation—sometimes every day of the week—but she could get breaks if she had something else to do.  (Tr. 47:13-48:5.)  During other periods she worked less; in 2016, she opened a dry cleaning business and worked at the Carvel stores only one day a week for about four to six weeks.  (Tr. 45:18-46:10.)

I credit Ms. Luk's testimony that she generally worked three days a week at the Commack store and two days a week at the Jericho store, and that she worked during the operating hours of the stores on the days that she worked.  Her testimony about when the Jericho store opened on weekdays was somewhat unclear, but her testimony and Mr. Tam's testimony support a finding that it opened at 11:00 a.m.  Ms. Luk suggested that she worked somewhat longer hours on Sundays, but she was unclear about when the Jericho store opened.  Mr. Tam was more specific about the operating hours of the stores, and I credit his testimony.  Accordingly, I find that Ms. Luk's workday was 9 hours and 45 minutes at the Commack store

on weekdays, 10 hours and 30 minutes at the Commack store on Saturdays, 10 hours and 15 minutes at the Commack store on Sundays, 10 hours and 30 minutes at the Jericho store on weekdays and Sundays, and 11 hours at the Jericho store on Saturdays.  I credit Ms. Luk's testimony that she sometimes worked more when Ms. Dai and Mr. Tam were on vacation, but because there were weeks when she also worked less, I find that her five day schedule is an adequate estimate of her hours throughout the year.  Because I find that the Ms. Luk did not have bona fide meal breaks, I do not adjust her daily hours for breaks.

Ms. Luk testified that her "rate of pay followed the minimum wage . . . , and only in the last year it was a little bit higher, it is about $11.50." (Tr. 18:8-11.)  Mr. Tam testified that he paid her more than the minimum wage.  (*See* Tr. 132:24-133:3 ("So it is since 2004, I—it is 50 cents more, but some—like, let's say, in 2016, I pay her 10.50.  It is 150 higher than the minimum wage on 2016.").)  Because Mr. Tam's testimony about Ms. Luk's wages was vague, I credit Ms. Luk's testimony about her rate of pay.

In addition to her regular pay, Ms. Luk received yearly cash bonuses.  (Tr. 42:12-24, 44:3-8.)

Accordingly, I find that until the Commack store closed, Ms. Luk generally worked either 9 hours and 45 minutes, 10 hours and 15 minutes, 10 hours and 30 minutes or 11 hours, depending on the store and the day of the week, that she worked five days a week, and was paid minimum wage, except for in 2018 when she was paid about $11.50 an hour.  She generally worked three days at the Commack store, where she usually worked 9 hour and 45 minute days, and two days at the Jericho store, where she usually worked 10 hour and 30 minute days, for a total of 50 hours and 15 minutes a week.  After the Commack store closed, she worked one day a week at the Jericho store.

8

### 6.  The Defendants' Notice and Payment Practices

Mr. Tam did not give his employees written notice of how he calculated their wages.  (Tr. 161:16-162:8.)  Ms. Luk did not receive "any writings informing [her of] the pay," and Ms. Dai was never given any written notice of how her pay was calculated when she received it.  (Tr. 35:12-14, 63:23-64:1.)  Counsel for the defendants admitted that Mr. Tam did not provide any written notice to his employees about their wages.  (Tr. 165:7-9.)

Mr. Tam knew that the law required him to pay minimum wage and overtime wages "from [his] simple accounting knowledge," or because someone reminded him when he opened his stores.  (Tr. 154:11-20, 155:7-9.)  He was "not sure" if he knew that he needed to pay spread of hours payments.  (Tr. 155:10-13.)

### CONCLUSIONS OF LAW

The plaintiffs claim that they are entitled to minimum wage and overtime wages under the FLSA and NYLL, spread of hours pay under the NYLL and statutory damages under the NYLL for the defendants' failure to provide time of hire notices and wage statements.  For the reasons that follow, I find that the plaintiffs have proved by a preponderance of the evidence that the defendants violated the minimum wage, overtime, spread of hours and wage statement provisions of the NYLL, but that they have not proved their other claims.

### I.    FLSA Claims

Under the FLSA, an employer must pay minimum and overtime wages if the employee either "1) is engaged in commerce or in the production of goods for commerce, or 2) is employed in an *enterprise* engaged in commerce or in the production of goods for commerce."  *Jacobs v. N.Y. Foundling Hosp.*, 577 F.3d 93, 96-97 (2d Cir. 2009) (quoting 29 U.S.C. § 207(a)(1)) (internal quotation marks omitted); *see also* 29 U.S.C. § 206.  The statute defines an "[e]nterprise

engaged in commerce or in the production of goods for commerce" as an enterprise that: "(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A). "[T]he question of whether a defendant qualifies as an enterprise under the FLSA is not a jurisdictional issue, but an element that a plaintiff must establish in order to prove liability." *Benitez v. F & V Car Wash, Inc.*, No. 11-CV-01857, 2012 WL 1414879, at *1 (E.D.N.Y. Apr. 24, 2012).

I conclude that the plaintiffs did not meet their burden of showing that the defendants qualify as an enterprise under the FLSA, and therefore that the defendants are not liable to the plaintiffs under the FLSA. As discussed in my findings of fact, the defendants' tax returns provided the most reliable and credible evidence about the stores' income. Based on these tax returns, the combined income for the stores was $302,546 for the 2012 tax year, $307,493 for 2013, $317,259 for 2014, $327,756 for 2015, $318,739 for 2016, and $179,155 for 2017. (*See* Def. Exs. B1-6, C1-6.) The stores' combined income was less than $500,000 for all years.

Moreover, even the plaintiff's estimates—which I credit only as good faith estimates—do not show that the yearly income exceeded $500,000. Based on Ms. Luk's testimony, the income range for the Commack store was $6,600 to $8,400 a week during the summer, and $4,400 to $5,600 a week during the winter. For the Jericho store, it was $5,200 to $6,600 a week during the summer, and $3,466.66 to $4,400 a week during the winter. Ms. Dai estimated that the income range for the Jericho store was $6,000 to $7,700 a week during the summer, and $4,000 to $4,700 a week during the winter. According to the plaintiffs' estimates, the yearly income

range for the Commack store was approximately $257,400 to $327,600 a year, the yearly income range for the Jericho store was approximately $202,800 to $283,400 a year, and the combined income for the two stores was approximately $460,200 to $611,000 a year.[7]  As discussed above, the plaintiffs did not offer any evidence about the income for any specific years, or evidence that the actual income for the relevant years fell at the higher end of this range.

## II.  NYLL Claims

"New York's Labor Law is the state analogue to the federal FLSA," but it "does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of annual sales."  *Valdez v. H & S Rest. Operations, Inc.*, No. 14-CV-4701, 2016 WL 3079028, at *3 (E.D.N.Y. Mar. 29, 2016) (citations and quotation marks omitted), *report and recommendation adopted*, 2016 WL 3087053 (E.D.N.Y. May 27, 2016).  There is a six year statute of limitations for claims brought under the NYLL.  N.Y. Lab. Law § 663.  The plaintiffs initiated this action on September 13, 2018, so I consider claims for the period from September 13, 2012 onward.

"Although a plaintiff generally 'has the burden of proving that he performed work for which he was not properly compensated,' when an employer has 'inaccurate or inadequate' records, the plaintiff 'has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"  *Feuer v. Cornerstone Hotels Corp.*, No. 14-CV-5388, 2020 WL 401787, at *9 (E.D.N.Y. Jan. 24, 2020)

---

[7] I calculate these yearly estimates based on the plaintiffs' weekly estimates for the summer and winter months, and assuming that there are approximately 13 weeks in the summer months and 39 weeks in the winter months.  I reject the plaintiffs' approach of calculating the yearly income by adding the estimated weekly summer income and winter income together, dividing by two, and multiplying by 52 (*see* ECF No. 65 at 21-22), because the summer months do not make up half of the year.

(quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  "Sufficient evidence may be established by recollection alone."  *Id.* (citation and quotation marks omitted); *see also Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) ("It is well settled among the district courts of this Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection.").  For FLSA claims, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Anderson*, 328 U.S. at 687-88.  "New York law incorporates a similar standard." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 332 (S.D.N.Y. 2005).  "Under the NYLL, the burden is on the employer to prove by a preponderance of the evidence that Plaintiff was properly compensated for the hours he worked."  *Jian Hua Li v. Chang Lung Grp. Inc.*, No. 16-CV-6722, 2020 WL 1694356, at *5 (E.D.N.Y. Apr. 7, 2020); *see also* N.Y. Lab. Law § 196-a(a) (if an employer does not "keep adequate records or provide statements of wages[,] . . . the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements"); *Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 307 (E.D.N.Y. 2009) ("New York law places a more demanding burden on employers than the FLSA.") (citing *Jiao v. Chen*, No. 03-CV-165,  2007 WL 4944767, at *3 (S.D.N.Y. Mar. 30, 2007)).

The parties agree that the defendants did not give the plaintiffs any statements of wages. (*See* Tr. 35:12-14, 63:23-64:1, 161:16-162:8, 165:7-9.)  Nor did the defendants submit into evidence any adequate records.  Accordingly, I consider the plaintiffs' recollections in making my determinations.

### a. Minimum Wage

Under the NYLL, employers must pay employees at least minimum wage.  *See* N.Y. Lab. Law § 652.  At trial, the plaintiffs asked me to take judicial notice of the applicable minimum wage, which was $7.25 in 2012 and 2013, $8.00 in 2014, $8.75 in 2015, $9.00 in 2016, $9.70 in 2017 and $10.40 in 2018.  (Tr. 18:15-19:25); N.Y. Lab. Law § 652.

Ms. Luk testified that she was paid the minimum wage or higher (Tr. 18:9-12; 20:12-15), and there is no evidence suggesting that she was paid less than minimum wage.  Ms. Dai was paid a daily rate of $100, or $500 a week, which, as is discussed in more detail below, brings her regular hourly wage to $10.00 an hour.  *See* 12 N.Y.C.R.R. § 142-2.16.  This rate meets the minimum wage, except in 2018.  Because Ms. Dai received $20 to $30 more a week in the summer, she was paid below minimum wage only from January through May of 2018.  She is owed 40 cents more per hour for 50 hours a week during this 21-week period, which totals $420.

### b. Overtime

Under the NYLL, employers must pay employees "for overtime at a wage rate of one and one-half times the employee's regular rate" for hours worked in excess of forty hours a week.  12 N.Y.C.R.R. § 142-2.2; *see also Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) ("The FLSA mandates that an employee . . . be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week," and "the NYLL adopts this same standard."); *Valdez*, 2016 WL 3079028, at *3 ("New York's Labor Law is the state analogue to the federal FLSA.  Although the Labor Law does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of annual sales, it otherwise mirrors the FLSA in compensation provisions regarding overtime wages.") (citations and quotation marks omitted).

Based on my findings of fact, the defendants violated the NYLL because they did not pay overtime wages to the plaintiffs, who worked more than forty hours a week. Ms. Luk was paid at the hourly minimum wage rate, with a slightly higher rate in 2018, and generally worked 50 hours and 15 minutes a week. Ms. Dai was paid a daily rate of $100, or $500 a week, with additional compensation in the summer months, and worked 50 hours a week. There was no testimony or evidence that Mr. Tam ever discussed overtime pay rates with the plaintiffs, or that the plaintiffs were paid overtime. Accordingly, I find that the plaintiffs were not paid one and a half times their regular rate of pay for hours worked over forty each week.

To determine overtime wages owed, I must determine the employees' regular rate of pay. Ms. Luk's regular rate was the minimum wage, except for in 2018 when it was $11.50.

Unlike Ms. Luk, Ms. Dai was paid on a daily rather than an hourly basis. Section 142-2.16 of the New York Department of Labor's regulations provides that "[w]hen an employee is paid on a piece work basis, salary, or any basis other than hourly rate, the regular hourly wage shall be determined by dividing the total hours worked during the week into the employee's total earnings."[8]

It is not clear whether the plaintiffs propose that I calculate Ms. Dai's regular rate based on a forty hour week, or based on the actual hours that she worked. The plaintiffs' post trial brief cites the language of the regulation without explanation (*see* ECF No. 65 at 15), but their damages chart lists Ms. Dai's hourly rate as $12.50 (ECF No. 65-1), which is her weekly pay divided by forty. The plaintiffs may be attempting to rely on the law that "[t]he FLSA and the NYLL carry a rebuttable presumption that a weekly salary covers only the first forty hours,

---

[8] The plaintiffs ask me to calculate Ms. Dai's regular rate according to this section; they do not argue that Section 146-3.5, which defines the regular rate of pay for restaurant and hotel employees, applies, and appear to concede that it does not.

14

unless the parties have an alternate agreement," *Pinovi v. FDD Enterprises, Inc.*, No. 13-CV-2800, 2015 WL 4126872, at *4 (S.D.N.Y. July 8, 2015) (collecting cases), but because their post trial submissions are silent on the issue, I can only speculate.

However, because I find that Ms. Dai was paid a daily wage, not a fixed weekly salary, I conclude that it is more appropriate to calculate her regular rate by dividing her weekly wages by the total number of hours she worked each week, and that her regular rate was $10 an hour.  *See Espinoza v. Indus. Glass & Mirror Inc.*, No. 16-CV-64, 2016 WL 7650592, at *5 (E.D.N.Y. Nov. 30, 2016) ("Here, Defendants paid [the plaintiff] $120 per day, regardless of the amount of hours he worked. Espinoza worked 10 hours per day.  Thus, [his] regular rate was $12 per hour. Under both federal and state laws, [his] overtime rate was $18 per hour.") (citing 12 N.Y.C.R.R. § 142-2.2), *report and recommendation adopted*, 2017 WL 65828 (E.D.N.Y. Jan. 5, 2017); *Nuriddinov v. Masada III, Inc.*, No. 15-CV-5875, 2018 WL 1251335, at *2 (E.D.N.Y. Mar. 12, 2018) ("The court calculated plaintiff's lawful hourly rate on a week-by-week basis for every workweek (Monday-Sunday) he worked for defendants.  By multiplying plaintiff's daily rate ($120) by the number of days worked, the court calculated plaintiff's actual weekly compensation ('Actual Pay Received').  The court calculated plaintiff's lawful hourly rate by dividing plaintiff's Actual Pay Received by the number of hours worked in that week."); *Chen v. JP Standard Constr. Corp.*, No. 14-CV-1086, 2016 WL 2909966, at *9 (E.D.N.Y. Mar. 18, 2016) (calculating the "regular rate" under 29 C.F.R. § 778.112 by dividing the plaintiff's weekly wages by the hours he worked, noting that 12 N.Y.C.R.R. § 142-2.16 "requir[es] a similar formula," and explaining that it was appropriate to apply the regulations governing "day rates" even though the plaintiff "was paid once per week"), *report and recommendation adopted*, 2016 WL 2758272 (E.D.N.Y. May 12, 2016); *De La Cruz Moreno v. Happy Angel Nail Spa Inc.*,

No. 15-CV-10078, 2019 WL 2438966, at *3 (S.D.N.Y. June 12, 2019) (calculating the hourly

rate by dividing the weekly wages by the number of hours actually worked where the plaintiff

was paid "a flat rate . . . per day"), *report and recommendation adopted*, 2019 WL 2717153

(S.D.N.Y. June 28, 2019).

I calculate the overtime wages owed to Ms. Dai as follows:

| Year | Regular Rate | OT Rate | OT Hours Per Week | Weeks Worked | Total Owed |
|------|--------------|---------|-------------------|--------------|------------|
| 2012 | 10.00 | 15.00 | 10 | 15 | 750 |
| 2013 | 10.00 | 15.00 | 10 | 52 | 2,600 |
| 2014 | 10.00 | 15.00 | 10 | 47 | 2,350 |
| 2015 | 10.00 | 15.00 | 10 | 47 | 2,350 |
| 2016 | 10.00 | 15.00 | 10 | 47 | 2,350 |
| 2017 | 10.00 | 15.00 | 10 | 47 | 2,350 |
| 2018 | 10.40 | 15.60 | 10 | 28 | 1,568 |
| TOTAL | | | | | 14,318 |

I calculate the overtime wages owed to Ms. Luk as follows:

| Year | Regular Rate | OT Rate | OT Hours Per Week | Weeks Worked | Total Owed |
|------|--------------|---------|-------------------|--------------|------------|
| 2012 | 7.25 | 10.875 | 10.25 | 15 | 557.34 |
| 2013 | 7.25 | 10.875 | 10.25 | 52 | 1,932.13 |
| 2014 | 8.00 | 12.00 | 10.25 | 52 | 2,132 |
| 2015 | 8.75 | 13.125 | 10.25 | 52 | 2,331.88 |
| 2016 | 9.00 | 13.5 | 10.25 | 52 | 2,398.50 |
| 2017 | 9.70 | 14.55 | 10.25 | 52 | 2,585.05 |
| 2018 | 11.50 | 17.25 | 10.25 | 12 | 707.25 |
| TOTAL | | | | | 12,644.15 |

The defendants argue that the plaintiffs' yearly bonuses cover any overtime payments

they are owed, but cite no law that supports crediting bonuses to unpaid overtime, and I have

found none.  In fact, the law that suggests that bonuses cannot be credited in this manner.  *See* 29

C.F.R. § 778.310 ("[W]here extra compensation is paid in the form of a lump sum for work

performed in overtime hours, it . . . may not be credited against statutory overtime compensation

due."); *McLean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d 332, 339 (S.D.N.Y. 2011) ("The EC Bonus payments are lump sum payments that are regularly made in the same amounts to an individual Garage Manager.  Since they do not fluctuate based on the number of overtime hours an employee has worked, they cannot qualify as overtime payments.").

### c.  Spread of Hours

In addition to minimum wage, "[a]n employee shall receive one hour's pay at the basic minimum hourly wage rate" for days in which "the spread of hours exceeds 10 hours."  12 N.Y.C.R.R. § 142-2.4.  An employee is entitled to this pay only if she is paid the minimum wage.[9]  *See Williams v. Tri-State Biodiesel, L.L.C.*, No. 13-CV-5041, 2015 WL 305362, at *16 (S.D.N.Y. Jan. 23, 2015) ("[R]ecent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the minimum-wage level.") (citing cases and Opinion Letters from the New York State Department of Labor that interpret the spread of hours provision as applying only to employees earning minimum wage); *Nuriddinov*, 2018 WL 1251335, at *1 ("spread-of-hour premiums" are not owed if the "plaintiff's daily compensation was . . . greater than the state minimum wage rate plus one additional hour").

Ms. Dai is not entitled to spread of hours wages because her workday did not span more than ten hours a day.

Ms. Luk was paid minimum wage through 2017, and she worked more than ten hours a day when she worked on weekends at the Commack store, and when she worked at the Jericho store.  Because her scheduled changed often and she did not testify about how many weekend

---

[9] The plaintiffs state that "[s]pread of hours wages are only available to employees earning *less than* the minimum wage."  (ECF No. 65 at 14 (emphasis added).)  Based on the cases that they cite, they seem to mean that these wages are only available to employees who earn *no more than* the minimum wage.  In any case, they do not argue that the wages should be awarded to employees who earn more than the minimum wage.

days she worked at the Commack store, I base my damages calculation on my finding of fact that

she generally worked two days a week at the Jericho store, except after March of 2018 when she

worked at the Jericho store one day a week.  In 2018, she was paid $11.50 an hour.  Because she

was compensated at a higher rate than the minimum wage for hours worked plus an extra hour at

the minimum wage rate, she is not entitled to spread of hours pay for 2018.  Accordingly, she is

entitled to two hours of pay at the basic minimum hourly wage rate per week for the period from

September 13, 2012 to December 31, 2017, totaling $4,658.30.

I calculate her spread of hours wages owed as follows:

| Year | Rate | Days in which Spread of Hours Exceeded 10 | Weeks Worked | Total Owed |
|------|------|-------------------------------------------|--------------|------------|
| 2012 | 7.25 | 2 | 15 | 217.50 |
| 2013 | 7.25 | 2 | 52 | 754.00 |
| 2014 | 8.00 | 2 | 52 | 832.00 |
| 2015 | 8.75 | 2 | 52 | 910.00 |
| 2016 | 9.00 | 2 | 52 | 936.00 |
| 2017 | 9.70 | 2 | 52 | 1,008.80 |
| TOTAL | | | | 4,658.30 |

### d.  Time of Hire Notice

Under Section 195-1(a), employers must give their employees, at the time of hiring, a

written notice that includes their rate of pay and additional information.  N.Y. Lab. Law § 195-

1(a).  If an employee is not given this notice "within ten business days of . . . her first day of

employment," she may recover "damages of fifty dollars for each work day that the violations

occurred or continue to occur, but not to exceed a total of five thousand dollars, together with

costs and reasonable attorney's fees."  *Id.* § 198(1-b).  There has been a private right of action for

employees to recover damages for an employer's failure to provide proper notices since April 9,

2011, when New York's Wage Theft Prevention Act ("WTPA") went into effect.  *See Bravo v. Rodriguez*, No. 18-CV-5807, 2020 WL 4586391, at *3 (E.D.N.Y. Aug. 10, 2020) ("Before April 9, 2011, . . . there was no private right of action for an employee to recover damages if their employer failed to provide the proper notices."); 2010 Sess. Law News of N.Y. ch. 564 § 7 (adding Section 198(1-b), effective April 9, 2011).  "[T]he WTPA does not apply retroactively." *Bravo*, 2020 WL 4586391, at *3; *see also Gold v. N. Y. Life Ins. Co.*, 730 F.3d 137, 144 (2d Cir. 2013) ("[T]he 2011 amendment is not retroactive."); *Remache v. Mac Hudson Grp.*, No. 14-CV-3118, 2018 WL 4573072, at *16 (E.D.N.Y. Sept. 7, 2018) ("It is clear that employees who were hired prior to the effective date of the WTPA cannot recover statutory damages for an employer's failure to provide wage notices at the time of hiring, as the WTPA does not apply retroactively."), *report and recommendation adopted*, 2018 WL 4568860 (E.D.N.Y. Sept. 24, 2018).

From April 9, 2011 until February 26, 2015, the statute also required employers to provide annual notices.  *See* 2010 Sess. Law News of N.Y. ch. 564 § 3 (employers must provide a notice "at the time of hiring" and "on or before February first of each subsequent year of the employee's employment"); 2014 Sess. Law News of N.Y. ch. 537 § 1 (the annual reporting requirement was removed from the provision, effective February 27, 2015).  However, although Section 198(1-b) penalizes employers who do not provide notices at the time of hiring, it does not refer to and has never referred to annual notices.  *See* N.Y. Lab. Law § 198(1-b).  Based on the language of the statute, which provides no right to damages for failure to provide annual notices, I agree with the "many courts" that "have held that employees may not bring a claim based on the annual wage notices."  *Bravo*, 2020 WL 4586391, at *3; *see, e.g.*, *Remache*, 2018 WL 4573072, at *17 ("I agree with those courts that have held that no damages are available for

19

annual wage notice violations, as the text of the statute is contrary to such a result. . . . Even

though the Act, prior to the 2015 amendments, required annual wage notices, it did not provide

that employees could recover civil damages for a violation of this requirement."); *Imbarrato v.*

*Banta Mgmt. Servs., Inc.*, No. 18-CV-5422, 2020 WL 1330744, at \*9 (S.D.N.Y. Mar. 20, 2020)

("Plaintiffs are not entitled to damages for Defendants' failure to provide annual wage

notices . . . even prior to the [2014] amendment, as the WTPA did not provide for damages for

annual wage notice violations during the time that the annual notice requirement was in effect.")

(citations omitted); *Pierre v. Hajar, Inc.*, No. 15-CV-2772, 2018 WL 2393158, at \*5 (E.D.N.Y.

Mar. 28, 2018) ("Courts have . . . found that an employee who began working before the WTPA

took effect on April 9, 2011, may not bring a claim for an employer's failure to provide wage

notices. . . . [E]mployees[] hired before 2011[] have no right to recover damages . . . § 198(1-b)

does not provide for damages for annual notice violations for the years that requirement was in

effect.") (citations, quotation marks and alterations omitted); *but see Inclan v. N.Y. Hosp. Grp.,*

*Inc.*, 95 F. Supp. 3d 490, 502 (S.D.N.Y. 2015) (allowing the plaintiffs to recover statutory

damages for the failure to provide annual notices).

      The defendants did not give the plaintiffs written notice at the time they were hired, or

annually.  (*See* Tr. 35:12-14, 63:23-64:1, 161:16-162:8, 165:7-9.)  However, because the

plaintiffs were hired before the WTPA's effective date (*see* Tr. 7:14-18; 60:10-14), they cannot

recover for their employer's failure to provide a written notice at the time of hiring.  Nor can

they recover for the failure to provide annual notices in the period from April 9, 2011 to

February 26, 2015, because there was no private right of action for this violation.  *See Bravo*,

2020 WL 4586391, at \*3 (the defendant was not liable for wage notice claims brought by

plaintiffs who "began their employment in 2003 and 2004 and never received the required

notices" because they "were hired before the effective date of the WTPA" and because the WTPA does not give a cause of action for failure to provide the annual notices).

### e. Wage Statements

Under Section 195(3), employers must give their employees accurate wage statements that include the dates and hours worked, the rate of pay and additional details.  N.Y. Lab. Law § 195(3).  If an employee is not given these statements, she may recover "damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees."  N.Y. Lab. Law § 198(1-d).  This daily penalty and cap became effective on February 27, 2015.[10]  *See* 2014 Sess. Law News of N.Y. ch. 537 § 2.

The plaintiffs did not receive wage statements throughout their employment.  (*See* Tr. 35:12-14, 63:23-64:1, 161:16-162:8, 165:7-9.)  Accordingly, they are each entitled to the maximum statutory damages of $5,000.  *See Bravo*, 2020 WL 4586391, at *3 ("Plaintiffs received inaccurate wage statements throughout their employment at the factory.  Because plaintiffs' employment after February 27, 2015 spans years, they are entitled to the maximum statutory damages of $5,000."); *Wing Chan v. Xifu Food, Inc.*, No. 18-CV-5445, 2020 WL 5027861, at *9 (E.D.N.Y. Aug. 5, 2020) ("Both plaintiffs testified that they never received wage statements with their pay. . . . Because plaintiffs' employment after February 26, 2015 spans more than twenty days, they are each entitled to damages in the full statutory amount of $5,000 for the wage statement violations."), *report and recommendation adopted*, 2020 WL 5027147 (E.D.N.Y. Aug. 25, 2020).

---

[10] From April 9, 2011 until February 27, 2015, the penalty was one hundred dollars per week, not to exceed a total of twenty-five hundred dollars.  *See* 2010 Ses. Law News of N.Y. ch. 564 § 7.

Under Section 198(1-b), employers have an affirmative defense if they pay their

employers properly.  Because I find that the plaintiffs were not paid properly, the defendants are

not entitled to this defense.

## III.   Defendants' Joint and Several Liability

"A single employer situation exists where two nominally separate entities are actually

part of a single integrated enterprise."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193,

198 (2d Cir. 2005) (citations and quotation marks omitted); *see also Ayala v. Your Favorite Auto

Repair & Diagnostic Ctr., Inc.*, No. 14-CV-5269, 2016 WL 5092588, at *16 (E.D.N.Y. Sept. 19,

2016) (the doctrine allows multiple defendants to be "jointly and severally liable for any FLSA

and NYLL violations").  "To establish single employer liability, courts employ a four-factor test,

analyzing the extent of: (1) the interrelation of operations, (2) centralized control of labor

relations, (3) common management, and (4) common ownership or financial control."  *Ayala*,

2016 WL 5092588, at *16 (citations and quotation marks omitted).  The plaintiffs have met this

test; as discussed above, Mr. Tam owned and managed the Commack and Jericho stores; he also

hired the employees for the stores, at least one of whom worked at both stores.

The evidence establishes that Mr. Tam, in addition to the corporate defendants, was the

plaintiffs' employer.  Courts look to the *Carter* factors to determine the "economic reality" of an

employment relationship, specifically "whether the alleged employer (1) had the power to hire

and fire the employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment

records."  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984); *see also Napoli v. 243

Glen Cove Ave. Grimaldi, Inc.*, 397 F. Supp. 3d 249, 264 (E.D.N.Y. 2019) (applying these

factors to determine whether the plaintiffs had shown that an individual acted as an employer

under NYLL).  As discussed above, Mr. Tam hired the plaintiffs, controlled their work schedules and determined their pay.

Accordingly, the defendants are jointly and severally liable.

## IV.   Damages

As discussed above, Ms. Dai is owed $420 in minimum wage payments and $14,318 in overtime wages.  Ms. Luk is owed $12,644.15 in overtime wages and $4,658.30 in spread of hour payments.  In addition, each of the plaintiffs is entitled to $5,000.00 in statutory damages for violations of Section 195(3) of the New York Labor Law.

The plaintiffs seek liquidated damages for their unpaid wages under the NYLL.  Under Section 198(1-a) of the NYLL, the Court may assess liquidated damages, calculated as no more than "one hundred percent" of the unpaid wages unless the violation is "willful," for unpaid wages "unless the employer provides a good faith basis for believing that its underpayment of wages was in compliance with the law."  N.Y. Lab. Law § 198(1-a); *see also Feuer*, 2020 WL 401787, at *11 ("Liquidated damages in the amount of actual damages are . . . available under NYLL.").  "Liquidated damages are not available for violations of the NYLL wage notice and statement provisions." *Jian Hua Li*, 2020 WL 1694356, at *14.  "The Second Circuit has described the employer's burden of proving good faith as 'a difficult one to meet' and has held that 'double damages are the norm, single damages the exception.'  The Second Circuit has also rejected the view that the absence of subjective malice or bad faith, on its own, is sufficient to invoke the exception." *Haifeng Xie v. Sakura Kai I Inc.*, No. 17-CV-7509, 2019 WL 1568756, at *8 (E.D.N.Y. Apr. 11, 2019) (quoting *Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).

Although the defendants offered evidence that Mr. Tam went out of his way to help the plaintiffs, there is no evidence that he had a good faith basis to believe that underpaying the plaintiffs complied with the law.  He was aware that there were laws governing minimum wage and overtime (*see* Tr. 154:11-20, 155:7-9) but did not pay the plaintiffs in accordance with those laws.  *See Xie*, 2019 WL 1568756, at *8 ("In this case, Defendants have not met their 'difficult' burden.  To the contrary, the evidence suggests that Defendants were aware of law's requirements and did not comply with them.").  Accordingly, I award liquidated damages in the amount equal to the plaintiffs' unpaid wages.

The plaintiffs also seek pre-judgment interest.  Under Section 198(1-a) of the NYLL, plaintiffs who prevail on NYLL wage claims are entitled to prejudgment interest on their "underpayment[s]."  "The applicable interest rate is 9% per annum, calculated 'from the date [each item] was incurred or upon all of the damages from a single reasonable intermediate date.'"  *Feuer*, 2020 WL 401787, at *12 (quoting N.Y. C.P.L.R. §§ 5001(b), 5004).  "[P]rejudgment interest is not available for violations of the wage statement or wage notice provisions."  *Id.* (quoting *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 515 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018)) (internal quotation marks omitted).  Nor is it available "for any award of liquidated damages."  *Estrada v. Giovanni's Italian Eatery, Inc.*, No. 16-CV-6152, 2020 WL 4917179, at *5 (S.D.N.Y. Aug. 20, 2020).  Damages were incurred from September 13, 2012 until July 14, 2018, a period of 2130 days.  I conclude that the midpoint of this period, August 14, 2015, is an appropriate intermediate date for the purpose of calculating interest.  Accordingly, the plaintiffs are entitled to pre-judgment interest on their unpaid wage damages of $32,040.45 from August 14, 2015 until the date judgment is entered, at $7.90 per day (($32,040.45 x .09) / 365 days).

## CONCLUSION

For the reasons stated above, I conclude that the plaintiffs did not demonstrate by a preponderance of the evidence that the defendants violated the FLSA.  However, I find that they established minimum wage, overtime, spread of hours and wage statement violations under the NYLL by a preponderance of the evidence.  The Court enters judgment against the defendants in the amount of $74,080.90, consisting of: (1) $14,738.00 in unpaid wages to Ms. Dai; (2) $17,302.45 in unpaid wages to Ms. Luk; (3) $14,738.00 in liquidated damages for Ms. Dai; (4) $17,302.45 in liquidated damages for Ms. Luk; and (5) $10,000.00 in statutory damages for violations of the wage statement provision of the NYLL.  Pre-judgment interest should be added to this amount, to be calculated as stated above.  In accordance with Section 198(4) of the NYLL, if any amounts remain unpaid ninety days after the issuance of this judgment, or ninety days after expiration of the time to appeal if no appeal is then pending, whichever is later, the total amount of judgment will automatically increase by fifteen percent.  The Clerk of Court is respectfully directed to enter judgment accordingly.


**SO ORDERED.**

        s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated:  Brooklyn, New York
        September 29, 2020